# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

MIGUEL A. CRUZ, and John
D. Hansen, individually
and on bahalf of all
others similarly
situated,

        Plaintiffs,

                Case No.  C07-02050 SC

    vs.

DOLLAR TREE STORES, INC.,

        Defendant.


DEPOSITION OF JOHN D. HANSEN



DATE:           THURSDAY, OCTOBER 11, 2007

TIME:           10:05 a.m.


LOCATION:      Kauff, McClain & McGuire
               One Post Street, Suite 2600
               San Francisco, California


PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227



REPORTED BY:  Wendy L. Van Meerbeke, CSR #3676

1

1 you know, before that happened, that -- so that's

2 how I ended up with the two.

3    **Q. It was your decision to discharge**

4 **Ms. Baas; correct?**

5    **A. Yes. Well, of course, I had counseling**

6 **from -- what was her name? Candace Camp and Rick.**

7    Q. Ms. Camp was and is a regional human

8 resource person; correct?

9    A. Yes.

10    Q. Was it your practice, when you were

11 discharging an employee at your store, to consult

12 with Ms. Camp?

13    A. Yes.

14    Q. Is it correct that that consultation

15 consisted of you telling Ms. Camp what the

16 performance problems were and Ms. Camp saying, "I

17 think your decision to terminate is appropriate"?

18    A. Correct.

19    Q. Did Ms. Camp ever come down to the store

20 and do an independent investigation with respect to

21 your reasonings?

22    A. No. I don't believe she has ever been to

23 the store.

24    Q. So she has never been to the store for any

25 reason; is that right?

00025

1    Q. Briefly, what were Ms. Baas' performance

2 issues?

3    A. Just tasks that I asked her to do weren't

4 getting done.  The closing procedures weren't 100

5 percent followed.  There were a couple that I just

6 can't recall right now.

7        We had had an incident in a meeting -- oh,

8 yeah.  Actually, the main reasons -- now I

9 remember -- is the way she was interacting with

10 customers, the way she was interacting with her

11 associates, including myself.

12    Q. Was it part of your job responsibility to

13 evaluate how Ms. Baas interacted with customers?

14    A. I would -- yeah.  I was in charge of the

15 store, so, yes -- I would say yes.

16    Q. Was it part of your job responsibility to

17 counsel Ms. Baas with respect to a better way to

18 interact with customers?

19    A. Yes, definitely.

20    Q. At some point in time, did you say to

21 Ms. Baas, "If you don't correct this problem, I'm

22 going to have to terminate your employment"?

23    A. To be honest, I don't think I ever

24 actually said that.

25    **Q. Did you give her warning notices --**

1    A. Yes.

2    Q. -- that she needed to improve?

3    A. Uh-huh.

4    Q. Yes?

5    A. Yes.

6    Q. You said that Ms. Baas was not following

7 closing procedures that you required.  What were

8 those procedures?

9    A. Just like making sure that the end caps

10 were clean and things like that, mostly the

11 cleanliness of the store.  That was the procedures

12 I was upset about.

13    Q. Would you give her direction in that

14 regard?

15    A. Yes.  I actually would come in and close

16 with her a couple times and show her, you know, the

17 way I would do things.

18    Q. Did you view that as a training session

19 with her?

20    A. Uh-huh.

21    Q. Yes?

22    A. Yes.  Another one in the jar.

23    Q. What were Ms. Lofquist's performance

24 deficiencies?

25    A. A little of the same.  I didn't really

1    A. Yeah.

2    Q. For disciplinary reasons?

3    A. Uh-huh.

4    Q. Yes?

5    A. Yes. Sorry.

6        MS. McCLAIN: May I have this marked as

7 next in order, please?

8        (A document was marked as Exhibit 28

9 for identification.)

10       MS. McCLAIN:

11    Q. Is this the effective notice for

12 termination?

13    A. Oh, no. This was just another -- it looks

14 like around the exact same time, so maybe I had

15 like three or four ready for her.

16    **Q. So this again is a warning notice to**

17 **Ms. Lofquist based upon her not following your**

18 **direction; is that right?**

19    **A. Yeah.**

20    **Q. You made the decision to issue this**

21 **warning notice?**

22    **A. Uh-huh.**

23    **Q. Yes?**

24    **A. Yes.**

25    **Q. How would you describe the reasons for**

1 **Ms. Lofquist's termination?  Your recommendation**

2 **that she be terminated.**

3    **A.  Um, mostly the attendance, um, not showing**

4 **up enough and, um, not showing up on time.**

5    Q.  Did you ever ask her what her problem was?

6    A.  Well, towards the end, she moved to

7 Lakeport, which was an hour, at least, I think,

8 drive, and so I'm sure that was a problem.

9    Q.  You don't recall ever specifically asking

10 her, but you knew that that was a factor or you

11 thought that was a factor; is that right?

12    A.  I never asked.  I just said, you know --

13 you know, I just made sure she knew that it was

14 starting to get on my nerves.

15    Q.  Did you advise both Ms. Bassignani and

16 Ms. Lofquist of their terminations?  Did you tell

17 them?

18    A.  What do you mean?

19    Q.  Did you call them and say, "You're fired"?

20    A.  Yes.  Kassondra -- I believe she was off

21 that week or something.  I can't remember exactly

22 what it was.

23       And all of a sudden, the -- I was supposed

24 to do it the next day when she was supposed to show

25 up, but she -- she didn't get her check.  She was

1    Q.  Did Mr. Tellstrom ever direct you to

2  change an employee's punches to avoid overtime?

3    A.  I don't recall whether he did or not.

4    Q.  And he certainly didn't do it very often

5  under any circumstance because you only did this

6  once; correct?

7    A.  Correct.  Um, I didn't have a whole lot of

8  issues with it and so I don't think it was

9  something that -- you know, it wasn't something

10  that was recurring.

11    Q.  You didn't have a lot of issues with

12  overtime because you scheduled your employees

13  correctly?

14    A.  Correct.

15    Q.  And they didn't work overtime,

16  necessarily?

17    A.  Uh-huh.

18    Q.  And you understood that if somebody did

19  work overtime, the way to handle it was to say,

20  "Please don't do that.  We're going to pay you, but

21  please don't do that"; correct?

22    A.  Correct.

23    Q.  You have no current recollection that you

24  can tell me of a day, place and time when

25  Mr. Tellstrom said to you, "Alter time records"; is

1  that right?

2  A. That's correct.

3  Q. Did any other Dollar Tree manager ever say

4  to you in any fashion, "Alter time records"?

5  A. Not to me. No.

6  Q. When you reviewed 1868 punches -- which

7  you're doing online; correct?

8  A. Uh-huh.

9  Q. Yes?

10  A. Yes.

11  Q. Did you do so to make sure that people had

12  punched in and out correctly? Did you have any

13  other purpose other than to make sure that the

14  punches correctly reflected what they were doing?

15  A. No. That was exactly what I was doing.

16  Q. With the goal being that they were paid

17  for all time worked?

18  A. Correct. That the punches that they

19  entered were correct and that, you know -- that if

20  they left one off, it was -- it was either I'd have

21  to ask them directly or have it documented of when

22  they signed in and out. And even if I asked them,

23  I would ask somebody else to double-check.

24  Q. So you wanted to get the time accurate; is

25  that right?

1    **A. Correct.**

2    **Q.  And was there ever a case when an employee**

3    **forgot to punch in and out for lunch, for example?**

4    **Did that happen?**

5    **A. It happened all the time.  Yeah.**

6    Q.  And did that mean they didn't take the

7    lunch or just meant they forgot to punch in and

8    out?

9    A.  Um, most of the time they just forgot to

10   punch in and out.

11   Q.  Do you recall any instance where someone

12   didn't take the lunch?

13   A.  Um, no, not necessarily.

14   Q.  When you were reviewing time records, you

15   were often doing them the next day, right, or maybe

16   even a couple of days later?

17   A.  Yeah.  If I wasn't -- if there was some

18   left over from the next day and they weren't fixed,

19   yes, I would do them.

20   Q.  So you're sitting at the computer and you

21   see that Vickie doesn't have a punch-out or back in

22   for lunch, for example?

23   A.  Okay.

24   Q.  That happened maybe not with Vickie, but

25   that happened; is that right?

1  once.

2    A. Counsel -- I honestly --

3      MR. FIETZ: Don't say anything about --

4  I'll move to strike that testimony.

5      MS. McCLAIN:

6    Q. You don't have to tell me what, um -- what

7  transpired. The fact of the matter is --

8    A. It was --

9    Q. Hang on.

10   A. Okay. Go ahead.

11   Q. The fact of the matter is that you had an

12  opportunity to speak with your counsel in that time

13  frame; correct?

14   A. Correct.

15   **Q. Um, and as you sit here today, can you**

16  **really tell me whether it was none, one, two or**

17  **three?**

18   **A. Um, I can't tell you how many times. No.**

19  **I honestly -- and then it was more of -- because**

20  **I -- because it could have been more than once, and**

21  **I don't remember. I don't remember. To be**

22  **truthful and honest, there's not -- I don't think**

23  **there's any way I could remember how many times.**

24   **Q. You didn't keep a record of it?**

25   **A. Oh, absolutely not.**

1    Q. And, um you're -- you're certain it was

2 limited, though? We're not talking about more than

3 two or three?

4    A. No.

5    MR. FIETZ: Objection. Lacks foundation.

6    THE WITNESS: I'm not exactly sure, to be

7 honest, how many times I did it. I remember there

8 was a short period of time that I felt very

9 pressured and some of the stuff was happening. And

10 that's all I can remember. So that's all I figure.

11 It's a very limited amount of time that I did it.

12    MS. McCLAIN:

13    Q. And it was your decision to handle the

14 pressure in that fashion; wasn't it?

15    A. It was my decision?

16    Q. It was your decision to handle whatever

17 pressure you were feeling by making that change, no

18 one else's?

19    A. No one else's. No.

20    Q. Correct?

21    A. Correct.

22    Q. Thank you. Good. We'll see you the

23 beginning of November. Your counsel and I will be

24 talking about scheduling before then.

25    A. Okay.

1          CERTIFICATION OF DEPOSITION OFFICER

2          I, WENDY L. VAN MEERBEKE, duly authorized to

3     administer oaths pursuant to Section 2093(b) of the

4     California Code of Civil Procedure, do hereby

5     certify that the witness in the foregoing

6     deposition was duly sworn by me to testify to the

7     truth in the within entitled cause; that said

8     deposition was taken at the time and place set

9     forth; that the testimony of said witness was

10    reported by me, a Certified Shorthand Reporter and

11    a disinterested person, and was thereafter

12    transcribed by computer under my direction into

13    booklet form; that the witness was given an

14    opportunity to read and correct said deposition and

15    to subscribe to the same.

16         I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any

19    way interested in the outcome of the cause named in

20    said caption.

21         Dated the 1st day of November, 2007.

22

23         WENDY L. VAN MEERBEKE, CSR 3676

24

25

290

1
                        Preferred Reporters
                        201 E. Watmaugh Road
2
                    Sonoma, California 95476
                          707-938-9227
3
                        October 27, 2007
4

5

6     TO:   John D. Hansen
            c/o Jeremy R. Fietz, Esq.
7           Santa Rosa, CA 95401

8
      Re:   Cruz v. Dollar Tree Stores
9           Deposition taken on October 11, 2007
            Reported by Wendy Van Meerbeke, CSR #3676
10

11    Dear Mr. Hansen,

12         The original transcript of your deposition
      taken in the above-entitled action has been
13    prepared and is available at this office for your
      reading, correcting and signing.
14

15         You may wish to discuss this matter with your
      attorney to determine if counsel requires that the
16    original transcript of your deposition be read,
      corrected and signed by you before it is sealed.

17         Your rights regarding signature of this
      deposition are contained in the California Code of
18    Civil Procedure.

19         If you wish to make arrangements to review
      the original transcript of your deposition, please
20    contact this office during office hours, 9:00 to
      5:00 Monday through Friday, to make an appointment
21    to review the original transcript.

22                      Sincerely,

23

                        Wendy L. Van Meerbeke
24                      Certified Shorthand Reporter

25    cc:  All Counsel

                                                              291

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL A. CRUZ, and JOHN D.       )
HANSEN, individually, and on      )
behalf of all others similarly    )
situated,                         )
                                  )
                Plaintiffs,       )
                                  )
vs.                               )  Case No: C07-02050 SC
                                  )
                                  )
DOLLAR TREE STORES, INC.,         )
                                  )
                Defendant.        )
_____)


DEPOSITION OF JOHN D. HANSEN
VOLUME II


DATE:          Thursday, November 1, 2007

TIME:          9:32 a.m.

LOCATION:      Kauff, McClain & McGuire
               One Post Street, 26th Floor
               San Francisco, California 94104


PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227


Reported By:  Linda Vaccarezza, RPR, CSR #10201

292

1 violation of Dollar Tree policy for family          03:

2 members to work in the same store?               03:

3    A   Yes. I think at the time he applied, I       03:

4 didn't realize it was her son. And, you know, so     03:

5 they weren't working together, you know, after      03:

6 that. I think he only worked there a couple of      03:

7 days. So, yeah.                          03:

8    Q   During that time when those extra people    03:

9 were there for a few days, did you ever work in      03:

10 the middle of the night?                    03:

11    A   Oh, I was there the whole time. Yeah.      03:

12    Q   During the time when you were working in    03:

13 the middle of the night and Kelly Lofquist's son     03:

14 was working in the middle of the night, was        03:

15 Ms. Lofquist, to your observation, ever working     03:

16 in the middle of the night?                  03:

17    A   I don't recall if she was there that        03:

18 night. I know that there was some -- there was a   03:

19 time that she worked in the middle of the night.    03:

20 I don't remember if it was the same time that I     03:

21 had her son. I thought -- I thought she came and   03:

22 picked him up. That was about it.             03:

23    **Q   How did it happen that Ms. Lofquist was**   **03:**

24 **working in the middle of the night on one**        **03:**

25 **occasion?**                           **03:**

1   A   We just needed as much help as we could        03:

2  get, so.                              03:

3   Q   Did she volunteer?                  03:

4   A   I think I asked her.  And she said she        03:

5  would do it.  Yeah.  It was a way to get more        03:

6  hours.                               03:

7   Q   Did you pay her for that time?          03:

8   A   Yeah.  Yeah.                   03:

9   Q   Did you tell her to punch in and        03:

10 carefully clock her time, make sure she got paid?        03:

11   A   As far as I remember.  I don't remember        03:

12 ever not telling her -- as far as I know, it was        03:

13 her.  I never asked anybody to come in and not --        03:

14 work off the clock.  So I don't remember -- you        03:

15 know, come in, punch the clock, and go to work.        03:

16 That's all I remember.                   03:

17   Q   Did you ever kind of wink at somebody;        03:

18 say, you know, we all need to be on the clock but        03:

19 I'm not looking if you're not on clock.  Do you        03:

20 understand the question?                   03:

21       Did you ever pretend like you wanted        03:

22 people to work on the clock but knew that they        03:

23 were not working on the clock, employees at store        03:

24 1868?                          03:

25   A   No.  I -- I don't recall -- I mean, I        03:

1 11:03, and you changed the clock out to 11:33,          06:

2 correct?                              06:

3    A   Correct.                       06:

4    Q   Do you know why you did that?              06:

5    A   No.                            06:

6    Q   Was it because she was in error and         06:

7 really worked until 23:33?                   06:

8    A   I can only speculate.  I don't know.       06:

9    **Q   Over and over again you've said to me, I**      06:

10 **cannot look at these Audit Trail Reports and tell**     06:

11 **you whether the change was legitimate or**          06:

12 **illegitimate and I really can't recall all of the**     06:

13 **underlying circumstances to fill that information**     06:

14 **in, correct?**                          06:

15    **A   That's correct.**                    06:

16    **Q   Is that true of every change, not just**      06:

17 **the ones we have looked at?**                06:

18    **A   I would have to say yes.  I can't say**     06:

19 **100 percent what would be really -- I know for a**     06:

20 **fact that I did some that were wrong, and I did**      06:

21 **some that were right.  But I can't say which ones**     06:

22 **are which without going back in time and looking**     06:

23 **at it and being there.**                  06:

24    MS. MCCLAIN:  May I have this marked as next     06:

25 in order, please.                       06:

1  I always needed to cover up on -- I felt like        06:

2  these were mistakes that I made in not being a        06:

3  good manager, I guess, of a store.                06:

4      Q   Every time you did that, did you say to        06:

5  yourself, boy, I hope I don't get caught, I'm        06:

6  violating company policy?                06:

7      A   I don't remember.                06:

8      Q   Did you have that thought on occasion,        06:

9  "I hope I don't get caught"?                06:

10     A   No. I think afterwards -- I remember at        06:

11  one time thinking -- having a really bad feeling        06:

12  of what I was doing, but I don't remember.        06:

13     **Q   Because you knew every time you made a        06:**

14  **change that interfered with an employee's work or        06:**

15  **misrepresented when they took lunch, that you        06:**

16  **were violating company policy, correct?        06:**

17     **A   Correct.                06:**

18     Q   Would you turn to Lisa Murphy, please?        06:

19     A   Okay.                06:

20     Q   On 9/28. Ms. Murphy has filled out the        06:

21  Time Clock Worksheet for 9/28, correct?        06:

22     A   Uh-huh.                06:

23     Q   Were you using the Time Clock Worksheet        06:

24  to guide your punch edits for 9/28?        06:

25     A   Looks like it's pretty straightforward.        06:

1    STATE OF CALIFORNIA    )

2    COUNTY OF SONOMA        )

3        I, LINDA VACCAREZZA, a Certified Shorthand

4    Reporter of the State of California, duly

5    authorized to administer oaths pursuant to

6    Section 2025 of the California Code of Civil

7    Procedure, do hereby certify that

8                JOHN D. HANSEN,

9        The witness in the foregoing examination,

10   was by me duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the

12   within-entitled cause; that said testimony of

13   said witness was reported by a disinterested

14   person, and was thereafter transcribed under my

15   direction into typewriting and is a true and

16   correct transcription of said proceedings.

17       I further certify that I am not of counsel

18   or attorney for either or any of the parties in

19   the foregoing examination and caption named, nor

20   in any way interested in the outcome of the cause

21   named in said caption.

22       Dated the 14th day of November, 2007.

23   _____

24       LINDA VACCAREZZA, RPR, CSR #10201

25

1    Preferred Reporters
     201 E. Watmaugh Road
2    Sonoma, California 95476

3    November 15, 2007

4

5

6    To:  John D. Hansen
          EDGAR LAW FIRM
7         ATTENTION::  JEREMY R. FIETZ, ESQUIRE
          408 College Avenue
8         Santa Rosa, CA  95401

9    Re:  Cruz, Hansen v. Dollar Tree Store
          Deposition taken on November 1, 2007
10        Reported by Linda Vaccarezza

11   Dear Mr. Hansen,

12       The original transcript of your deposition taken in
     the above-entitled action has been prepared and is
13   available at this office for your reading, correcting and
     signing.

14

15       You may wish to discuss this matter with your
     attorney to determine if counsel requires that the
     original transcript of your deposition be read, corrected
16   and signed by you before it is sealed.

17       Your rights regarding signature of this deposition
     are contained in the California Code of Civil Procedure.

18

19       If you wish to make arrangements to review the
     original transcript of your deposition, please contact
     this office during office hours, 9:00 to 5:00 Monday
20   through Friday, to make an appointment to review the
     original transcript.

21

22                    Sincerely,

23                    Sherry Morrison
                      Office Manager

24   cc:  All Counsel

25

# EXHIBIT E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

MIGUEL A. CRUZ, and JOHN
D. HANSEN, individually
and on behalf of all
others similarly
situated,

            Plaintiffs,    Case No.  C07-02050 SC

     vs.


DOLLAR TREE STORES, INC.,

           Defendant.


DEPOSITION OF MIGUEL A. CRUZ



DATE:          FRIDAY, OCTOBER 12, 2007

TIME:          9:32 A.M.

LOCATION:      Kauff, McClain & McGuire
             One Post Street, Suite 2600
             San Francisco, California



PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227



REPORTED BY:  Wendy L. Van Meerbeke, CSR #3676

1

1 assistant managers; correct?

2    A. No.

3    Q. Who else worked overtime?

4    A. Sometimes stockers.

5    Q. Did the stockers ever work more than eight

6 hours?

7    A. Yes.

8    Q. Did some of your employees get overtime?

9    A. No.

10    Q. None of your employees in the Healdsburg

11 store ever got overtime; is that right?

12    A. No -- yes.

13    **Q. Let's be very clear about this. It's your**

14 **testimony that while you were store manager at**

15 **Healdsburg, no one got a single penny of overtime?**

16    **A. I never checked their check, so I don't**

17 **know.**

18    **Q. But you think you went in and changed**

19 **every possible overtime hour; is that right?**

20    **A. Yes.**

21    Q. Must have taken a lot of time for you to

22 do that.

23        MR. FIETZ: That's not a question.

24 Miguel, you don't have to answer.

25

00094

1    Q. Yes?

2    A. Yes.

3    **Q. Ms. Cape got overtime for 9-18; correct?**

4    **A. I don't remember.**

5    **Q. The hours would suggest she got overtime;**

6 **wouldn't they?**

7    **A. Yes.**

8    **Q. And you made no changes which got rid of**

9 **the overtime; correct?**

10    **A. Yes.**

11    Q. So your testimony is that you always

12 changed everyone's punches to deprive them of

13 overtime was not truthful; was it?

14    A. I made a mistake.

15        MR. FIETZ: Argumentative.

16        MS. McCLAIN:

17    Q. You made a mistake?

18    A. Yeah.

19    Q. Just one? This is the only time where

20 we're going to find that somebody got overtime at

21 store 2262; is that correct?

22        MR. FIETZ: Objection. Argumentative,

23 lacks foundation.

24        THE WITNESS: I don't know.

25

1    **Q. We see on October 1, 2006 that Ms. Rose**

2 **started work at 7:34 in the morning; correct?**

3    **A. Yes.**

4    **Q. And she ended work at 2200, which is**

5 **o'clock; correct?**

6    **A. Yes.**

7    **Q. Ms. Rose got overtime for that day; didn't**

8 **she?**

9    **A. Yes.**

10    Q. And you supplied punches because Ms. Rose

11 didn't punch end breaks, start breaks and lunches,

12 correct, but you didn't change her hours? She got

13 the overtime; didn't she?

14    A. 10-22 -- what was the date?

15    Q. 10-1.

16    A. 10-1.

17    Q. The shift started at 7:34 a.m. and ended

18 at 11:00 o'clock p.m.

19    A. Yes.

20    Q. How many times do you think we're going to

21 find in the punch audit reports people who worked

22 over eight hours and there were no changes?

23    A. I don't know.

24    Q. Why did you allow overtime on these days

25 if -- the two days we've just looked at if

1      Is it correct that assistant managers were

2  not to assign overtime to employees without

3  approval from you?

4      A. Nobody should be allowed, not even me.

5      Q. No one should be allowed to sign overtime;

6  correct?

7      A. No.

8      Q. Was it a policy of Dollar Tree that under

9  no circumstances ever, ever, ever could you work

10  overtime -- could anyone work overtime?

11      MR. FIETZ: Objection. Vague.

12      MS. McCLAIN:

13      **Q. Did you understand that Dollar Tree had**

14  **any policy one way or the other about hourly**

15  **employees working overtime?**

16      **A. No.**

17      Q. You didn't understand that there was a

18  policy either prohibiting it or allowing it?

19      A. As far as I know, you're not supposed to

20  give overtime at Dollar Tree.

21      Q. How do you know that?

22      A. From Mr. Rick.

23      MS. McCLAIN: May I have this marked as

24  next in order, please?

25

1    A. Mr. Rick.

2    Q. How did Mr. Tellstrom tell Mr. Corina

3 that?

4    A. He will call me to tell him.

5    Q. Is it correct that every time we see a

6 change between the schedule and the actual worked,

7 that Mr. Tellstrom made that decision?

8    A. Yes.

9    Q. Every single time it appears in these

10 schedules?

11    A. Yes.

12    Q. And Mr. Tellstrom called you up and told

13 you that?

14    A. Yes.

15    Q. Did Mr. Corina get overtime for October

16 11th?

17    A. I don't remember.

18        MS. McCLAIN: May I have this marked as

19 next in order, please?

20        (A document was marked as Exhibit 59

21 for identification.)

22        MS. McCLAIN:

23    Q. If you look on the second page of this

24 document, Mr. Cruz, do you see a time period on

25 October 11th that corresponds with Mr. Corina's

1  schedule -- his actual work schedule?

2  **A. Yes.**

3  **Q. So the actual time on Exhibit 36 says that**

4  he started his shift at 10:49; correct?

5  **A. Yes.**

6  **Q. And the actual time on that same punch**

7  audit report says he ended at 8:05; correct? 2005

8  is 8:05?

9  **A. Yes.**

10  **Q. So the numbers correspond precisely to**

11  those listed on the actual work time on Exhibit 36;

12  correct?

13  **A. Yes.**

14  **Q. He had apparently no breaks that day, so**

15  he was paid for that whole time frame; correct?

16  **A. Yes.**

17  **Q. So he got overtime that day; correct?**

18  **A. I would say I don't know.**

19  **Q. This reads as if he's entitled to**

20  overtime; correct?

21  **A. Yes.**

22  **Q. And you haven't changed any start shift or**

23  end shifts which would deprive him of overtime;

24  correct?

25  **A. No.**

1    Q. So this is another example where you

2 didn't make a change that reduced an employee's

3 time so that they wouldn't get overtime; correct?

4 There's no change in these punches; is there?

5    A. No.

6    Q. Does this cause you to reconsider your

7 testimony, Mr. Cruz, that you changed everyone's

8 time so that no one ever got overtime?

9    A. No.

10    Q. You still think that testimony is

11 accurate?

12    A. Yes.

13    Q. Even in the face of now three examples

14 where people got overtime?

15    A. Yes.

16    Q. How do you explain that?

17    A. A mistake.

18    Q. A mistake on your part?

19    A. Yes.

20    Q. Letting that overtime slip by?

21    A. Yes.

22    **Q. Did Mr. Tellstrom ever call you and say,**

23 **"I see that so-and-so got overtime. You didn't**

24 **change the punch audit report as you should have"?**

25    **A. Oh, yeah, for sure.**

1          CERTIFICATION OF DEPOSITION OFFICER

2          I, WENDY L. VAN MEERBEKE, duly authorized to

3    administer oaths pursuant to Section 2093(b) of the

4    California Code of Civil Procedure, do hereby

5    certify that the witness in the foregoing

6    deposition was duly sworn by me to testify to the

7    truth in the within entitled cause; that said

8    deposition was taken at the time and place set

9    forth; that the testimony of said witness was

10   reported by me, a Certified Shorthand Reporter and

11   a disinterested person, and was thereafter

12   transcribed by computer under my direction into

13   booklet form; that the witness was given an

14   opportunity to read and correct said deposition and

15   to subscribe to the same.

16         I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any

19   way interested in the outcome of the cause named in

20   said caption.

21         Dated the 1st day of November, 2007.

22              *Wendy Van Meerbeke* (signature)

23         WENDY L. VAN MEERBEKE, CSR 3676

24

25

265

1                         Preferred Reporters
                          201 E. Watmaugh Road
2                      Sonoma, California 95476
                            707-938-9227
3
                          October 31, 2007
4

5

6     TO:    Miguel A. Cruz
             c/o JEREMY R. FIETZ, ESQ.
7            408 College Avenue
             Santa Rosa, California 95401
8

9     Re:    Hansen v. Dollar Tree Stores
             Deposition taken on October 12, 2007
10           Reported by Wendy Van Meerbeke, CSR #3676

11
      Dear Mr. Cruz,
12
             The original transcript of your deposition
13    taken in the above-entitled action has been
      prepared and is available at this office for your
14    reading, correcting and signing.

15           You may wish to discuss this matter with your
      attorney to determine if counsel requires that the
16    original transcript of your deposition be read,
      corrected and signed by you before it is sealed.

17
             Your rights regarding signature of this
18    deposition are contained in the California Code of
      Civil Procedure.

19
             If you wish to make arrangements to review
20    the original transcript of your deposition, please
      contact this office during office hours, 9:00 to
21    5:00 Monday through Friday, to make an appointment
      to review the original transcript.

22
                             Sincerely,
23

24                           Wendy L. Van Meerbeke
                             Certified Shorthand Reporter
25

                                                          266

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL A. CRUZ, and JOHN D.      )
HANSEN, individually, and on     )
behalf of all others similarly  )
situated,                        )
                                 )
                 Plaintiffs,     )
                                 )
vs.                              )  Case No: C07-02050 SC
                                 )
                                 )
DOLLAR TREE STORES, INC.,        )
                                 )
                 Defendant.      )
_____)


DEPOSITION OF MIGUEL CRUZ
VOLUME II


DATE:          Friday, November 2, 2007

TIME:          9:29  a.m.

LOCATION:      Kauff, McClain & McGuire
               One Post Street,  26th Floor
               San Francisco, California 94104


PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227


Reported By:  Linda Vaccarezza, RPR, CSR #10201

267

1    A   Yes.

2    **Q   The employee had punched a start break**

3 **at 12:51, correct?**

4    **A   12:51? I don't see 12:51.  What day is**

5 **it?**

6    **Q   It's the very first line on page 60,**

7 **9/23/2006.**

8    **A   Yes.**

9    **Q   The employee's punch is at 12:51,**

10 **correct?**

11   **A   Yes.**

12   **Q   You changed that punch to 13:50,**

13 **correct?**

14   **A   Yes.**

15   **Q   Why did you do that?**

16   **A   I don't remember why.**

17   Q   It has no impact upon pay, correct, that

18 change?

19   A   No.

20   Q   Do you agree with that statement; that

21 change has no impact on pay, correct?

22   A   Yes.

23   Q   Why did you do it?

24   A   I don't know.

25   Q   Do you have any recollection?  Did the

1  STATE OF CALIFORNIA      )

2  COUNTY OF SONOMA         )

3      I, LINDA VACCAREZZA, a Certified Shorthand

4  Reporter of the State of California, duly

5  authorized to administer oaths pursuant to

6  Section 2025 of the California Code of Civil

7  Procedure, do hereby certify that

8                  MIGUEL CRUZ,

9      The witness in the foregoing examination,

10  was by me duly sworn to testify the truth, the

11  whole truth and nothing but the truth in the

12  within-entitled cause; that said testimony of

13  said witness was reported by a disinterested

14  person, and was thereafter transcribed under my

15  direction into typewriting and is a true and

16  correct transcription of said proceedings.

17      I further certify that I am not of counsel

18  or attorney for either or any of the parties in

19  the foregoing examination and caption named, nor

20  in any way interested in the outcome of the cause

21  named in said caption.

22      Dated the 15th day of November, 2007.

23  _____

24  LINDA VACCAREZZA, RPR, CSR #10201

25

494

1              Preferred Reporters
              201 E. Watmaugh Road
2            Sonoma, California 95476

3            November 15, 2007

4

5

6  To: Miguel Cruz
     EDGAR LAW FIRM
7     ATTENTION:  Jeremy R. Fietz, Esquire
     408 College Avenue
8     Santa Rosa, CA  95401

9  Re:  Cruz, Hansen v. Dollar Tree
      Deposition taken on November 2, 2007
10    Reported by Linda Vaccarezza, CSR #10201

11  Dear Mr. Cruz,

12     The original transcript of your deposition
taken in the above-entitled action has been
13 prepared and is available at this office for your
reading, correcting and signing.

14

15     You may wish to discuss this matter with
your attorney to determine if counsel requires
that the original transcript of your deposition
16 be read, corrected and signed by you before it is
sealed.

17

18     Your rights regarding signature of this
deposition are contained in the California Code
of Civil Procedure.

19

20     If you wish to make arrangements to review
the original transcript of your deposition,
please contact this office during office hours,
21 9:00 to 5:00 Monday through Friday, to make an
appointment to review the original transcript.

22            Sincerely,

23

24            Linda Vaccarezza
            Certified Shorthand Reporter

25  cc:  All Counsel

495

# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

KASSONDRA BAAS AND KELLY LOFQUIST,

individually and on behalf of all

others similarly situated,

        Plaintiffs,

      vs.           Case No. C0703108 JSW

DOLLAR TREE STORES, INC.,

        Defendants.

_____/


DEPOSITION OF KELLY LOFQUIST

October 15, 2007


REPORTED BY:

SANDRA L. CARRANZA, CRR, RPR, CSR 7062


PREFERRED REPORTERS

CERTIFIED SHORTHAND REPORTERS

201 E. Watmaugh Road

Sonoma, California   95476

Phone (707) 938-9227

1

1    Q.  Is it correct then that at least one of

2  your divorces was contested?  There was testimony

3  taken about it?

4    A.  No.  I don't believe so.  I don't remember.

5    Q.  If they were not contested, that would mean

6  that you were testifying --

7    A.  One of my marriages was annulled, so there

8  was no -- there was no court proceeding in that.

9    Q.  Was that Mr. Kelley?

10    A.  Mr. Albertony.

11    Q.  If your divorces were not contested, is it

12  correct then that your testifying in court has been

13  restricted to criminal proceedings?

14    A.  Yes.

15    Q.  As far as you know, those criminal

16  proceedings have all been in California; is that

17  right?

18    A.  They have all been in California.

19    Q.  Have they all been in Sonoma County?

20    A.  Yes.

21    Q.  You told me that you and Ms. Baas discussed

22  unfair practices.  And when I asked you what you

23  talked about, you said Tina being deprived of an

24  hour of work because Mr. Hansen wished to meet his

25  payroll hours, correct?

1   A.  Right.

2   Q.  Do you know that as a fact, or do you just

3  know that Mr. Hansen told you that?

4   A.  I was sitting right there.

5   Q.  You were sitting with him?

6   A.  When he did it.

7   Q.  Did you watch him do it?

8   A.  Yes.

9   Q.  So you saw him actually go into the Compass

10  report and make a change in Tina's hours; is that

11  right?

12   A.  Yes.

13   Q.  Did you say to him that's not right,

14  Mr. Hansen?

15   A.  No.

16   Q.  Why not?

17   A.  I didn't want to lose my job.

18   Q.  You knew Mr. Hansen had the authority to

19  fire you?

20   A.  Yes.

21   Q.  Did you know that what he was doing was

22  inconsistent with company policy, with Dollar Tree

23  policy?

24   A.  I don't know.

25   Q.  How did Mr. Hansen accomplish that task of

1    Q.  Right.

2        Is there more than one number for human

3  resources?

4    A.  I don't remember.

5    Q.  Do you recall there being a care line

6  number as well, an anonymous line where you could

7  make reports?

8    A.  Tip line, yeah.

9    Q.  Tip line?

10       (Reporter clarification.)

11       MS. McCLAIN:  Tip line.

12   Q.  Do you know what Dollar Tree called that

13  tip line?

14   A.  I don't remember.

15   Q.  Did you ever call human resources to

16  complain about any change in your pay?

17   A.  No.

18   Q.  Why not?

19   A.  I didn't want to complain and lose my job.

20   Q.  You thought Mr. Hansen would have fired you

21  for that?

22   A.  I thought, yeah, I might rock the boat and

23  get fired, yeah.

24   Q.  My question is more specific than that.

25  Did you think Mr. Hansen would fire you for that,

1  clocking in and out for a 30-minute meal break even

2  when you didn't take them?

3   A.  Yes.

4   Q.  What did he say to that?

5   A.  He didn't really have too much to say.

6   Q.  You don't recall --

7   A.  I don't recall what -- what our

8  conversation was, but I know we talked about it.

9   Q.  Did you ever make an inquiry of anyone --

10  of human resources, of the tip line, of a manager --

11  as to what Dollar Tree's policies were with respect

12  to payment for time worked?

13   A.  No.

14   Q.  Did you ever inquire of anyone -- again,

15  human resources, a manager, the tip line -- as to

16  whether Dollar Tree expected you to accurately

17  record your hours worked?

18   A.  No.

19   Q.  Did you have a general understanding that

20  it was your obligation to accurately record your

21  hours worked?

22   A.  Yes.

23   Q.  Where did you get that understanding from?

24   A.  Prior -- previous employment.

25   Q.  Did you always punch in when you arrived at

  
1  once; is that right?

2   A.  Yes.

3   Q.  Do you have any information whatsoever that

4  this situation, having people work when they weren't

5  punched in or punched out, entering meal periods,

6  deducting overtime, do you have any factual

7  information that that occurred at any other store

8  aside from 1868?

9   A.  No.

10   Q.  Do you have any factual information that

11  suggests to you that Mr. Hansen was doing this

12  because some higher manager told him to do it?

13   A.  Just hearsay.

14   Q.  You don't have any direct factual

15  information about that; is that right?

16   A.  No.

17   Q.  You never heard another manager tell him

18  that. Mr. Hansen never said, well, I'm just doing

19  this because so and so told me to do it. You don't

20  have any direct accounting of that?

21   A.  Just John telling me.

22   Q.  So your information is John telling you; is

23  that right?

24   A.  Yes, hearsay from him.

25   Q.  Do you have --

1  how the district manager bonus was calculated?

2    A.  No, I don't.

3    Q.  You had a bonus as an assistant manager,

4  correct?

5    A.  Once.

6    Q.  That was based upon sales?

7    A.  Yes.

8    Q.  So if the store sales improved, managers at

9  the store level got bonuses, correct?

10    A.  Correct.

11    Q.  Did you have any factual information that

12  your bonus was related in any way to payroll hours?

13    A.  No.

14    Q.  Is that the case with Mr. Hansen as well?

15  Was his bonus based on the same criteria as yours,

16  or do you know?

17    A.  I don't know.

18    Q.  You never saw an e-mail that said, don't

19  pay people for time worked, did you, from

20  Mr. Tellstrom?

21    A.  No.

22    Q.  So the only e-mails you saw that gave you

23  any information was the e-mails that said, let's

24  keep employee hours in line with sales projections?

25    A.  Yes.  Or we are going to owe him.

1   Q.  Can you tell me whether it was a day later

2   or two days later or three days later?

3   A.  It was one to two days later.

4   Q.  On this occasion you did not punch in?

5   A.  No.

6   Q.  Is that right?

7   A.  Correct.

8   Q.  Did you tell Mr. Hansen that you hadn't

9   punched in?

10   A.  Yes.

11   Q.  What did he say?

12   A.  Good.

13   Q.  Were there any witnesses to either of those

14   conversations with Mr. Hansen?  To your knowledge,

15   did anyone overhear?

16   A.  My son.  He was one of the temporary hired.

17   Q.  Is that Daniel?

18   A.  Yes.

19   Q.  We will find that there was a

20   Daniel Patrick on the payroll for some time in the

21   Christmas season of 2006; is that right?

22   A.  Correct.

23   Q.  For a couple of days?

24   A.  Yes.

25   Q.  And the first such day that he was on the

1  payroll is the occasion of the first such instance;

2  is that right?

3     A.  Correct.

4     Q.  It was your observation that Daniel heard

5  Mr. Hansen both express regret that you had punched

6  in on the first occasion and express pleasure that

7  you had not punched in on the second occasion; is

8  that right?

9     A.  I don't know if he overheard it.  I know he

10  was there.

11     Q.  I asked you whether you thought there were

12  any witnesses to the conversation.  Is your answer,

13  maybe Daniel, you're not sure?

14     A.  No, he was there.

15     Q.  The question is whether he heard the

16  conversation.

17     A.  I don't know.

18     Q.  My question really is, do you know whether

19  anyone was close enough to hear the conversation,

20  and your answer is you're not sure?

21     A.  I don't know.

22     Q.  But your son was there somewhere?

23     A.  He was there right next to me.

24     Q.  Did you talk to your son about this on any

25  other occasion?

1          REPORTER CERTIFICATE

2               I hereby certify that the witness to the

3     foregoing deposition was by me duly sworn to testify

4     to the truth the whole truth and nothing but the

5     truth in the within-entitled cause; that said

6     deposition was taken at the time and place herein

7     named; that the deposition is a true record of the

8     witness's testimony as reported to the best of my

9     ability by me, a duly certified shorthand reporter

10    and a disinterested person, and was thereafter

11    transcribed under my direction into typewriting by

12    computer; that the witness was given an opportunity

13    to read and correct said deposition and to subscribe

14    the same.  Should the signature of the witness not

15    be affixed to the deposition, the witness shall not

16    have availed himself or herself of the opportunity

17    to sign or the signature has been waived.

18               I further certify that I am not

19    interested in the outcome of said action, nor

20    connected with, nor related to any of the parties in

21    said action, nor to their respective counsel.

22               IN WITNESS WHEREOF, I have hereunto set

23    my hand this October 26, 2007

24

25               SANDRA L. CARRANZA
                      CSR No. 7062

1                    PREFERRED REPORTERS
              CERTIFIED SHORTHAND REPORTERS
2                  201 E. Watmaugh Road
              Sonoma, California  95476
3                  Phone (707) 938-9227
4
   October 26, 2007
5
   TO:  KELLY LOFQUIST
6        C/O:  JEREMY R. FIETZ, ATTORNEY AT LAW
         EDGAR LAW FIRM
7        408 College Avenue
         Santa Rosa, California 95401
8
   RE:  KASSONDRA BAAS AND KELLY LOFQUIST, individually
9        and on behalf of all others similarly situated
         vs. DOLLAR TREE STORES, INC.
10       Deposition taken October 15, 2007
         Reported by SANDRA L. CARRANZA, CSR No. 7062
11
   Dear Ms. Lofquist:
12
   The original transcript of your deposition taken in
13 the above-entitled action has been prepared and is
   available at this office for your reading,
14 correcting and signing.  In the alternative, you may
   wish to review your counsel's copy.  Please notify
15 this office and all counsel of any corrections you
   wish to make.
16
   Your rights regarding signature of this deposition
17 are contained in the California Code of Civil
   Procedure Section 2025.520.  Unless otherwise
18 directed, your original deposition transcript will
   be sealed after 35 days.
19
   If you wish to make arrangements to review the
20 original transcript of your deposition, please
   contact this office during office hours, 9:00 to
21 5:00 Monday through Friday, to make an appointment.
22              Sincerely,
23
24       Sandra L. Carranza
              CSR No. 7062
25 cc:  All counsel
26

319

# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

KASSONDRA BAAS AND KELLY LOFQUIST,
individually and on behalf of all
others similarly situated,

        Plaintiffs,

vs.                      Case No. C0703108 JSW

DOLLAR TREE STORES, INC.,

        Defendants.

_____/


DEPOSITION OF KASSONDRA BAAS

October 17, 2007


REPORTED BY:

SANDRA L. CARRANZA, CRR, RPR, CSR 7062

PREFERRED REPORTERS
CERTIFIED SHORTHAND REPORTERS
201 E. Watmaugh Road
Sonoma, California 95476
Phone (707) 938-9227

1

00059

1 Mr. Hansen's attention?

2    A.  Yes.  No.  I don't know if I advised her of

3 that.

4 Q.  Did you advise her to call payroll?

5 A.  The only thing I advised her was to check

6 her pay stubs.

7 Q.  So your answer was no, you did not advise

8 her to call payroll, correct?

9 A.  Right.

10 Q.  Did you advise her to call human resources?

11 A.  No.

12 Q.  Did you know, at that time, that there was

13 a Dollar Tree representative in California?

14 A.  Like Candace?

15 Q.  Yes.

16 A.  Yes.

17 Q.  You're speaking of Candace Camp?

18 A.  Yes, I'm sorry.

19 **Q.  How did you know that Candace was a human**

20 **resources employee?**

21 **A.  Because the time period from April until,**

22 **possibly, July or August -- from possibly June,**

23 **maybe -- no.  July or August, when I was still**

24 **getting $7.35 an hour, I had e-mailed Candace Camp**

25 **about my increase in pay, unknowingly or not**

1 **thinking we didn't have a store manager to correct**

2 **all that, so I e-mailed Candace Camp, and she then**

3 **talked to Mike Cossolotto, who, at the time, was the**

4 **district manager, and then they sent me a retro,**

5 **retro pay for the increase in wages from the time**

6 **period of April 2006 to whatever my current --**

7 **whatever the current month was that I e-mailed.**

8 Q.  If I understand your answer, there was a

9 time when you did not get the increase after you had

10 been promoted, you e-mailed Candace Camp and said, I

11 want the increase, or what's going on here, or words

12 to that effect; she handled the matter and made sure

13 that you got the assistant manager pay retroactive

14 to when you started in that position?

15 A.  Correct.

16 Q.  So your one encounter with human resources

17 at Dollar Tree found the function to be effective,

18 correct, it took care of the problem that you

19 raised?

20 A.  Right.  I e-mailed -- I e-mailed Candace a

21 few times on that matter and my status as an

22 assistant manager.

23 Q.  Did you keep these e-mails?

24 A.  No.  Sorry.  I -- I wasn't aware that I

25 could.

00074

1 A.  With regard to that message, no.

2 **Q.  I understand that you had made Care Line**

3 **reports but not on that topic; is that right?**

4 **A.  Right.**

5 **Q.  Am I correct that the Care Line is a phone**

6 **that you can -- a phone number that you call to make**

7 **any complaint or voice any concern you have, at all,**

8 **about Dollar Tree?**

9 **A.  Employee and/or customers.**

10 Q.  How many times did you call the Care Line?

11 A.  A few.

12 Q.  Did you call using your name, or did you

13 make anonymous calls?

14 A.  Both.

15 Q.  Tell me all that you recall and what the

16 topics were, please.

17 A.  With regard to John Hansen and the

18 overtime.  I made calls and stated that there was

19 things going on around the store that needed -- that

20 needed attention or looking into.

21 Q.  Did you ever, specifically, mention that

22 overtime wasn't being paid, or did you just,

23 generally, say things needed to be looked into?

24 A.  I generalized.

25 Q.  I want to be very clear that I understand

1 superior, "Hey, dude, you know, watch your step,"

2 or, you know, "Fix yourself."

3 I just wasn't aware if that was something

4 that, as an assistant, I could go to a store manager

5 and say.

6 Q.  You had told us on one occasion, leaving a

7 message for Mr. Cossolotto that you have described.

8 Is that the only conversation, communication,

9 e-mail, any sort of communication that you had with

10 Mr. Cossolotto with respect to overtime issues?

11 A.  I believe so.

12 **Q.  Did you ever have a communication with**

13 **Mr. Tellstrom with respect to overtime issues?**

14 **A.  With respect overtime, specifically?**

15 **Q.  Yes.**

16 **A.  No.**

17 **Q.  So you never communicated in any way to**

18 **Mr. Tellstrom a concern that Mr. Hansen was reducing**

19 **overtime from people's time records; is that right?**

20 **A.  Specifically, no.**

21 **Q.  Is that correct?**

22 **A.  I mean, yes.**

23 Q.  When you said "Specifically, no," you're

24 saying, I never specifically said anything about

25 overtime to Mr. Tellstrom; is that correct?

1  A.  I think one time face-to-face.

2  Q.  How were the other communications

3  accomplished?

4  A.  Over the phone.

5  Q.  On each of those occasions, Mr. Tellstrom

6  would say, "What are you talking about? Give me

7  some details," something along those lines?

8  A.  Right.  He would -- he would want to talk

9  with me about it, but I didn't feel comfortable --

10  Q.  Again, so we're talking about --

11  A.  -- telling him specifics --

12  Q.  I'm sorry.  I will take responsibility for

13  that one.

14  Is the reason why you didn't give

15  Mr. Tellstrom any further details your lack of

16  comfort with talking about your supervisor, or is

17  there some other reason?

18  A.  That's part of it.  Keeping my job.  I

19  didn't want to lose my job, and I was afraid that if

20  I "ratted out my boss," that I would be out soon

21  myself of a job.

22  Q.  Is that because you thought Mr. Hansen had

23  the power to make the decision to terminate you?

24  A.  Yeah.

25  **Q.  You knew that what he was doing was against**

1 **company policy, correct?**

2 **A.  I thought, yeah.**

3 Q.  So why would you be afraid about losing

4 your job for reporting some conduct that was against

5 company policy?

6 A.  I don't know.  I was just afraid.

7 Q.  Did Mr. Tellstrom try to get you to give

8 him the information?

9 A.  He did.

10 Q.  Aside from the specifics that you have now

11 told me about that you recall, and that is the

12 specific with regard to Ms. Kosinski and the two

13 other specifics with regard to Ms. Pinole -- was

14 that her last name?

15 A.  Pinola.

16 Q.  Pinola?

17 A.  I wanted to go back that one.

18 Q.  Sure.

19 A.  Because I don't -- I'm trying to remember

20 if it was Matthew was the .20, or if it was myself

21 that had the .20.

22 Q.  You're not sure that Matthew was involved

23 in this?

24 A.  Right.  I am not for sure.  I'm not

25 positive that it was Matthew that had the .20 or if

REPORTER CERTIFICATE

1

2        I hereby certify that the witness to the

3    foregoing deposition was by me duly sworn to testify

4    to the truth the whole truth and nothing but the

5    truth in the within-entitled cause; that said

6    deposition was taken at the time and place herein

7    named; that the deposition is a true record of the

8    witness's testimony as reported to the best of my

9    ability by me, a duly certified shorthand reporter

10   and a disinterested person, and was thereafter

11   transcribed under my direction into typewriting by

12   computer; that the witness was given an opportunity

13   to read and correct said deposition and to subscribe

14   the same.  Should the signature of the witness not

15   be affixed to the deposition, the witness shall not

16   have availed himself or herself of the opportunity

17   to sign or the signature has been waived.

18        I further certify that I am not

19   interested in the outcome of said action, nor

20   connected with, nor related to any of the parties in

21   said action, nor to their respective counsel.

22        IN WITNESS WHEREOF, I have hereunto set

23   my hand this October 30, 2007.

24

25                SANDRA L. CARRANZA
                  CSR No. 7062

323

PREFERRED REPORTERS
CERTIFIED SHORTHAND REPORTERS
201 E. Watmaugh Road
Sonoma, California  95476
Phone (707) 938-9227


October 30, 2007

TO:  KASSONDRA BAAS
     C/O:  JEREMY R. FIETZ, ATTORNEY AT LAW
     EDGAR LAW FIRM
     408 College Avenue
     Santa Rosa, California 95401

RE:  KASSONDRA BAAS AND KELLY LOFQUIST, individually
     and on behalf of all others similarly situated
     vs. DOLLAR TREE STORES, INC.
     Deposition taken October 17, 2007
     Reported by SANDRA L. CARRANZA, CSR No. 7062

Dear Ms. Baas:

The original transcript of your deposition taken in
the above-entitled action has been prepared and is
available at this office for your reading,
correcting and signing.  In the alternative, you may
wish to review your counsel's copy.  Please notify
this office and all counsel of any corrections you
wish to make.

Your rights regarding signature of this deposition
are contained in the California Code of Civil
Procedure Section 2025.520.  Unless otherwise
directed, your original deposition transcript will
be sealed after 35 days.

If you wish to make arrangements to review the
original transcript of your deposition, please
contact this office during office hours, 9:00 to
5:00 Monday through Friday, to make an appointment.

                    Sincerely,

                    Sandra L. Carranza
                    CSR No. 7062

cc:  All counsel


                                                    324