

1  Donald S. Edgar, Esq. (SBN 139324)
2  Jeremy R. Fietz, Esq. (SBN 200396)
   Rex Grady, Esq. (SBN 232236)
3  **EDGAR LAW FIRM**
   408 College Avenue
4  Santa Rosa, California, 95401
   Tel:   (707)  545-3200
5  Fax:   (707)  578-3040

6  Attorneys for Plaintiffs,
7  KASSONDRA BAAS and KELLY LOFQUIST
   individually and on behalf of all employees
8  similarly situated

9

10              **IN THE UNITED STATE DISTRICT COURT**

11         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12

13

14  KASSONDRA BAAS and KELLY          )   **CASE NO.  C 07-03108 JSW**
    LOFQUIST, individually and on behalf of all  )
15  others similarly situated,        )   **DECLARATION OF JEREMY R. FIETZ,**
                                      )   **ESQ. IN SUPPORT OF MOTION FOR**
16              Plaintiffs,           )   **CLASS CERTIFICATION**
                                      )
17                                    )   Hearing Date: April 4, 2008
        v.                            )
18                                    )   Time:  9:00 a.m.
                                      )
19  DOLLAR TREE STORES, INC.,         )
                                      )   Courtroom 2
20              Defendant.            )
                                      )   Honorable Jeffrey S. White
21                                    )
                                      )
22  ─────────────────────────────────)

23

24  I, JEREMY R. FIETZ, hereby declare as follows:

25          1.      I am an attorney licensed to practice in all of the courts of the state of California

26  as well as the Northern District Court.  I am a partner with the Edgar Law Firm, counsel for

27  plaintiff and plaintiff's class.

28

                                    - 1 -

DECL. OF JEREMY R. FIETZ IN SUPPORT OF MOTION FOR CLASS CERT.

07-03108 JSW

2.      I have personal knowledge of the following facts and, if called as a witness could and would competently testify thereto.

3.      True and correct copies of excerpts from the deposition of Dollar Tree District Manager Richard Tellstrom are attached hereto as Exhibit A.    A true and correct copy of a Dollar Tree policy concerning associate responsibility to clock in and out for all shifts and break periods is attached hereto as Exhibit B.   This document was produced by Dollar Tree and authenticated by Richard Tellstrom in his deposition.

4.      A true and correct copy of excerpts from the deposition of John Hansen are attached hereto as Exhibit C.

5.      I received my first law degree from the University of Victoria, often ranked #1 among Canadian Law Schools. I sat for the California Bar exam only once, in the year 1998. I received my passing results while completing a Master's Degree in Law, at Widener University in Delaware.   While obtaining this specialty degree, I also served as a Law Clerk to the Honorable Judge Marvin Halbert, of the Complex Civil Litigation Division, in the Court of Common Pleas, Philadelphia, Pennsylvania.

6.      Since beginning my law practice in the State of California I have handled several Court and jury trials to verdict.   Most notably, I served as trial counsel in a month- long §17200 case, resulting in a Plaintiff's verdict including a substantial award of attorneys' fees under C.C.P. §1021.5, which then led to my successful appearance before the Third Appellate District on appeal. (See *Pichler v. Simmons* (2002) 2002 WL 31259892).

7.      Both before, and since, joining the Edgar Law Firm, I have spent most of my legal career focused in the area of complex litigation, and multi-plaintiff litigation, in various areas.

8.      Most recently, within the last year, the Northern District of California has twice certified my law firm as class counsel in two unrelated employment law class action cases.   In one case, ***Sims et al. v. Metropolitan Life Insurance Company***, Case No. 05-02980 TEH, my firm was approved as the sole legal counsel for a class of over 300 persons in a $6.25 million dollar class settlement.   The settlement was reached after two years of active litigation against

- 2 -

DECL. OF JEREMY R. FIETZ IN SUPPORT OF MOTION FOR CLASS CERT.

07-03108 JSW

Morgan Lewis, a premier employment law defense firm. In the other recent case, ***Wamboldt v. Safety-Kleen Systems***, Case No. 07-00884 PJH, my firm was among the firms approved by the Court to represent the class. In that case, the certification of the class was over the hard fought opposition of the defendant, who was represented by Seyfarth Shaw, another well-known employment law defense firm. I personally took a lead role in the litigation of both cases.

9.    No one from my law firm has never been disciplined by the State Bar of California for any matter whatsoever.

10.    To date, our firm has spent many hours working on this case, including review of hundreds of pages of documents produced by Dollar Tree, depositions of Plaintiffs and Dollar Tree employees, legal research and preparation of legal briefing for the Court appointed evaluator. Plaintiffs, Kassondra Baas and Kelly Lofquist, have consistently assisted us in the preparation of this case, conducting record review, consulting with us as needed to explain Dollar Tree company records, submitting themselves for deposition, and responding to written discovery. Both have shown great respect for the import of this litigation and willingness to stand up for the rights of all class members. Each has been completely cooperative in making themselves available for deposition and discovery purposes, and for other litigation needs.

I declare under penalty of perjury under the laws of the state of California, and United States of America that the above is true and correct and was executed in Santa Rosa on February 29, 2008.

JEREMY R. FIETZ, ESQ.

- 3 -

DECL. OF JEREMY R. FIETZ IN SUPPORT OF MOTION FOR CLASS CERT.

# EXHIBIT A

COPY

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4

5

6  KASSONDRA BAAS and KELLY      )
   LOFQUIST, individually        )
   and on behalf of all          )
7  others similarly situated,    )    No. C 07-03108 JSW (ENE)
                                  )
8          Plaintiffs,            )
                                  )
9        vs.                      )
                                  )
10 DOLLAR TREE STORES, INC.,      )
                                  )
11         Defendants.            )
   _____ )

12

13

       DEPOSITION OF RICHARD A. TELLSTROM

14
             Held at the Offices of

15
          Verbatim Reporting Service

16
       141 Stony Circle, Santa Rosa, California

17
       Tuesday, November 13, 2007, 9:45 a.m.

18

19

20

21

22

23

24

25

## Verbatim ■

A COMPUTERIZED REPORTING SERVICE
(707) 575-1819 · (800) 634-4311 · FAX (707) 575-8541

1

```
 1   APPEARANCES:

 2        For the Plaintiffs:   EDGAR LAW FIRM
                                BY:   JEREMY R. FIETZ, ESQ.
 3                              408 College Avenue
                                Santa Rosa, California   95401
 4                              (707) 545-3200

 5
          For the Defendants:   KAUFF MCCLAIN & MCGUIRE LLP
 6                              BY:   MAUREEN E. MCCLAIN, ESQ.
                                One Post Street, Suite 2600
 7                              San Francisco, California
                                94104
 8                              (415) 421-3111

 9                                       -and-

10                              WILLIAMS MULLEN
                                BY:   BETH HIRSCH BERMAN, ESQ.
11                              999 Waterside Drive
                                Suite 1700
12                              Norfolk, Virginia   23510
                                (757) 629-0604
13

14        Also Present:         CARRIE LIN, ESQ.
                                WAYHAN TAN, VIDEOGRAPHER
15

16        Reported by:          BRENDA L. MARSHALL, CSR
                                License No. 6939
17

18

19

20

21

22

23

24

25
```

1    Q.   And what does the store manager look at to

2  determine scheduling in light of the SPEH hours?

3    A.   In Compass, it's got, actually, sales in

4  there now, it tells them how many hours is worked,

10:17:03  5  what the sales are.  They also have a sheet that

6  they fill out on a clipboard that gives them a week

7  average sale, customer count, overs and shorts, bank

8  deposit, then they call it in to me at nighttime.

9    MS. MCCLAIN:  Okay.  May I have this marked

10:17:21 10  as next in order, please.

11    (Whereupon, the document referred to

12    was marked Defendants' Exhibit 2 for

13    identification by the Reporter, a

14    copy of which is attached hereto.)

10:17:49 15  BY MS. MCCLAIN:

16    Q.   This is a document that Mr. Hansen produced

17  to us, Mr. Tellstrom.  Is this the sheet that you're

18  talking about?

19    A.   Yes.

10:17:57 20    Q.   And how does the store manager use this

21  information on an ongoing basis; that is, if you

22  look at it on Monday, how does that impact the store

23  manager's planning for the rest of the week?

24    A.   Well, he can look at his trends and see

18:12 25  what -- whether the sales are up or down over last

**Verbatim** ■

1    year and adjust accordingly through the week.

2        Q.    When you say "adjust accordingly," adjust

3    what?

4        A.    Hours.

10:18:21  5        Q.    So, adjust the schedule?

6        A.    The schedule.  Correct.

7        Q.    If the sales look like they're trending above

8    projection, how would that affect the scheduling if

9    you were a store manager?

10:18:36  10        A.    He could add more hours, based on the SPEH.

11        Q.    Conversely, if they were declining, how would

12    that affect him?

13        A.    He -- he would decrease the hours.

14        Q.    In your judgment, Mr. Tellstrom, and tell us

10:18:52  15    if you don't think you're able to form this

16    judgment, do the store managers in your district

17    have sufficient hours to run their stores properly?

18        A.    Yes.  With the right people and the right

19    performance on everybody, correct.

10:19:13  20        Q.    Whose job is it to make sure that there are

21    the right people in the stores?

22        A.    The store manager.

23        Q.    Whose job is it to make sure that they are

24    all trained properly?

:19:23  25        A.    Store manager.

**Verbatim** ■

1    BY MS. MCCLAIN:

2       Q.  How would you do it if you were a store

3    manager?

4       A.  Store manager.  Look and see what the --

10:35:35  5    you're not making sales, you've got to cut payroll

6    if you're not doing it.  Your hours are based on

7    Compass.  Our forecasted hours, you have a set

8    forecast that you should hit.  If you're not hitting

9    that, you need to adjust it up or down.

10:35:49 10       Q.  Is it correct, then, that you're describing a

11    process of constantly monitoring actual sales?

12       A.  Sure.  Store manager function.

13       Q.  And you say, "Contact your D.M. with any

14    payroll issues.  Remember, overtime is not

10:36:07 15    acceptable unless your D.M. authorizes it

16    beforehand."

17       Had you asked the store managers in your

18    district to notify you if overtime was needed?

19       A.  Yes.  They -- it's -- it was the D.M. before

10:36:21 20    me, and it just kept coming down.  Same policy.

21       Q.  Did you find that Mr. Hansen complied with

22    that?

23       A.  For the most part, sure.

24       Q.  When you were notified, did you authorize the

:36:33 25    overtime?

1      Q.   What is Dollar Tree's policy with respect to

2   fixing punches in the Compass system?  What's the

3   purpose of fixing punches?

4      A.   Well, if they have to fix it, it's something

12:22:35  5   that, No. 1, either the assistant, or whoever,

6   didn't get to punch the time clock right.  So they

7   mispunched.  Whether the time clock being down, the

8   satellite being down, there's certain situations

9   that doesn't let them punch.  So they have a time

12:22:54  10   clock worksheet that they're supposed to fill out,

11   what time they're punched, sign it, store manager or

12   the assistant, whoever corrects that punch, should

13   initial that they did it, and at the end of the

14   week, that should be put in a folder, recorded with

12:23:11  15   the scheduled work for that week and the time clock

16   edit sheet.  Make sure they record and pay everybody

17   what hours they've worked.

18      MS. MCCLAIN:  May I have this marked as next

19   in order, please.

12:23:44  20      (Whereupon, the document referred to

21      was marked Defendants' Exhibit 11 for

22      identification by the Reporter, a

23      copy of which is attached hereto.)

24   BY MS. MCCLAIN:

23:53  25      Q.   This is an excerpt from the handbook.  Is the

```
 1              THE WITNESS:  Correct.  Correct.
 2    BY MS. MCCLAIN:
 3        Q.   Any exceptions to that?
 4        A.   No.
 5        Q.   Is -- has the Compass system been explained
 6    to you?  Has someone trained you on it?
 7        A.   Yes.  But they -- we keep on updating, and
 8    we -- the store managers have done classes on how to
 9    get to where they need it.  And they have -- they've
10    got me as a person they can call, and also, Mike, if
11    they need any direction or any help.
12        Q.   Were you --
13        A.   Or even Brian Henry.  I'm sorry.
14        Q.   Were you a store manager when Compass was
15    introduced?
16        A.   Yes, I was.  It rolled out when I was a store
17    manager.  I was one of the test pilot stores.
18        Q.   Was that store 2162?
19        A.   Yes, it was.
20        Q.   Who rolled it out to you?
21        A.   Well, the company rolled it out, and I had to
22    go to Sacramento and get trained by Carlos
23    Hernandez.  Mike, me and Jason.  Mike Cossolotto,
24    myself, and Jason all went over there on a Friday
25    afternoon and had a two-hour class on it.  And then
```

The time stamps in the left margin: 12:26:37 (line 5), 12:27:00 (line 10), 12:27:13 (line 15), 12:27:23 (line 20), 12:27:43 (line 25).

1    we brought it back here.  And, like I said, I was a

2    test pilot store.  So I had to go through some rough

3    times as far as learning it myself.

4             MS. MCCLAIN:  May I have this marked as next

12:28:48  5    in order, please.

6             (Whereupon, the document referred to

7             was marked Defendants' Exhibit 12 for

8             identification by the Reporter, a

9             copy of which is attached hereto.)

12:29:11  10    BY MS. MCCLAIN:

11       Q.   Would you take a moment to review this

12    document, please.

13             Do you recognize this document,

14    Mr. Tellstrom?

12:30:00  15       A.   Yes.

16       Q.   What is it?

17       A.   Time and attendance policies and procedures

18    for store manager and assistants.

19       Q.   Is this policy available to store managers?

12:30:09  20       A.   Yes.  I believe so.

21       Q.   And there's a reference on page 95 of this

22    policy that store management must monitor associates

23    to ensure that they record all time worked, no

24    off-the-clock work, and record lunches and breaks

:30:33  25    fully and properly.

1    And is that a policy that has been

2    communicated to store managers in your district?

3    A.   Yes.   We've had -- we had a meeting over in

4    Sacramento this last year at -- on making sure the

12:30:49  5    store manager is giving lunches and breaks for their

6    assistants and giving them a half-hour uninterrupted

7    lunch.

8    Q.   Was that a meeting that Mr. Hansen attended?

9    A.   Yes.

12:30:59 10    Q.   Did Mr. Cruz attend it; do you recall?

11    A.   I don't recall.   I think that might have been

12    after he left.

13    Q.   If you go to the very end of page 95, there's

14    a statement, "The store manager is still responsible

12:31:30 15    for the review, verification, and approval of time

16    sheets no matter who enters (Store Manager or

17    Assistant Manager) or approves the time records."

18    Is that an accurate statement of Dollar Tree

19    policy?

12:31:43 20    A.   Yes.   And if the store manager is on vacation

21    and they needed to be submitted on Sundays, the D.M.

22    goes and submits it so the store gets their payroll.

23    Most assistants now know how to accept payroll and

24    finalize it if the store manager is --

12:32:11 25    Q.   Is unavailable?

1      A.    Is unavailable.  Correct.

2            MS. MCCLAIN:  May I have this marked as next

3      in order, please.

4            (Whereupon, the document referred to

5            was marked Defendants' Exhibit 13 for

6            identification by the Reporter, a

7            copy of which is attached hereto.)

8      BY MS. MCCLAIN:

9      Q.    Do you recognize this document,

12:33:01 10    Mr. Tellstrom?

11     A.    Yes.

12     Q.    What is it?

13     A.    Responsibilities for the management team as

14     far as what -- the time adjustments and overtime and

12:33:10 15    specific instructions for them not to fix anything

16     without any -- authorized from the associate as far

17     as change in punches, assistants not being able to

18     change their own punches.  Any kind of a time clock

19     adjustment.  Guideline.

12:33:36 20    Q.    You were telling us earlier about the use of

21     the time clock worksheet, which is referenced under

22     time adjustments in the first list of bullet points,

23     and do you have knowledge on an ongoing basis that

24     your stores in your district are using time clock

34:01 25   worksheets?  Do you know one way or the other?

1  it should have been the time clock worksheet.

2      Q.  Under Store Manager's Responsibilities,

3  there's a reference to "Payroll must be approved

4  each week.  It can be approved as early as close of

12:35:31  5  business on Saturday or as late as Monday by 9:30

6  AM, your local time."

7          Is that a rule that's applied throughout the

8  time that you've been a district manager?

9      A.  Yes.  I prefer for them to have it done on

2:35:46 10  Sundays.  I don't throw a fit if they don't have it

11  done by Sundays, but it would be nice to be

12  consistent, and that way I can get my numbers

13  together on Sunday night.  It's a routine that I

14  have.

12:35:57 15      Q.  And how is the approval of payroll

16  communicated to you?  How do you know that that's

17  happened?

18      A.  I go into Compass; I've got access to all 12

19  stores.  I review it on a daily basis, see where I'm

2:36:11 20  at for the district.  But I can look at it Sunday

21  morning and see who hasn't done their payroll.  I'll

22  call the store, find out what assistant is there or

23  what store manager is there, direct them to make

24  sure that they adjust anything that needs to be

36:24 25  adjusted and submit it.

**Verbatim** ■

1    Q.   And when you say "adjust anything that needs

2    to be adjusted," what are you referencing?

3    A.   Any punches -- when you go on that screen,

4    there's black -- or actually, it's gray, red and

12:36:39  5    blue.  Anybody that has the red or the blue, that

6    means that there's either a punch that wasn't

7    correctly done, or if they were taking lunches or

8    breaks or anything, that they have to specifically

9    click on that and see what -- what direction they

12:36:55  10    need to go in fixing it.

11         And then, also, whatever assistants -- each

12    assistant has their own Compass password.  When they

13    go in, it tells them when they have fixed punches

14    and who did it, what time, so you can find out who

12:37:20  15    did it and if they have a time clock or worksheet to

16    verify who did it.  You got three assistants and you

17    got one person fixing all the adjustments, you can

18    tell it's not being trained.

19    Q.   You can tell that the other two are not being

12:37:33  20    trained; is that right?

21    A.   (No audible response.)

22    Q.   Do you have any personal knowledge that at

23    Mr. Hansen's store, once he became store manager,

24    assistants were using each other's numbers?

37:45  25    A.   No idea.  No.

**Verbatim**

A COMPUTERIZED REPORTING SERVICE
(707) 575-1819 • (800) 634-4311 • FAX (707) 575-8541

131

1    A.    No.

2    Q.    What did your review consist of?

3    A.    Just looking to see hours for each store

4    worked, what was scheduled and what was actually

12:42:30  5    worked and then to make sure that everybody's

6    punches were -- they weren't in the red or the blue

7    saying they had violations or warnings.

8    Q.    And did I understand you correctly to say

9    that the red or the blue would be missed punches,

12:42:43  10    essentially?

11    A.    Correct.

12    Q.    Anything else?

13    A.    No.

14    Q.    Do you have --

12:43:16  15        THE WITNESS:    Can we take a quick break?

16        MS. MCCLAIN:    Sure.  Absolutely.

17        THE VIDEOGRAPHER:    We're going off the

18    record.  The time is 12:44 P.M.

19        (Whereupon, a lunch recess was taken.)

13:34:01  20        THE VIDEOGRAPHER:    We are going back on the

21    record.  The time is 1:35 P.M.

22    BY MS. MCCLAIN:

23    Q.    Mr. Tellstrom, we talked this morning about

24    strengths and weaknesses of certain of the store

13:34:21  25    managers in your district.  Do you recall that

**Verbatim** ∎

1  eliminate overtime from an employee's pay?

2      A.   No.

3      Q.   Have you ever directed any store manager to

4  reduce the time worked by making a punch change and

13:42:40  5  edit in the punch records?

6      A.   No.

7      Q.   Is it correct that you've not done that for

8  any reason?  You've never done it, period?

9      A.   No.

13:42:53  10      MR. FIETZ:   Object.   Leading?

11  BY MS. MCCLAIN:

12      Q.   Is that right?

13      A.   Yeah.   No.

14      Q.   No what?

13:42:57  15      A.   No, I haven't.

16      Q.   Have you had any knowledge that -- let me

17  rephrase the question.

18          Aside from information you may have gotten in

19  the course of this lawsuit, so I want you to set

13:43:33  20  aside any conversations that you and I have had or

21  that you've heard relating to this lawsuit, I'm

22  asking you about a time period before you knew about

23  this issue in conjunction with a lawsuit, have you

24  ever -- did you ever hear, when Mr. Hansen was a

13:43:46  25  store manager -- let's start at 1868 -- did you ever

1    is to know company policies and procedures.

2        Q.   So the answer is no, you did not?

3        A.   As far as --

4        Q.   Instructing in those same e-mails that the

15:08:41  5    store managers were to direct themselves to company

6    policies regarding the manner in which they should

7    make their payroll, you did not do that; correct?

8        A.   No.

9        Q.   You are aware that time shaving occurred?

15:08:58 10    A.   Now I am.   Correct.

11        Q.   Are you aware of to -- how many employees in

12    your district were victims of time shaving?

13        A.   I have no idea.

14        Q.   Do you know whether it's more than 10?

15:09:13 15    A.   No idea.   Have 12 stores, each store has

16    probably about 12 to 15 people.

17        Q.   So it's possible that could have happened to

18    a hundred people in your district?

19            MS. MCCLAIN:   Objection.   Calls for

15:09:26 20    speculation.

21            THE WITNESS:   Not sure.

22    BY MR. FIETZ:

23        Q.   You have no idea, except that it has

24    happened, but you don't know to how many people?

09:31 25    A.   Correct.

**Verbatim** ■

1    Q.    And for how long have you known that time

2  shaving occurred?

3    A.    Since this has came up.

4    Q.    Since the filing of the lawsuit?

15:09:47  5    A.    Yes.

6    Q.    What have you done, then, to -- let me back

7  up.

8           You indicated that you were shocked when you

9  learned that Jerry Burger's store had some time

15:10:06 10  shaving or time manipulation or failure to pay for

11  time worked when you first found that out a couple

12  of months ago; correct?

13    A.    Correct.

14    Q.    Were you similarly shocked when you learned

15:10:18 15  about the filing of this lawsuit about other time

16  shaving within your district?

17    A.    Sure.

18    Q.    How -- why is it that if you learned about

19  time shaving in your district many, many months ago,

15:10:32 20  you haven't gotten to the bottom of how many

21  employees were subject to this time shaving so you

22  could make sure they got paid?

23    A.    I've left that in the store managers'

24  control, to research it, find out, get with Pat

10:44 25  Doss, and make him -- have him get paid.

# Verbatim ■

1    Q.    You have directed the store managers to

2    research each store's payroll, going back for some

3    period of time, to identify punch changes resulting

4    in the subtraction of work time?

15:11:01  5    A.    No.

6    Q.    Can you explain to me then what you just

7    meant by you left it to store managers?

8    A.    If associates came up to them and said they

9    didn't get paid, to go back and look and see the

15:11:12 10    time frame that it happened.

11    Q.    Okay.    So the extent to which you followed up

12    to determine what action could be taken to determine

13    how many employees were the potential victims of

14    time shaving is to tell store managers to

15:11:31 15    investigate if an employee raises an issue?

16    A.    Correct.

17    Q.    Did you indicate that to your store managers

18    in writing in any way?

19    A.    No.

15:11:41 20    Q.    So several months ago, you became aware of a

21    lawsuit alleging that time shaving occurred, and

22    you, in fact, confirmed the time shaving had

23    occurred; correct?

24    A.    At that time, yes.

11:57 25    Q.    And as the district manager, the only action

**Verbatim** ■

```
 1   you took to investigate the extent to which the time

 2   shaving occurred so that people could get paid was

 3   to tell your store managers orally that if someone

 4   complains, investigate it; correct?

 5       A.   No.

 6       Q.   Okay.  What else did you do?

 7       A.   They need -- they know what goes on in their

 8   building, they need to control it.  I'm not at their

 9   store seven days a week to see what's going on in

10   their building.  If it was brought to their

11   attention, they need to address it.

12       Q.   But time shaving was brought to your

13   attention, wasn't it?

14       A.   Just in the one store, yes.

15       Q.   You understood that the allegation was that

16   time shaving had occurred throughout the district,

17   at the very least; correct?

18       A.   Store specific only.

19       Q.   You were not made aware that the allegation

20   was that time shaving occurred at more than one

21   store?

22       A.   No.  No.

23       Q.   And with regard to the store you're referring

24   to, store 1868, the Rohnert Park store?

25       A.   I would say yes.
```

Time stamps in left margin:
- 15:12:12 (line 5)
- 15:12:25 (line 10)
- 15:12:36 (line 15)
- 15:12:51 (line 20)
- 13:04 (line 25)

1   foundation.

2       You understand that Ms. McClain is your

3   attorney?

4       A.   Correct.

15:15:30   5       Q.   And you understand that Ms. Berman is your

6   attorney?

7       A.   Correct.

8           MS. MCCLAIN:   That's not correct, and I

9   have --

15:15:36 10         MR. FIETZ:   I'm asking what his understanding

11  is.

12          MS. MCCLAIN:   He -- this witness has been

13  told over and over again we represent Dollar Tree,

14  and you are misstating communications I've had with

15:15:46 15  you.   I have not --

16          MR. FIETZ:   I'm misstating no communication.

17          MS. MCCLAIN:   Yes, you are.

18          MR. FIETZ:   I asked this witness what his

19  understanding was regarding whether or not you

15:15:52 20  represent him.

21          MS. MCCLAIN:   I don't think you quite asked

22  it that way.   And I'll make it very clear who we

23  represent.   We represent the company, and the

24  attorney-client privilege applies to Mr. Tellstrom

16:07 25  because he's a manager of the company.

## Verbatim ■

```
             1            We do not represent you individually, Rick,

             2    and I don't want there to be any miscommunication

             3    about that.

             4    BY MR. FIETZ:

15:16:24     5        Q.   Have you ever seen the complaint in the

             6    Baas/Lofquist case?

             7        A.   Complaint, no.

             8        Q.   Yes.  The complaint.

             9        A.   No.

15:16:32    10        Q.   No?

            11        A.   No.

            12        Q.   As a district manager, you're interested in

            13    finding out whether there was any time shaving in

            14    your district so that it can be corrected; is that

15:16:50    15    fair to say?

            16        A.   Sure.

            17        Q.   When you learned that Miguel Cruz had

            18    testified that he shaved time, what action did you

            19    take to investigate to whom he shaved time from so

15:17:04    20    that they could be paid?

            21        A.   I did none.

            22        Q.   Why not?

            23        A.   Wasn't instructed.

            24        Q.   Isn't it your job as a district --

 17:18      25        A.   Didn't know.
```

**Verbatim** ■

1      Q.   Why do you need to be instructed to make sure
2  people get paid for all time worked when we've just
3  talked about all the Dollar Tree policies that say
4  everyone should get paid for every minute that they
15:17:28    5  worked?
6      A.   Because if the store manager is doing their
7  job, they would know that they would get paid right.
8  That's their job, to make sure their store is run
9  correctly, get paid right, follow policies and
5:17:38   10  procedures.

11      Q.   When you learned that a store manager,
12  Mr. Cruz, had testified that he shaved time,
13  depriving employees in your district of pay for the
14  time they worked, you took no action.  Why not?
15:17:54   15      A.   Thought maybe it was an isolated incident.
16      Q.   So --
17      A.   Thought it just happened under Miguel Cruz
18  because that's what he did.
19      Q.   Well, let's just assume, then, that you did
15:18:09   20  think that it was an isolated incident.  Aren't the
21  people that that happened to entitled to be paid for
22  their time worked?
23      A.   Absolutely.
24           MS. MCCLAIN:  Objection.  Calls for
18:17   25  speculation.  Lack of foundation.

**Verbatim** ■

```
 1   BY MR. FIETZ:

 2      Q.   Why didn't you do anything to investigate so

 3   that those people that he shaved time from could get

 4   paid?

 5          MS. MCCLAIN:  Objection.  Lack of foundation

 6   that there's been any time shaving.

 7          THE WITNESS:  I'm not sure.

 8   BY MR. FIETZ:

 9      Q.   Raley's was the job you had immediately prior

10   to Dollar Tree; correct?

11      A.   Yes.

12      Q.   What was the reason for that employment

13   terminating?

14      A.   I left.

15          MS. MCCLAIN:  Objection.  Invasion of

16   privacy.

17          And if a question is asked of you that you

18   think is personal about your employment background,

19   Mr. Tellstrom, let me know that, and we'll talk

20   about whether it's too invasive of your individual

21   privacy.

22          And if you want to answer this, you can, but

23   if there's any reason why you prefer not to talk

24   about your past employment, we should step out and

25   talk about it.
```

15:18:24
15:18:55
15:19:00
15:19:14
19:28

**Verbatim** ∎

1    training position already, but he left for T.J.Maxx

2    for more money.  He actually had said he enjoyed

3    working for Dollar Tree, so did Marty.

4        Q.   Do you know which T.J.Maxx Mr. Burger works

16:04:14  5    for?

6        A.   Yeah.  Santa Rosa.  On Cleveland Avenue.

7        Q.   In any event, after Mr. Burger left, you

8    discovered that he had violated Dollar Tree policy

9    concerning payroll; correct?

16:04:30 10        A.   Yes.

11        Q.   With regard to the manner in which Mr. Burger

12    violated Dollar Tree policy regarding payroll, what

13    can you tell us about how it was actually done?  Do

14    you know?  Did he go in to change a punch that had

16:04:57 15    already been made?  Did he simply not make punches

16    or not record what had been written on a hand sheet?

17        A.   What -- what John showed me was that, after

18    researching, that he actually went in and ignored

19    the second half of the shift, and it said ignored,

16:05:14 20    and it clicked on it, and it said who ignored it.

21        Q.   And as I understand it, ignore a punch simply

22    means that it -- it's like it was never made?

23        A.   Correct.

24        Q.   So these are punches that employees would

05:29 25    make as far as they would have a start shift punch,

1    some break punches, a meal punch, and an end shift

2    punch, or maybe some more break punches, and

3    Mr. Burger had gone in to change the punches to

4    simply ignore the last half of the day?

16:05:46  5         MS. MCCLAIN:  Objection.  Lack of foundation.

6         THE WITNESS:  John showed me.  I didn't

7    really specifically look at it.  He just showed me

8    it said ignored on it and said the person and how

9    many hours were deleted.  That's all I -- that's all

16:05:58 10   I noticed.  I had him get with Pat Doss and -- and

11   try to figure out what was happening.

12   BY MR. FIETZ:

13       Q.  So you didn't study it, but you know enough

14   to know that as a result of Mr. Burger going into

16:06:10 15   the payroll system and utilizing the ignore

16   function, the payroll system acted as if work had

17   not been performed by the employee?

18       A.  Correct.

19       Q.  Has there been any investigation of the

16:06:46 20   payroll throughout 2262, or has there only been

21   investigation as to those employees that notified

22   you or management that they hadn't been paid

23   appropriately?

24         MS. MCCLAIN:  Objection.  Lack of foundation.

:07:01 25   BY MR. FIETZ:

**Verbatim** ■

1    Q.   So she indicated to you that she was going to

2    further research the punches as to those employees

3    who had raised an issue with you?

4    A.   Yes.

16:08:21  5    Q.   So, again, my question is, do you have any

6    understanding, either because someone told you they

7    were going to or because you directed someone to,

8    investigate employee punches in store 2262 as to any

9    employees other than those who specifically raised

16:08:39  10   the issue with you?

11   A.   No.

12   Q.   Why not?

13        MS. MCCLAIN:   Objection.   Lack of foundation.

14   Calls for speculation.

16:08:48  15   BY MR. FIETZ:

16   Q.   Why didn't you direct a further investigation

17   to ensure that other employees of 2262 were not

18   subject to the same violations that Mr. Burger

19   subjected the people to that came to you?

16:09:01  20   A.   I was thinking it should have been maybe

21   isolated with just the time frame that he was there.

22   Q.   How many employees were employed by 2260 --

23   in store 2262 at the time that Mr. Burger was there?

24   A.   I don't -- don't have the numbers for it.

.09:23  25   Q.   More than 20?

**Verbatim** ■

1    A.    Possibly.

2    Q.    Definitely more than 15?

3    A.    Close to 15.

4    Q.    And how many people raised an issue with you

16:09:35  5  concerning not being paid appropriately while

6    Mr. Burger was the store manager?

7    A.    Three.

8    Q.    So you had reports of three people out of a

9    store of probably 15 employees.  Why did you assume

16:09:53 10  that Mr. Burger's time shaving was not done to any

11   other employees other than the ones -- than the ones

12   that specifically came to you?

13   A.    The rest are part-timers.

14   Q.    And it's your understanding that the time

16:10:06 15  shaving only occurred to full-time employees?

16   A.    Possibly.

17   Q.    What do you -- what did you base that

18   assumption on?

19   A.    Because it was the night crew that was

16:10:14 20  working anywhere from four-and-a-half to

21   seven-and-a-half-hour shifts.

22   Q.    Was it your understanding that the time

23   shaving that Mr. Burger did was only as to the

24   longer shifts?  In other words, not the

1:10:28 25  four-and-a-half-hour shifts?

**Verbatim** ■

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | A.   That's all we isolated was the longer shifts.           |
| 2     | Q.   Did you look for more?                                   |
| 3     | A.   No.                                                      |
| 4     | Q.   How long were you a store manager?                       |
| 5     | A.   With Dollar Tree?                                         |
| 6     | Q.   Yes.                                                      |
| 7     | A.   May 31st of '05 to probably end of October of            |
| 8     | '06.                                                          |
| 9     | Q.   Approximately a year and a half?                         |
| 10    | A.   Correct.                                                 |
| 11    | Q.   And is Roseland the only store you were a                |
| 12    | store manager at?                                             |
| 13    | A.   Healdsburg.                                              |
| 14    | Q.   Healdsburg.  Sorry.  Healdsburg the only                 |
| 15    | store?                                                        |
| 16    | A.   Both.  Healdsburg and Roseland.                          |
| 17    | Q.   Can you give me the time frame on that,                  |
| 18    | which -- which --                                             |
| 19    | A.   Healdsburg first.                                        |
| 20    | Q.   So May 31st, '05 --                                      |
| 21    | A.   To the end of August of that same year.                  |
| 22    | Q.   And then from August of '05 to approximately             |
| 23    | October of '06 --                                             |
| 24    | A.   Correct.                                                 |
| 25    | Q.   -- you were at Roseland?                                 |

16:11:03 — 5
16:11:26 — 10
16:11:36 — 15
16:11:43 — 20
11:57 — 25

**Verbatim** ■

1    A.    Yes.

2    Q.    During any of your time as a store manager,

3 did you make additions to punches that were not made

4 by employees?

16:12:15    5    A.    Only if they stated what needs to be punched

6 in and out.

7    Q.    So when there was a missing punch, you added

8 a punch?

9    A.    Possibly I'm talking to that associate or

16:12:30   10 finding out from the assistant or looking -- looking

11 on somebody that clocked out at the same time that

12 store manager assistant might have left.

13    Q.    So when you made punch changes for missing

14 punches, you did so when you had satisfied yourself

16:12:49   15 that you had some reasonable basis for the punch

16 entry you were making; is that fair?

17    A.    If it was correct, yes.

18    Q.    What do you mean, "if it was correct"?  Maybe

19 you didn't understand my question.  Let me reask it.

16:13:05   20 We're probably talking about the same thing, but

21 let's clear it up.

22          When you supplied a missing punch to an

23 employee's payroll record, you did so only when you

24 had satisfied yourself as to the reasonableness of

.:13:23   25 the punch addition you were making?

**Verbatim** ∎

                1       A.   No.   It was what the employee's needs were.

                2    If they worked what they worked, that's when I put

                3    it in.   It wasn't up to me where I wanted to put it.

                4       Q.   But you satisfied yourself prior to making --

16:13:38        5    you didn't just guess --

                6       A.   Oh, no.

                7       Q.   -- when it came to supplying a missing punch?

                8       A.   Oh, no.   No.   Right.   No.   No.   Absolutely

                9    not.

16:13:43       10       Q.   Okay.   So you had some reasonable basis in

               11    your mind for making the punch changes for missing

               12    punches?

               13       A.   Yes.

               14       Q.   And sometimes it's because an employee would

16:13:53       15    tell you?

               16       A.   Leave notes.   They'd sign the time clock

               17    worksheet.

               18       Q.   How else would you know?

               19       A.   Verbal.   Another associate.

16:14:04       20       Q.   You could say, you know, "Hey, Bob, you know,

               21    did you happen to see when Mary left?"

               22       A.   Or you could actually go back on cameras and

               23    see what time they left the building.

               24       Q.   Did you do that?

14:15          25       A.   Couple times.   Sure.

## Verbatim ∎

1    Q.  During the portions of your testimony today

2   in which you've discussed making punches to employee

3   time within the Compass system, the -- my

4   understanding of your testimony is that you've only

17:06:52  5   referred to punching missing punches; is that

6   correct?

7    A.  As a -- as a D.M.?  Store manager?

8    Q.  As a -- when you were à store manager.  When

9   you supplied punches, you did so to missing punches

17:07:06 10  only?

11    A.  I don't recall if it was missing punches or

12   clocking out.

13    Q.  What I mean by missing punches is -- so we're

14   on the same page -- is that an employee comes in and

17:07:25 15  clocks in, clocks in a break, clocks out on a break,

16   clocks in a lunch, then goes back to work and never

17   clocks out of lunch.  In other words, never

18   indicates on their punches that their lunch ended.

19      You, as a store manager, would need to add a

17:07:43 20  punch for the end of lunch in order for that payroll

21   to be processed; correct?

22    A.  Or another assistant manager could have done

23   it.  Correct.

24    Q.  Someone would need to add a missing punch, or

07:55 25  it couldn't be submitted?

1      A.   Correct.

2      Q.   In fact, it was color-coded to indicate

3  there's a missing punch here, action must be taken?

4      A.   Correct.

17:08:02  5      Q.   Other than supplying missing punches, were

6  there ever any other occasions that you would supply

7  punches to the Compass system?

8      A.   Not that I recall.  Just, you know, normal

9  punch in and punch out.

17:08:12 10      Q.   Missing punches?

11      A.   Correct.

12      Q.   So there was no occasion that you had as a

13  store manager in which you changed an employee punch

14  from something the employee had input themselves to

17:08:24 15  something different?

16      A.   Not that I can recall.

17      Q.   Do you have any understanding one way or the

18  other whether any of the assistant managers working

19  under you, while you were a store manager, made any

17:08:48 20  changes at all to employee punches that had been

21  input by the employee?

22      A.   Not to my knowledge.

23      Q.   Would you approve of that?

24      A.   Of course not.

08:58 25      Q.   Why not?

```
 1        A.   Because it's not right.  They need to get
 2   paid for what they worked.
 3        Q.   Do you have any understanding as to the
 4   reason that Dollar Tree's cashiers are typically
 5   scheduled below five hours?
 6        A.   Why they are?
 7        Q.   Yes.
 8        A.   Just four-and-a-half-hour shifts is what the
 9   company guidelines are.
10        Q.   Do you understand that when an employee works
11   over five hours, they're entitled to a meal period?
12        A.   Of course.
13        Q.   So is it your understanding that one of the
14   legitimate business purposes of scheduling an
15   employee to work four and a half hours is to avoid
16   having to provide them with a meal period?
17             MS. MCCLAIN:  Objection.  Lack of foundation.
18             THE WITNESS:  Never thought of it that way.
19   In all the years of retail, I've never thought of it
20   that way.
21   BY MR. FIETZ:
22        Q.   Who's Tonya Burger?
23        A.   That's Jerry.  Store manager.
24        Q.   That's --
25        A.   Jerry Burger.
```

**Verbatim** ■

1    Q.    Tanya --

2    A.    That was the store manager at 2262.

3    Q.    And Tanya was his first name, and he went by

4    Jerry or --

17:10:23   5    A.    Yeah.  Well, his -- well, Tanya is his name,

6    but he went by Jerry.  Correct.

7    Q.    Who is Linda Bailey?

8    A.    Jerry's assistant at 2262.

9    Q.    No longer Jerry's assistant; right?

17:10:56  10    A.    She's no longer with us, either.

11    Q.    Why is that?  If you know.

12    A.    When -- when Jerry left, she left.  Jerry

13    brought her aboard.

14    Q.    Who is Janie Wu?

17:11:11  15    A.    Assistant at 2162.  Or I'm sorry.  2168.

16    Felice's store.

17    Q.    Raymond Solis?

18    A.    He's the assistant manager at 1845.

19    Q.    How about Jo Lynch?

17:11:39  20    A.    No longer with us.  She was the assistant at

21    2262.

22    Q.    And do you have any understanding as to why

23    she left the employment of Dollar Tree?

24    A.    She was let go due to post void fraud.

12:03  25    Q.    She was found to have been violating Dollar

# Verbatim  ■

 1    A.   What was it?

 2         MS. MCCLAIN:  Don't guess.

 3         THE WITNESS:  I don't recall.  Yeah.

 4  BY MR. FIETZ:

17:13:55   5    Q.   Jessica Lopez?

 6    A.   She was an assistant at Willits.  Transferred

 7  to Sacramento.

 8    Q.   Still working for Dollar Tree; do you know?

 9    A.   I'm not sure.

17:14:12  10    Q.   Jorge Trejo?

11    A.   Still with us.

12    Q.   Where does he work?

13    A.   2162.

14         MS. MCCLAIN:  May I have the spelling on that

17:14:25  15  name?

16         MR. FIETZ:  Jorge, J-o-r-g-e, Trejo,

17  T-r-e-j-o.

18    Q.   He's an assistant manager at 2162?

19    A.   Yes.

17:14:36  20    Q.   As you sit here today, can you think of any

21  good reason why there would be a management person

22  going into the Compass system, changing a punch that

23  had been made by the employee, which would result in

24  a subtraction of employee time?  Can you think of

15:13  25  any good reason for that to occur?

```
  1              MS. MCCLAIN:   Objection.  Calls for
  2   speculation.
  3              THE WITNESS:   No.
  4              MS. MCCLAIN:   Lack of foundation.
  5   BY MR. FIETZ:
  6      Q.   The answer is no?
  7      A.   No.
  8      Q.   If you learned that different managers of
  9   different stores had engaged in time shaving, do you
 10   have any idea how it is that they would all come up
 11   with that same idea?
 12              MS. MCCLAIN:   Objection.
 13              THE WITNESS:   No.
 14              MS. MCCLAIN:   Compound.  Rick, hang on.
 15   Compound.  Lack of foundation.  Calls for
 16   speculation.  That's an impossible question.
 17   BY MR. FIETZ:
 18      Q.   Are you aware of any conspiracy between store
 19   managers, discussions between store managers, along
 20   the lines of, "Hey, let's shave some employee time"?
 21      A.   Am I aware of it, no.  If I was, I wouldn't
 22   allow it.
 23      Q.   When was the first time that you met
 24   Ms. McClain?
 25      A.   Maybe a month ago, if that.
```

17:15:42 10
17:15:54 15
17:16:09 20
16:41 25

**Verbatim** ■

1    time.

2    BY MS. MCCLAIN:

3        Q.    Right.    You were thinking about it in terms

4    of changing time that had actually been worked;

17:34:41  5    correct?

6        A.    Sure.    Yes.

7            MR. FIETZ:    Objection.    Leading.    Misstates

8    testimony.

9    BY MS. MCCLAIN:

17:34:45 10        Q.    However, are there situations where an

11    employee punches in late, for example, and says to

12    the store manager, "I punched in late, but I really

13    started working a half an hour ago"?

14        A.    Yes.

17:34:59 15        Q.    Has that ever happened to you?

16        A.    Yes.

17        Q.    In that situation, is it proper and necessary

18    for the store manager to correct the punch to

19    reflect the actual time worked?

17:35:09 20        A.    Absolutely.

21        Q.    Is it correct, then, that it's your rule of

22    thumb that punches have to reflect the actual time

23    worked?

24        A.    Yes.

35:19 25        Q.    If changes have to be made to make that

**Verbatim** ∎

1   reflection, those changes are proper; is that right?

2        A.   Yes.

3             MR. FIETZ:   Objection.   Leading.

4   BY MS. MCCLAIN:

17:35:27   5        Q.   And are there circumstances when such changes

6   would be proper, in your experience?

7        A.   No.

8        Q.   If the change is to actually reflect time

9   worked?

17:35:41  10        A.   Oh, yes.   Yes.   Most definitely, they should

11   be corrected.

12        Q.   Are we talking about the same thing, that is,

13   are there times when the manager edits time to make

14   sure that all time is paid for, as opposed to just

17:35:58  15   supplying the same functions?

16        A.   Yes.   Yes.

17        Q.   Can you give me an example of that?

18        A.   The computer goes down and time clock

19   worksheet is filled out.   Like I said, sometimes

17:36:12  20   they leave it on 3 by 5 cards, forgot to punch, this

21   is the time, leave it right for the store manager,

22   they -- they edit it.   Something that's been

23   associate-written, instructed to.

24        Q.   What about a situation where somebody just

:36:28  25   makes a mistake in a punch?   Has that ever happened?

1    I punched in at 10:00, but I really started working

2    at 9:30?

3        A.    Yes.

4        Q.    What is the store manager's obligation in

17:36:40  5    that situation?

6        A.    Pay that employee.

7        Q.    And to change the punch to reflect it?

8        A.    Yes.

9        Q.    What about the reverse?  What about a

17:36:48  10    situation where an employee says, "I punched out at

11    11:00, but I really stopped working at 10:30.  I

12    made a mistake and delayed punching out"?  Has that

13    ever happened?

14        A.    They said they stopped working at 10:30 and

17:37:05  15    punched out at 11:00?  Not to my knowledge.

16        Q.    If you observed that situation, and -- would

17    you make such a change?

18        A.    To correct the punch to reflect the time

19    worked, yes.

17:37:22  20        MS. MCCLAIN:  I have no further questions.

21    Thank you.

22        MR. FIETZ:  I have a quick follow-up.  We can

23    do this all night, unfortunately.  But, no.  I'm

24    kidding.  I only have a couple more questions.

25    ///

**Verbatim** ■

```
 1                    FURTHER EXAMINATION

 2    BY MR. FIETZ:

 3        Q.   You indicated, in answering one of the last

 4    couple of questions, that you're not aware of any

 5    time when someone punched out and punched out later

 6    than they actually stopped working.  In fact, in

 7    order to make a punch, you actually have to be there

 8    in person and typing at the computer; correct?

 9        A.   Yes.

10        Q.   In other words, an employee --

11             MS. MCCLAIN:  Excuse me, Jeremy.  Just a

12    second.

13             Can I have the question read back.  The

14    initial question.

15             (The record was read.)

16    BY MR. FIETZ:

17        Q.   And the answer was correct?

18             MS. MCCLAIN:  Objection.  I think you

19    misstated the record, Jeremy.  We need to look at

20    the record.  I don't think that was the question and

21    answer.  So, objection.  Misstates the record.

22    BY MR. FIETZ:

23        Q.   Well, let's clear up the record.  It's my

24    understanding that when Ms. McClain asked you if you

25    were aware of any circumstance in which someone had
```

17:37:48 5
17:38:05 10
17:38:28 15
17:38:37 20
:38:50 25

**Verbatim** ■

1    clocked out at 10:00 but actually said, "Hey, you

2    know what, I stopped working at 9:30," you're not

3    aware of such a circumstance occurring?

4        A.    No.

17:39:07    5        Q.    That's correct?

6        A.    Yeah.

7        Q.    Yes?

8        A.    Yes.

9        Q.    And, again, as I indicated earlier, and we'll

17:39:19    10    clear up the record here, in order to make a time

11    punch in Compass or the prior system, the employee

12    has to be there in person; correct?

13        A.    Correct.

14        Q.    So an employee can't stop working at the end

17:39:29    15    of the day, go home, and then make a punch later on;

16    right?

17            MS. MCCLAIN:    Objection.    Lack of foundation.

18            THE WITNESS:    No.    They can.    Without -- it

19    would show worked till that period they punched back

17:39:42    20    in.

21    BY MR. FIETZ:

22        Q.    I mean, they would have to be in the store.

23    So in order for a punch at the end of the day to

24    reflect a time later than they stopped working,

:39:57    25    they'd have to stop working and then come back to

**Verbatim** ■

1  the store at some later time to do a punch?

2         MS. MCCLAIN:  Objection.  Lack of foundation.

3         THE WITNESS:  If I understand the question

4  right, if somebody doesn't punch the time clock and

17:40:10  5  they go home, they could come back the next day and

6  it still would be accumulating their time.

7  BY MR. FIETZ:

8     Q.   Okay.  I see.

9     A.   Is that the question you were asking?

17:40:19  10     Q.   Yeah.

11     A.   Okay.

12     Q.   So, in other words, they can't -- they can't

13  punch out from home?

14     A.   No.

17:40:23  15     Q.   And, similarly, at the beginning of the day,

16  if a start shift punch indicates that someone

17  started their shift at 9:00 A.M., while it is

18  possible that they could have been there earlier

19  than that but punched in late -- first of all, we

17:40:41  20  agree that's possible; right?

21     A.   Yes.

22     Q.   And it's perfectly reasonable for a manager

23  to add the extra half hour if they were working a

24  half hour before they punched in; correct?

:40:51  25     A.   Yes.

**Verbatim**  ■

1    Q.   But the reverse is not true, is it?   Because

2    if you punched in at 9:00, obviously, you were there

3    at the store, and so it's not possible that you

4    didn't come in until 9:30 if your punch indicates

17:41:07  5    that you were there at 9:00; is that fair?

6          MS. MCCLAIN:   Objection.   Lack of foundation.

7    Calls for speculation.

8          THE WITNESS:   I think so.   Sure.

9          MR. FIETZ:   I don't have anything further.

10   Thank you.

11         THE WITNESS:   Unless somebody else had their

12   number that were punching them in.   That's happened.

13   BY MR. FIETZ:

14   Q.   It's your understanding that that's a rarity?

17:41:23  15   A.   Yes.

16         MR. FIETZ:   Thank you.   Nothing further.

17         THE VIDEOGRAPHER:   Okay.   This concludes

18   today's proceeding in the deposition of Richard

19   Tellstrom.   The number disks used is five.   We are

17:41:35  20   now going off the record.   The time is 5:43.

21         THE REPORTER:   Mr. Fietz, do you need a copy

22   of the transcript?

23         MR. FIETZ:   Of course.   Please.

24         (Whereupon, the deposition proceedings

25          were concluded at 5:42 P.M.)

## Verbatim ■

A COMPUTERIZED REPORTING SERVICE
(707) 575-1819 • (800) 634-4311 • FAX (707) 575-8541

305

1    STATE OF CALIFORNIA )
                          )
2    County of Sonoma   . )

3

4          I, BRENDA L. MARSHALL, holding CSR License

5    No. 6939, a Certified Shorthand Reporter, licensed

6    by the State of California, hereby certify that,

7    pursuant to Notice to take the foregoing deposition,

8    said witness was by me duly sworn to tell the truth,

9    the whole truth and nothing but the truth in the

10   within-entitled cause; that the testimony of the

11   said witness was recorded by me by stenotype, and

12   that said deposition was, under my direction

13   thereafter, reduced to computer transcript and, when

14   completed, was available to said witness for

15   signature before any Notary Public.

16         I further certify that I am not of counsel or

17   attorney for either of the parties to said

18   deposition, nor in any way interested in the outcome

19   of the cause named in the caption.

20         IN WITNESS WHEREOF, I have hereunto set my

21   hand this 27th day of November, 2007.

22

23

24   _____
     BRENDA L. MARSHALL
     Certified Shorthand Reporter
25   California License 6939



**Verbatim**

A COMPUTERIZED REPORTING SERVICE
(707) 575-1819 · (800) 634-4311 · FAX (707) 575-8541                    307

**EXHIBIT B**

> Associate can **not** clock in for another associate.

### Time Adjustments
> Changes to an associate's time record may occur only if there is a discrepancy between the actual time worked and what company records indicate.
> Adjustments to any time clock records may not be made without proper verification, including notifying the associate.
> Changes to the "Time Clock Worksheet" must be noted on the worksheet and the associate initial the change.
> Any associate who enters time for another associate, changes their own time or falsely records time worked will be subject to disciplinary action up to and including termination.

### Overtime
> All non exempt associates must be paid overtime for working any amount of time over 40 hours.
> If a state has a more restrictive policy the state policy will be followed.
> Overtime will be paid in the regular payroll cycle for the week in which it occurred.
> Non exempt associates may not be compensated in any other way such as compensatory time.
> Associates are not permitted to work off the clock.
> If an associate was not authorized to work overtime hours, they must be paid for all time worked, but will be counseled per company guidelines and disciplined if appropriate.

## Payroll Responsibilities

### Management Responsibilities
> Must communicate "Time Keeping" policy to all associates.
> Must enter associates into Lawson HR system prior to the day they begin work.
> Verify and resolve time discrepancies with associates prior to making adjustments and approving time record.
> Daily review and correct any time punch errors.
> Prior to the designated cut off time, all punch errors must be corrected, PTO approved, and approved time off entered.
> Failure to correct and approve payroll by the cut-off deadline will result in payroll not being processed for the store and the appropriate disciplinary action will be taken.

### Store Manager's Responsibilities
> Assistant Managers can not edit or approve their own time.
> Store Manager is the only store management associate who can approve payroll.
> Payroll must be approved each week. It can be approved as early as close of business on Saturday or as late as Monday by 9:30 AM, your local time.
> A Report will be sent to the District Manager, Regional Director and Regional Staff for those stores who have not approved payroll.
> If Manager is on vacation or not available their DM, Regional HR or Regional Director must approve payroll.
> Store Manager must delegate payroll approval to their DM. If store changes district, delegation must be changed to the new District Manager.

### Associates Responsibilities
> Must accurately record all time worked.
> Obtain prior approval for clocking in before or after their scheduled shift.
> Clock in and out for all breaks and rest periods.
> Clock in and out on the designated time clock.
> Never clock in and out other associates.
> Report to management in a timely manner any discrepancies in their paycheck.
> Request Paid Time Off (PTO) in advance or sick time as it occurs.
> **Do Not** work before punching in or after punching out.
> **Do Not** work outside your scheduled time before getting approval.

3


DEF EXHIBIT *13*
Brenda L. Marshall
CSR No. 6939
Date: 11-13-07
Witness:
TELLSTROM

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL A. CRUZ, and JOHN D. )
HANSEN, individually, and on )
behalf of all others similarly )
situated, )
                             )
           Plaintiffs, )
                             )
vs. )  Case No: C07-02050 SC
                             )
                             )
DOLLAR TREE STORES, INC., )
                             )
           Defendant. )
_____ )

**COPY**

DEPOSITION OF JOHN D. HANSEN
VOLUME II

DATE:              Thursday, November 1, 2007

TIME:              9:32 a.m.

LOCATION:      Kauff, McClain & McGuire
                     One Post Street,  26th Floor
                     San Francisco, California 94104

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

Reported By:  Linda Vaccarezza, RPR, CSR #10201

292

```
 1                        APPEARANCES

 2

     FOR THE PLAINTIFFS, CRUZ AND HANSEN:
 3

                       EDGAR LAW FIRM
 4                     BY:  JEREMY R. FIETZ, ESQUIRE
                       408 College Avenue
 5                     Santa Rosa, CA  95401
                       (707) 545-3200
 6

 7

 8       FOR THE PLAINTIFF, ROBERT RUNNINGS:

 9                     SCOTT COLE & ASSOCIATES
                       BY:  CARRIE LIN, ESQUIRE
10                     1970 Broadway, Ninth Floor
                       Oakland, California  94612
11                     (510) 891-9800

12

13       FOR THE DEFENDANT:

14                     KAUFF, MCCLAIN & MCGUIRE, LLP
                       BY:  MAUREEN E. MCCLAIN, ESQ.
15                     One Post Street, Suite 2600
                       San Francisco, CA  94109
16                     (415) 421-3111

17

18

19       FOR THE DEFENDANT:

                       WILLIAMS MULLEN
20                     BY:  BETH HIRSCH BERMAN, ESQUIRE
                       999 Waterside Drive, Suite 1700
21                     Norfolk, Virginia 23510
                       (757) 629-0604
22

23

24

25       VIDEOGRAPHER:    Gene Frye
```

|    |    |    |
|----|----|----|
| 1  | A    Yeah.   Let me think of what I had to do | 09:42:49a |
| 2  | last week.   I was so tired, I can't even | 09:42:54a |
| 3  | remember, because that overnight really threw my | 09:43:11a |
| 4  | -- because I had to open Sunday, go home, get an | 09:43:15a |
| 5  | hour's sleep, go to Lakeport, get an hour's | 09:43:19a |
| 6  | sleep.   Close Monday night, open Tuesday | 09:43:25a |
| 7  | morning.   And those are the days that I do most | 09:43:29a |
| 8  | of my work that I'm supposed to be doing in the | 09:43:36a |
| 9  | office. | 09:43:38a |
| 10 | So I know right now I'm doing a lot of | 09:43:39a |
| 11 | the work, looking for the hours that are missing | 09:43:45a |
| 12 | off these people's checks from -- before I got | 09:43:50a |
| 13 | there.   So that's a different circumstance or | 09:43:53a |
| 14 | situation that I'm trying to take care of. | 09:43:59a |
| 15 | But other than that -- so I can't | 09:44:02a |
| 16 | honestly recall. | 09:44:05a |
| 17 | Q    Looking at a calendar for October of | 09:44:08a |
| 18 | 2007, is it correct that the Sunday-Monday we are | 09:44:20a |
| 19 | talking about is October 21st and 22? | 09:44:23a |
| 20 | A    Yes.   Yes.   Yeah.   It looks right.   Days | 09:44:28a |
| 21 | seem to be running together for me right now. | 09:44:47a |
| 22 | Sorry. | 09:44:49a |
| 23 | Q    Your testimony was, then, that last | 09:44:49a |
| 24 | week, and even extending to the present time, you | 09:44:55a |
| 25 | have been spending a good deal of your time | 09:44:57a |

| | | |
|---|---|---|
| 1 | reviewing payroll issues; is that right? | 09:45:00a |
| 2 | A    Yeah.  There are -- it's kind of an | 09:45:04a |
| 3 | extraordinary issue of -- of just these people -- | 09:45:07a |
| 4 | looks like hours were cut from them.  And so... | 09:45:12a |
| 5 | Q    This is a situation you told me about | 09:45:14a |
| 6 | involving your examination of payroll reports | 09:45:16a |
| 7 | that Mr. Berger was responsible for, correct? | 09:45:20a |
| 8 | A    True.  Correct. | 09:45:22a |
| 9 | Q    Have you ever spoken to Mr. Berger about | 09:45:23a |
| 10 | those issues? | 09:45:25a |
| 11 | A    Actually, no.  I've made it kind of -- | 09:45:26a |
| 12 | didn't want to talk to him after I found all | 09:45:29a |
| 13 | this. | 09:45:32a |
| 14 | Q    You've reported it to the company, | 09:45:33a |
| 15 | correct? | 09:45:34a |
| 16 | A    I reported it to Rick, yes.  And what | 09:45:34a |
| 17 | he's -- and now I'm talking to Pat Doss about it. | 09:45:36a |
| 18 | Q    Ms. Doss is in payroll in Virginia, | 09:45:40a |
| 19 | correct? | 09:45:43a |
| 20 | A    Yes. | 09:45:44a |
| 21 | Q    Is it correct that Ms. Camp came out to | 09:45:45a |
| 22 | investigate the situation at your store? | 09:45:48a |
| 23 | A    Well, she came out Tuesday and asked for | 09:45:49a |
| 24 | some records, and that's all.  She asked me if I | 09:45:56a |
| 25 | had any questions or anything.  But that was | 09:46:00a |

309

| | | |
|---|---|---|
| 1 | A    For the truck, it's quick.  The stockers | 10:32:17a |
| 2 | know that it's going to be flexible.  So I make | 10:32:25a |
| 3 | the schedule the same every week.  And then when | 10:32:27a |
| 4 | we -- we don't get it until Monday morning and | 10:32:29a |
| 5 | the truck is coming on Wednesday.  So Monday | 10:32:33a |
| 6 | morning I know when the truck is coming. | 10:32:35a |
| 7 | And, in fact, I don't even talk to -- | 10:32:38a |
| 8 | what's his name -- Leonardo -- there goes my | 10:32:46a |
| 9 | memory again -- until Tuesday, and we just make a | 10:32:53a |
| 10 | quick -- and usually he even takes care of it. | 10:32:56a |
| 11 | He knows what to look for and things like that. | 10:32:59a |
| 12 | And then we usually bring in people.  He | 10:33:01a |
| 13 | comes in the morning with one person, and we | 10:33:03a |
| 14 | bring the rest in a half an hour after the truck | 10:33:06a |
| 15 | comes in. | 10:33:08a |
| 16 | Q    My question really went to your | 10:33:09a |
| 17 | scheduling review throughout the week, not just | 10:33:12a |
| 18 | related to when freight arrives. | 10:33:14a |
| 19 | How much time do you think you spend, on | 10:33:16a |
| 20 | any given day, looking at the schedule, | 10:33:17a |
| 21 | considering unforeseen circumstances, making | 10:33:19a |
| 22 | adjustments? | 10:33:22a |
| 23 | A    Couple minutes.  It's not that much.  I | 10:33:26a |
| 24 | think when you're looking at one day, you have a | 10:33:29a |
| 25 | lot more clarity than looking at a whole week and | 10:33:31a |

| | | |
|---|---|---|
| 1 | duties will be affected by the volume of the | 10:46:52a |
| 2 | store, the sales volume of the store? | 10:46:55a |
| 3 | MR. FIETZ:  Objection.  Vague. | 10:46:57a |
| 4 | BY MS. MCCLAIN: | 10:46:59a |
| 5 | Q    Do you understand that the busier the | 10:46:59a |
| 6 | store, the more work you have in scheduling, for | 10:47:01a |
| 7 | example? | 10:47:04a |
| 8 | A    It just seems to be -- you know, once | 10:47:04a |
| 9 | you have a set template of what you're going to | 10:47:19a |
| 10 | do with a store, it just seems to follow with | 10:47:22a |
| 11 | that.  It's not really anything changing -- I | 10:47:25a |
| 12 | would say, yes, there's going to be more | 10:47:26a |
| 13 | scheduling, you're going to schedule more people, | 10:47:29a |
| 14 | things like that. | 10:47:32a |
| 15 | But everything is done -- basically, you | 10:47:33a |
| 16 | can do a road map of what you're going to do. | 10:47:36a |
| 17 | And on busy days, you can add somebody here and | 10:47:40a |
| 18 | take somebody away there to save it. | 10:47:43a |
| 19 | So, yeah, different stores are going to | 10:47:45a |
| 20 | have different road maps.  But once you have the | 10:47:49a |
| 21 | road map, you're just going to pretty much repeat | 10:47:51a |
| 22 | that road map. | 10:47:54a |
| 23 | Q    Did you find that you had more | 10:47:55a |
| 24 | personnel-related functions in 1868 because it | 10:47:57a |
| 25 | was busier?  Did you have more people, for | 10:48:00a |

| | | |
|---|---|---|
| 1 | had deleted time from Tina Toler's work records? | 03:23:26p |
| 2 | A    I mean, I don't remember ever doing it, | 03:23:31p |
| 3 | period.  So... | 03:23:35p |
| 4 | Q    So if you didn't do it, you wouldn't | 03:23:36p |
| 5 | have discussed it, correct? | 03:23:38p |
| 6 | A    Correct. | 03:23:39p |
| 7 | Q    Did you ever delete time from Tina Toler | 03:23:39p |
| 8 | or anyone else's time records in front of | 03:23:45p |
| 9 | Ms. Lofquist? | 03:23:47p |
| 10 | A    I don't -- | 03:23:53p |
| 11 | Q    I mean, taking away time that was | 03:23:54p |
| 12 | actually worked? | 03:23:56p |
| 13 | A    I don't recall doing -- I don't remember | 03:23:57p |
| 14 | ever doing that.  I mean, I think the only thing | 03:24:02p |
| 15 | that I remember doing is the overtime thing.  I | 03:24:09p |
| 16 | don't remember because I didn't want to get into | 03:24:11p |
| 17 | the issue.  Because when I got to Dollar Tree, | 03:24:14p |
| 18 | there seemed to be a lot of issues of people of | 03:24:18p |
| 19 | time shaving, of things that I heard, and I never | 03:24:23p |
| 20 | wanted to get into that kind of a problem.  So I | 03:24:26p |
| 21 | remember thinking that wasn't something that I | 03:24:30p |
| 22 | really wanted to get into. | 03:24:33p |
| 23 | Q    You told me on the first day of your | 03:24:34p |
| 24 | deposition that you had heard rumors and hearsay | 03:24:46p |
| 25 | that DMs were altering time, but that you had no | 03:24:48p |

```
 1   factual knowledge to that effect.              03:24:51p

 2        Do you recall that testimony?             03:24:53p

 3   A    Yes.                                       03:24:55p

 4   Q    Is that what you're referring to, these   03:24:56p

 5   rumors and hearsay, when you say that there seem  03:25:04p

 6   to be a lot of people shaving time?            03:25:07p

 7   A    Well, no, these were actual people        03:25:09p

 8   talking about it a lot.                        03:25:13p

 9   Q    People talked to you, when you first got  03:25:15p

10   to Dollar Tree, about shaving time, but you never  03:25:18p

11   observed it --                                 03:25:24p

12   A    I never physically observed it being      03:25:26p

13   done.  But there was numerous complaints of    03:25:28p

14   people noticing hours missing off their checks.  03:25:33p

15   Q    Did you ever investigate any of those     03:25:37p

16   complaints?                                    03:25:39p

17   A    At the time, I didn't have the capacity   03:25:39p

18   to.                                            03:25:41p

19   Q    Did you ever investigate any of those     03:25:41p

20   complaints?                                    03:25:43p

21   A    No.                                       03:25:43p

22   Q    Do you agree that there can be mistakes   03:25:44p

23   in payroll, honest mistakes?                   03:25:50p

24   A    Honest mistakes, yeah.  I believe it      03:25:52p

25   could be.  Uh-huh.                             03:25:55p
```

536

```
 1            I'm not sure if it was because we were        03:29:09p
 2    more in control, the managers were more in           03:29:11p
 3    control of inputting hours, or whatever.  But it      03:29:13p
 4    was more visible to assistants what was going on      03:29:18p
 5    with the payroll.                                     03:29:22p
 6            So it seemed like those problems might        03:29:23p
 7    have either been remedied or just -- I don't          03:29:28p
 8    know.  They just seemed to be diminishing.            03:29:32p
 9        Q    Compass was a replacement time tracking      03:29:35p
10    payroll system, correct?                              03:29:39p
11        A    Correct.                                     03:29:41p
12        Q    Do you recall what the earlier system        03:29:41p
13    was?                                                  03:29:44p
14        A    I have no clue.                              03:29:44p
15        Q    Were you trained to use the earlier          03:29:45p
16    system?                                               03:29:48p
17        A    No.                                          03:29:49p
18        Q    The only way you used the earlier system     03:29:49p
19    was punching in and out; is that right?               03:29:51p
20        A    Correct.                                     03:29:53p
21        Q    Do you recall when Compass came into         03:29:54p
22    being?                                                03:29:56p
23        A    No.  I don't, actually.                      03:29:56p
24        Q    And, in any event, that's certainly          03:29:58p
25    consistent with your understanding of company         03:30:03p
```

| | | |
|---|---|---|
| 1 | didn't make the change at the time.  I don't | 04:31:32p |
| 2 | know. | 04:31:34p |
| 3 | THE VIDEOGRAPHER:  This concludes Videotape | 04:31:37p |
| 4 | Number 3, Volume 2.  The time is approximately | 04:31:41p |
| 5 | 4:31 p.m.  We are now off the record. | 04:31:44p |
| 6 | (Recess taken from 4:31 p.m. to 4:35 p.m.) | 04:31:46p |
| 7 | THE VIDEOGRAPHER:  This is the beginning of | 04:35:32p |
| 8 | Videotape Number 4 of Volume 2 of the deposition | 04:35:50p |
| 9 | of John Hansen in the case of Miguel A. Cruz and | 04:35:53p |
| 10 | John Hansen versus Dollar Tree Stores, | 04:35:57p |
| 11 | Incorporated, et al.  Today's date is November 1, | 04:36:00p |
| 12 | 2007.  We are now on the record. | 04:36:03p |
| 13 | BY MS. MCCLAIN: | 04:36:06p |
| 14 | Q    Looking at Ms. Kosinski's time, | 04:36:06p |
| 15 | Mr. Hansen, for June 30, 2006? | 04:36:09p |
| 16 | A    Uh-huh. | 04:36:13p |
| 17 | Q    You once again used Rebecca's password | 04:36:14p |
| 18 | and made a change in her start time, correct? | 04:36:20p |
| 19 | A    Made a change in her start time.  Yes. | 04:36:26p |
| 20 | Okay.  From -- | 04:36:31p |
| 21 | Q    She punched in at 11:58, and you changed | 04:36:35p |
| 22 | it to a punch that was three minute later; | 04:36:39p |
| 23 | correct? | 04:36:44p |
| 24 | A    Okay. | 04:36:44p |
| 25 | Q    Agreed? | 04:36:45p |

Preferred Reporters
1-866-372-3376

1      A    Agreed.                                    04:36:47p

2      Q    Did you do that to keep Ms. Kosinski       04:36:49p

3  under five hours or at five hours?                  04:37:01p

4      A    It looks like she was over five hours.     04:37:05p

5      Q    You see you also changed her end shift     04:37:16p

6  time, correct?  She punched out at 17:08, and you   04:37:19p

7  changed it to 17:00, correct?                       04:37:24p

8      A    I mean -- I can't recall why.              04:37:27p

9      Q    Do you agree with me that you made that    04:37:39p

10  change to deprive her of eight minutes?            04:37:42p

11     A    Well, I assume I would have.  For what     04:37:46p

12  reason, I don't know why.  Maybe -- I'm not         04:37:51p

13  sure.  Maybe if she clocked in and out late, I     04:38:00p

14  don't know.  Or, I mean, she clocked in early.     04:38:04p

15  Maybe didn't start to work.                         04:38:07p

16          She used to clock in and would go to the   04:38:09p

17  back and put her stuff away and things like        04:38:12p

18  that.  And maybe I didn't feel that was time       04:38:14p

19  worked, that was -- or something.  I really        04:38:21p

20  honestly don't remember -- couldn't recall why I   04:38:24p

21  did it on this instance.                            04:38:27p

22     Q    The changes in her punches leave her       04:38:30p

23  working precisely five hours, correct, from        04:38:44p

24  12:00 -- or very close to five hours.  From 12     04:38:49p

25  noon to 5:00?                                       04:38:52p

```
 1      A    Yes.   Yeah.   Three hours, 59 -- four        04:38:55p

 2  hours and 59 minutes.                                  04:39:01p

 3      Q    Her actual punches put her a little over      04:39:02p

 4  five hours, correct?                                   04:39:06p

 5      A    Uh-huh.                                        04:39:07p

 6      Q    Yes?                                           04:39:08p

 7      A    Yes.                                           04:39:08p

 8      Q    So the change deprived her of minutes,        04:39:09p

 9  but those minutes brought her to five hours,           04:39:15p

10  correct?                                               04:39:17p

11      A    Yes.                                           04:39:18p

12      Q    Did you do that so that you would have a      04:39:20p

13  record that she had no lunch entitlement, no meal      04:39:24p

14  period entitlement?                                    04:39:27p

15      A    I don't recall.                                04:39:29p

16      Q    Did you ever do that, change an               04:39:29p

17  employee's time taking off just a few minutes so       04:39:32p

18  that it would look like they only worked five          04:39:36p

19  hours?                                                 04:39:38p

20      A    I don't recall if I did that or not.    I     04:39:39p

21  -- you know, all I know is now I don't do things       04:39:42p

22  like that.   I don't remember if I was thinking of     04:39:48p

23  doing stuff like that then.                            04:39:50p

24      Q    When did you stop doing things like           04:39:52p

25  that?                                                  04:39:55p
```

585

| | | |
|---|---|---|
| 1 | be the one that actually went into the system, | 04:45:18p |
| 2 | correct? | 04:45:20p |
| 3 |     A    Sure. | 04:45:20p |
| 4 |     Q    Is that right? | 04:45:20p |
| 5 |     A    Correct. | 04:45:21p |
| 6 |     Q    Ms. Richmond punched out at 13:47 on | 04:45:28p |
| 7 | that same day, correct? | 04:45:36p |
| 8 |     A    Yes. | 04:45:39p |
| 9 |     Q    And you, at the same time that you | 04:45:41p |
| 10 | changed the start shift, made a change in the end | 04:45:45p |
| 11 | shift, correct? | 04:45:50p |
| 12 |     A    Correct. | 04:45:50p |
| 13 |     Q    To take off 17 minutes, correct? | 04:45:52p |
| 14 |     A    Yes. | 04:45:58p |
| 15 |     Q    Why did you make those changes? | 04:45:58p |
| 16 |     A    I don't know. | 04:46:31p |
| 17 |     Q    Do you have any idea? | 04:46:31p |
| 18 |     A    No. | 04:46:37p |
| 19 |     Q    The changes reduced the shift to eight | 04:46:38p |
| 20 | hours, correct? | 04:46:58p |
| 21 |     A    You would have to do the math for me, if | 04:46:59p |
| 22 | that's correct. | 04:47:03p |
| 23 |     Q    Why don't you do the math. | 04:47:04p |
| 24 |     A    Isn't that more than eight hours?  Isn't | 04:47:20p |
| 25 | that -- I mean, if you go from two o'clock to | 04:47:33p |

| | | |
|---|---|---|
| 1 | 1:30, that's, like, you know -- that's 11 hours, | 04:47:39p |
| 2 | isn't it?  Unless there was a long lunch.  I | 04:47:51p |
| 3 | guess. | 04:48:01p |
| 4 | Q    Look at the lunch and calculate that, | 04:48:01p |
| 5 | please. | 04:48:03p |
| 6 | A    Okay.  I guess there was -- two and a | 04:48:03p |
| 7 | half hour lunch.  So it looks like I made it to | 04:48:05p |
| 8 | eight hours, yes.  I'm not sure why she would be | 04:48:22p |
| 9 | working that long. | 04:48:27p |
| 10 | Q    You made it to eight hours by changing | 04:48:29p |
| 11 | the start time and the end time to reduce 18 | 04:48:45p |
| 12 | minutes, correct? | 04:48:55p |
| 13 | A    It looks like it, yes. | 04:48:57p |
| 14 | Q    Were you depriving Ms. Richmond of | 04:49:00p |
| 15 | overtime that she worked on 6/28/2006? | 04:49:05p |
| 16 | A    I honestly can't remember if I was or | 04:49:12p |
| 17 | not.  I don't know. | 04:49:18p |
| 18 | Q    You can't tell from this -- | 04:49:19p |
| 19 | A    I mean, to look at it, yes.  I would | 04:49:21p |
| 20 | have to say just looking at this, I would have to | 04:49:23p |
| 21 | say that's what I was doing.  But I don't know | 04:49:27p |
| 22 | what the circumstances.  Like before, I don't | 04:49:31p |
| 23 | know what the circumstances were. | 04:49:32p |
| 24 | Q    You remember that you did that extremely | 04:49:34p |
| 25 | rarely.  So you would expect there to be other | 04:49:37p |

| | | |
|---|---|---|
| 1 | Q    Looking at Ms. Bassignani's time, | 04:57:00p |
| 2 | please, which is on the second page.  We see that | 04:57:09p |
| 3 | there are some apparent changes on 7/7/2006. | 04:57:24p |
| 4 | That is -- my reference is to time initially | 04:57:34p |
| 5 | entered on 7/7/2006, apparently made by | 04:57:36p |
| 6 | Ms. Murphy on 7/8/2006, correct? | 04:57:40p |
| 7 | A    Uh-huh. | 04:57:43p |
| 8 | Q    Yes? | 04:57:46p |
| 9 | A    Yes. | 04:57:46p |
| 10 | Q    Are you with me? | 04:57:47p |
| 11 | A    Yes. | 04:57:48p |
| 12 | Q    And that's how you would read this | 04:57:48p |
| 13 | document, correct?  That, for example, there is a | 04:57:51p |
| 14 | change in the start lunch punch and -- on 7/7, so | 04:57:53p |
| 15 | that 12 minutes is added to the lunch, correct? | 04:58:00p |
| 16 | A    I'm trying to find it here.  12 minutes | 04:58:06p |
| 17 | added to the lunch.  I'm not seeing that.  But -- | 04:58:27p |
| 18 | oh, wait.  Maybe -- I'm sorry.  I'm looking on | 04:58:29p |
| 19 | the wrong one. | 04:58:31p |
| 20 | Q    It's 4564. | 04:58:32p |
| 21 | A    Okay.  Wait a minute.  Down here.  I was | 04:58:34p |
| 22 | looking at the completely wrong place. | 04:58:36p |
| 23 | Q    It's 7/7/2006. | 04:58:38p |
| 24 | A    Start lunch.  Yes.  Okay.  I see that | 04:58:40p |
| 25 | now. | 04:58:44p |

597

| 1 | Q    So that edit changes the lunch, which | 04:58:45p |
| 2 | had been a 30-minute lunch, to a 42-minute lunch, | 04:58:50p |
| 3 | correct? | 04:58:54p |
| 4 | A    Correct. | 04:58:55p |
| 5 | Q    And do you believe that Ms. Murphy was | 04:59:03p |
| 6 | the person who made that change? | 04:59:05p |
| 7 | A    I don't have any other reason to believe | 04:59:06p |
| 8 | that she didn't. | 04:59:10p |
| 9 | Q    Did you ever direct any assistant | 04:59:11p |
| 10 | manager working for you at 1868 to make edit | 04:59:16p |
| 11 | changes in employees' time to deprive them of time | 04:59:21p |
| 12 | worked or overtime? | 04:59:28p |
| 13 | A    No.  Not that I can recall. | 04:59:30p |
| 14 | Q    Do you have any knowledge that any of | 04:59:32p |
| 15 | your assistant managers ever did that? | 04:59:33p |
| 16 | A    Not that I -- not that I noticed or | 04:59:36p |
| 17 | recall. | 04:59:41p |
| 18 | Q    Did you review the punches and edits | 04:59:41p |
| 19 | that your assistant managers made? | 04:59:51p |
| 20 | A    Not necessarily.  Because if there was | 04:59:53p |
| 21 | no warnings, it wasn't brought to my attention | 04:59:57p |
| 22 | that there was edits made. | 05:00:00p |
| 23 | Q    Didn't you go over everybody's punches | 05:00:03p |
| 24 | and edits before you approved payroll? | 05:00:06p |
| 25 | A    Not in detail, no. | 05:00:09p |

| | | |
|---|---|---|
| 1 | that point.  So I don't remember ever having | 05:07:34p |
| 2 | Lisa's. | 05:07:37p |
| 3 | Q    So on 7/7, if we look at the punches, | 05:07:39p |
| 4 | the first thing that happened is that 12 minutes | 05:07:44p |
| 5 | was added to lunch, correct? | 05:07:46p |
| 6 | A    Yes. | 05:07:48p |
| 7 | Q    And the second thing that happened was | 05:07:48p |
| 8 | that six minutes was taken off the end of the | 05:07:52p |
| 9 | shift, correct? | 05:08:01p |
| 10 | MR. FIETZ:  I apologize, Ms. McClain.  I've | 05:08:13p |
| 11 | gotten off which one we are looking at.  Can you | 05:08:17p |
| 12 | tell me? | 05:08:19p |
| 13 | MS. MCLAIN:  Yes.  We are on 4564, 7/7/2006. | 05:08:20p |
| 14 | Ms. Bassignani's time. | 05:08:27p |
| 15 | THE WITNESS:  I see that. | 05:08:28p |
| 16 | MR. FIETZ:  Thank you. | 05:08:29p |
| 17 | THE WITNESS:  Yes.  Six minutes. | 05:08:30p |
| 18 | BY MS. MCCLAIN: | 05:08:31p |
| 19 | Q    So that's a total of 18 minutes taken | 05:08:31p |
| 20 | off time, correct? | 05:08:38p |
| 21 | A    Yes. | 05:08:39p |
| 22 | Q    And does that reduce the day to 8.5 with | 05:08:42p |
| 23 | .5 for lunch? | 05:08:58p |
| 24 | A    Yeah.  It sounds right. | 05:09:01p |
| 25 | Q    Do you have any factual understanding to | 05:09:06p |

605

| | | |
|---|---|---|
| 1 | tell me whether it is correct or not correct that | 05:09:08p |
| 2 | the edits made, with respect to this time, | 05:09:12p |
| 3 | deprived Ms. Bassignani of overtime to the tune | 05:09:17p |
| 4 | of 18 minutes? | 05:09:24p |
| 5 | A    It appears so. | 05:09:25p |
| 6 | Q    And can you tell me whether there's a | 05:09:29p |
| 7 | legitimate explanation for that situation? | 05:09:31p |
| 8 | A    No, I could not. | 05:09:32p |
| 9 | Q    Do you think there was a legitimate | 05:09:34p |
| 10 | explanation, or would it be total speculation on | 05:09:37p |
| 11 | your part to say one way or the other whether it | 05:09:39p |
| 12 | was legitimate or illegitimate? | 05:09:41p |
| 13 | A    Complete speculation. | 05:09:42p |
| 14 | Q    And you can't tell just by looking at | 05:09:45p |
| 15 | this punch edit report whether it was legitimate | 05:09:47p |
| 16 | or illegitimate, correct? | 05:09:50p |
| 17 | A    No. | 05:09:51p |
| 18 | Q    Is that right? | 05:09:52p |
| 19 | A    Correct. | 05:09:52p |
| 20 | Q    If you look at your time for July 4th, | 05:10:15p |
| 21 | 2006. | 05:10:20p |
| 22 | A    Yes. | 05:10:31p |
| 23 | Q    There is a change in the start shift, | 05:10:32p |
| 24 | correct, adding about 3.6 hours, correct? | 05:10:33p |
| 25 | A    Okay.  Right. | 05:10:39p |

606

| | | | |
|---|---|---|---|
| 1 | A | Uh-huh. | 05:27:51p |
| 2 | Q | Yes? | 05:27:51p |
| 3 | A | Yes. | 05:27:52p |
| 4 | Q | This is a change you made on July 4 at | 05:27:52p |
| 5 | | 12:41, correct? | 05:27:58p |
| 6 | A | Correct. | 05:27:59p |
| 7 | Q | The change you made was to lengthen the | 05:28:00p |
| 8 | | start lunch, correct?  The punch in for start | 05:28:08p |
| 9 | | lunch was 12:16, and you changed it to a start | 05:28:12p |
| 10 | | lunch of 12:00, correct? | 05:28:15p |
| 11 | A | Okay.  Yes. | 05:28:18p |
| 12 | Q | Adding 16 minutes to the lunch time and | 05:28:19p |
| 13 | | hence non-paid time, correct? | 05:28:22p |
| 14 | A | Okay. | 05:28:24p |
| 15 | Q | Yes? | 05:28:25p |
| 16 | A | Yes. | 05:28:26p |
| 17 | Q | Can you tell me why you did that? | 05:28:26p |
| 18 | A | No. | 05:28:29p |
| 19 | Q | Can you tell me whether it was a | 05:28:33p |
| 20 | | legitimate change or an illegitimate change? | 05:28:36p |
| 21 | A | No, I could not. | 05:28:38p |
| 22 | Q | Looking at this, you simply can't tell | 05:28:40p |
| 23 | | me; is that right? | 05:29:01p |
| 24 | A | Correct. | 05:29:02p |
| 25 | Q | Was it the case that from time to time | 05:29:03p |

Preferred Reporters
1-866-372-3376

| | | |
|---|---|---|
| 1 | people took two hour lunches? | 05:29:09p |
| 2 | A    If they needed to work a split shift. | 05:29:12p |
| 3 | Q    Is it right that from time to time | 05:29:17p |
| 4 | employees asked you if they could leave and come | 05:29:19p |
| 5 | back? | 05:29:22p |
| 6 | A    No.  It was usually -- they were asked | 05:29:22p |
| 7 | if someone called in sick. | 05:29:24p |
| 8 | Q    And can you tell whether that's the case | 05:29:27p |
| 9 | here or not? | 05:29:32p |
| 10 | A    It looks to be that she had to work a | 05:29:32p |
| 11 | split shift for some reason or another. | 05:29:35p |
| 12 | Q    Was there ever a case when you -- when | 05:29:36p |
| 13 | employees asked to be able to work a split shift | 05:29:39p |
| 14 | for their own personal convenience? | 05:29:41p |
| 15 | A    I can't recall any, off the top of my | 05:29:44p |
| 16 | head. | 05:29:46p |
| 17 | Q    Do you believe that you made that change | 05:29:46p |
| 18 | to reduce her time that day to eight hours of | 05:30:37p |
| 19 | work time? | 05:30:46p |
| 20 | A    It could have been. | 05:30:47p |
| 21 | Q    You're guessing? | 05:30:48p |
| 22 | A    I'm guessing. | 05:30:49p |
| 23 | Q    You can't actually tell, and you don't | 05:30:51p |
| 24 | know, and you don't recall, right? | 05:30:53p |
| 25 | A    Right. | 05:30:54p |

```
1       A    Correct.                                05:34:37p

2       Q    She failed to punch in for a second      05:34:39p

3   break, correct?                                   05:34:42p

4       A    Correct.                                05:34:42p

5       Q    Either in or out.  And then punched out  05:34:43p

6   for her shift, correct?                           05:34:47p

7       A    Yes.                                     05:34:49p

8       Q    You supplied the missing punches,        05:34:51p

9   correct?                                          05:34:55p

10      A    Correct.                                05:34:55p

11      Q    And did you do so using accurate         05:34:55p

12  information with respect to her break and meal     05:35:00p

13  time?  That is, is the final column of punching,   05:35:03p

14  including your edits, accurate?                    05:35:09p

15      A    I cannot say for sure.                   05:35:11p

16      Q    I thought you told us earlier that you   05:35:14p

17  always attempted to find out the real time, the   05:35:17p

18  actual time worked, before you added missed       05:35:22p

19  punches?                                          05:35:26p

20      A    I tried to, yes.                         05:35:26p

21      Q    So is it your testimony that, from all   05:35:27p

22  appearances, these edits on your part were adding  05:35:31p

23  correct actual time, both break time and work     05:35:37p

24  time?                                             05:35:40p

25      A    Correct.                                05:35:40p
```

| | | |
|---|---|---|
| 1 | Q    If you look at 8/15, please, for | 05:35:41p |
| 2 | Ms. Bassignani on 0025. | 05:35:59p |
| 3 | A    Okay. | 05:36:05p |
| 4 | Q    We see that you increased | 05:36:06p |
| 5 | Ms. Bassignani's lunch time by 20 minutes, | 05:36:15p |
| 6 | correct?  She punched an end lunch at 11:36 and | 05:36:19p |
| 7 | you edited that to have an end lunch 20 minutes | 05:36:24p |
| 8 | later at 11:56, correct? | 05:36:27p |
| 9 | A    Yes. | 05:36:31p |
| 10 | Q    You, therefore, gave her a longer lunch | 05:36:33p |
| 11 | time of unpaid time, correct? | 05:36:35p |
| 12 | A    Correct. | 05:36:37p |
| 13 | Q    Did you do that because she took a | 05:36:38p |
| 14 | longer lunch or did you do that to bring her down | 05:36:42p |
| 15 | to an eight-hour workday? | 05:36:44p |
| 16 | A    It may have been to cut it down.  I | 05:36:47p |
| 17 | don't remember, to be honest. | 05:36:54p |
| 18 | Q    Your answer is, I don't know? | 05:36:55p |
| 19 | A    I don't know.  Yeah. | 05:36:56p |
| 20 | Q    Either one is possible? | 05:36:58p |
| 21 | A    Either one is possible. | 05:36:59p |
| 22 | Q    If you look at Ms. Bassignani on 8/18, | 05:37:01p |
| 23 | please, we see that you made a punch change for | 05:37:22p |
| 24 | the start shift that provided Ms. Bassignani with | 05:37:31p |
| 25 | two more minutes of work, correct?  Her punch in | 05:37:35p |

| | | |
|---|---|---|
| 1 | Q    Correct? | 05:58:58p |
| 2 | MR. FIETZ:  Asked and answered. | 05:58:58p |
| 3 | THE WITNESS:  I'll have to say that was my | 05:58:59p |
| 4 | intention, to be as honest as I could.  And I | 05:59:08p |
| 5 | think, looking at it, you know, I -- I don't know | 05:59:13p |
| 6 | what was going through my mind at that time, you | 05:59:19p |
| 7 | know.  Maybe just excitement of a new job and not | 05:59:22p |
| 8 | trying to -- and trying not to screw up and do | 05:59:29p |
| 9 | things and look at punches and -- | 05:59:32p |
| 10 | BY MS. MCCLAIN: | 05:59:36p |
| 11 | Q    When did the excitement wear off, | 05:59:36p |
| 12 | Mr. Hansen? | 05:59:38p |
| 13 | A    When I -- I don't know.  It just -- when | 05:59:38p |
| 14 | the guilt, maybe, overcame me that I was doing | 05:59:47p |
| 15 | the wrong thing.  I don't know.  I honestly don't | 05:59:50p |
| 16 | know why I started doing it, except for the fact | 05:59:53p |
| 17 | that maybe I wanted to not get in trouble. | 05:59:56p |
| 18 | Q    You're speculating? | 05:59:59p |
| 19 | A    Well, I know that -- | 06:00:00p |
| 20 | Q    Because you don't have any basis for | 06:00:02p |
| 21 | saying you would get in trouble, do you? | 06:00:04p |
| 22 | A    Well, it was always talked about not to | 06:00:05p |
| 23 | have -- not to go over on hours and not to have | 06:00:07p |
| 24 | overtime.  It was a constant thing.  I mean, you | 06:00:09p |
| 25 | see in it all the e-mails from -- not only Rick. | 06:00:12p |

633

| | | |
|---|---|---|
| 1 | I'm sure if we went back from Mike, it was | 06:00:15p |
| 2 | consistent e-mails.  I remember hearing about it | 06:00:18p |
| 3 | all the time, when I was working for Rick. | 06:00:20p |
| 4 | Q    I also see payments for overtime on lots | 06:00:22p |
| 5 | of occasions for lots of different people, | 06:00:25p |
| 6 | including you? | 06:00:27p |
| 7 | A    I understand.  I don't know why I did | 06:00:27p |
| 8 | what I did. | 06:00:32p |
| 9 | Q    Do you have any question, Mr. Hansen, | 06:00:32p |
| 10 | but that you should be fired for this? | 06:00:42p |
| 11 | A    Do I have any question? | 06:00:43p |
| 12 | Q    For making time changes against company | 06:00:46p |
| 13 | policy? | 06:00:48p |
| 14 | MR. FIETZ:  Objection.  Argumentative. | 06:00:49p |
| 15 | BY MS. MCCLAIN: | 06:00:52p |
| 16 | Q    Don't you believe that the changes we | 06:00:52p |
| 17 | have looked at, if they were done for legitimate | 06:00:55p |
| 18 | reasons, is a basis for termination? | 06:00:57p |
| 19 | A    It's a basis for termination.  I would | 06:00:59p |
| 20 | -- yes. | 06:01:03p |
| 21 | Q    So you made a change in Ms. Bassignani's | 06:01:03p |
| 22 | end shift on August 24, correct?  You gave her 30 | 06:01:14p |
| 23 | more minutes, correct? | 06:01:22p |
| 24 | A    The 24th? | 06:01:23p |
| 25 | Q    Yes.  Ms. Bassignani clocked out at | 06:01:30p |

634

| | | |
|---|---|---|
| 1 | A      Correct. | 06:17:30p |
| 2 | Q      You, then, entered at end shift | 06:17:37p |
| 3 | consistent with the time she has written on the | 06:17:39p |
| 4 | time clockwork sheet, correct? | 06:17:42p |
| 5 | A      Uh-huh. | 06:17:44p |
| 6 | Q      Of 12:14; correct? | 06:17:44p |
| 7 | A      Yeah. | 06:17:47p |
| 8 | Q      Then you immediately change that to an | 06:17:49p |
| 9 | end shift of 12:00.  Can you explain why you did | 06:17:52p |
| 10 | that? | 06:17:57p |
| 11 | A      Probably to make it around five hours so | 06:17:58p |
| 12 | I wouldn't have to put an approval of -- | 06:18:05p |
| 13 | Q      Pardon me? | 06:18:12p |
| 14 | A      Probably to make it around five hours so | 06:18:13p |
| 15 | she wouldn't have to take a lunch. | 06:18:16p |
| 16 | Q      Do you speculate that you deprived | 06:18:20p |
| 17 | Ms. Avalos of 14 minutes of pay on 9/28 or for | 06:18:40p |
| 18 | time worked on 9/28? | 06:18:49p |
| 19 | A      Yes.  Unless I added it somewhere else, | 06:18:50p |
| 20 | which I don't know if I did or not. | 06:18:55p |
| 21 | Q      Did anybody ever discipline you or | 06:18:57p |
| 22 | criticize you in any manner for employees working | 06:19:11p |
| 23 | over five hours? | 06:19:13p |
| 24 | A      It was talked about a lot, yes, to keep | 06:19:16p |
| 25 | under five hours. | 06:19:21p |

Preferred Reporters
1-866-372-3376

1        Q    That wasn't my question.  That wasn't my          06:19:25p

2    question.  Generally speaking --                           06:19:30p

3        A    Was I ever written up, is that what               06:19:31p

4    you're asking?                                             06:19:32p

5        Q    Let me finish my question.                        06:19:33p

6        A    Okay.                                             06:19:33p

7        Q    Generally speaking, the rule was try to           06:19:33p

8    keep part-timers under five hours, correct?                06:19:36p

9        A    Correct.                                          06:19:38p

10       Q    And there were times when you had part-           06:19:39p

11   time employees who worked more than five hours,            06:19:43p

12   correct?                                                   06:19:46p

13       A    Yes.                                              06:19:46p

14       Q    Were you ever written up for that?                06:19:49p

15       A    No.                                               06:19:50p

16       Q    Were you ever criticized in any way for          06:19:51p

17   that?                                                      06:19:55p

18       A    Yes.                                              06:19:57p

19       Q    By whom?                                          06:19:57p

20       A    I know Rick does it now; I don't                  06:19:58p

21   remember then.                                             06:20:04p

22       Q    Mr. Tellstrom wasn't the district                 06:20:05p

23   manager in September of 2006, was he?                      06:20:07p

24       A    He may have been the area manager at the          06:20:09p

25   time, but I don't remember.                                06:20:13p

```
 1    I always needed to cover up on -- I felt like        06:22:29p
 2    these were mistakes that I made in not being a       06:22:33p
 3    good manager, I guess, of a store.                   06:22:36p
 4        Q    Every time you did that, did you say to     06:22:39p
 5    yourself, boy, I hope I don't get caught, I'm        06:22:41p
 6    violating company policy?                            06:22:44p
 7        A    I don't remember.                           06:22:45p
 8        Q    Did you have that thought on occasion,      06:22:50p
 9    "I hope I don't get caught"?                         06:22:52p
10        A    No.  I think afterwards -- I remember at    06:22:54p
11    one time thinking -- having a really bad feeling     06:22:59p
12    of what I was doing, but I don't remember.           06:23:04p
13        Q    Because you knew every time you made a      06:23:08p
14    change that interfered with an employee's work or    06:23:11p
15    misrepresented when they took lunch, that you        06:23:15p
16    were violating company policy, correct?             06:23:17p
17        A    Correct.                                    06:23:19p
18        Q    Would you turn to Lisa Murphy, please?      06:23:19p
19        A    Okay.                                       06:23:50p
20        Q    On 9/28.  Ms. Murphy has filled out the     06:23:51p
21    Time Clock Worksheet for 9/28, correct?              06:24:13p
22        A    Uh-huh.                                     06:24:15p
23        Q    Were you using the Time Clock Worksheet     06:24:16p
24    to guide your punch edits for 9/28?                  06:24:22p
25        A    Looks like it's pretty straightforward.     06:24:29p
```

| | | |
|---|---|---|
| 1 | Q    You changed that punch out for lunch, | 06:29:25p |
| 2 | correct? | 06:29:29p |
| 3 | A    Yes. | 06:29:30p |
| 4 | Q    You initially changed it to a punch out | 06:29:31p |
| 5 | starting at 10:00, which would have been an | 06:29:35p |
| 6 | increase in the lunch of an hour and 25 minute; | 06:29:37p |
| 7 | correct? | 06:29:41p |
| 8 | A    Uh-huh. | 06:29:43p |
| 9 | Q    Yes? | 06:29:43p |
| 10 | A    Yes. | 06:29:44p |
| 11 | Q    And you, then, immediately made another | 06:29:44p |
| 12 | change to 10:51? | 06:29:48p |
| 13 | A    Uh-huh. | 06:29:50p |
| 14 | Q    Correct? | 06:29:50p |
| 15 | A    Correct. | 06:29:51p |
| 16 | Q    Which changes the lunch by some 34 | 06:29:51p |
| 17 | minutes, correct? | 06:30:13p |
| 18 | A    Correct. | 06:30:14p |
| 19 | Q    Ms. Kosinski punched out at 17:17, that | 06:30:14p |
| 20 | is 5:17, and you changed the punch out to 4:30 in | 06:30:27p |
| 21 | the afternoon, correct? | 06:30:33p |
| 22 | A    Okay. | 06:30:34p |
| 23 | Q    Thereby reducing another 47 minutes, | 06:30:35p |
| 24 | correct? | 06:30:41p |
| 25 | A    Correct. | 06:30:41p |

```
1        Q    So all told, you -- thereby adding time        06:30:42p
2   to the lunch or reducing time in the end shift,          06:30:50p
3   took away approximately an hour and 20 minutes;          06:30:53p
4   correct?                                                 06:30:56p
5        A    Correct.                                       06:30:56p
6        Q    Why did you do that?                           06:30:57p
7        A    That one looks more likely just to             06:30:58p
8   reduce the overtime.                                     06:31:02p
9        Q    Why do you say that?                           06:31:03p
10       A    It's just the normal punches in and they       06:31:09p
11  are just drastically changed.                            06:31:12p
12       Q    Did Ms. Kosinski ever complain about           06:31:23p
13  this instance?                                           06:31:26p
14       A    Yes.  I -- well, actually, it was              06:31:30p
15  never -- I talked to her about it.  I remember           06:31:33p
16  having a discussion with her about this.                 06:31:36p
17       Q    Did Ms. Kosinski complain about it?  Did       06:31:54p
18  she say, I've looked at my paycheck and it's             06:32:00p
19  missing an hour and 20 minutes or so?                    06:32:03p
20       A    No.  I'm assuming I added it somewhere         06:32:04p
21  else because --                                          06:32:08p
22       Q    Because why?                                   06:32:11p
23       A    Because that was a discussion that I had       06:32:12p
24  with her.                                                06:32:16p
25       Q    How did that discussion arise?                 06:32:18p
```

Preferred Reporters
1-866-372-3376

```
 1      MS. MCCLAIN:  Ms. Reporter, please.           06:38:26p

 2      Q    See that, on October 11, 2006            06:38:28p

 3   Ms. Bassignani had a punch out at 16:16,         06:38:33p

 4   correct?                                         06:38:37p

 5      A    Uh-huh.                                   06:38:37p

 6      Q    So that's 4:16 in the afternoon,         06:38:38p

 7   correct?                                         06:38:43p

 8      A    Yeah.                                     06:38:44p

 9      Q    And you initially reduced that punch out 06:38:44p

10   by nine minutes, correct?                        06:38:55p

11      A    Yes.                                      06:38:56p

12      Q    That reduction brought Ms. Bassignani to 06:38:57p

13   eight hours of work, correct?                    06:39:01p

14      A    Yes.                                      06:39:02p

15      Q    You did that on October 11th, correct?   06:39:03p

16      A    Yeah.                                     06:39:10p

17      Q    That change, which reduced the nine      06:39:11p

18   minutes of overtime.  On October 14, which is,   06:39:14p

19   what, three days later, you made another change, 06:39:17p

20   correct?                                         06:39:20p

21      A    Yes.                                      06:39:20p

22      Q    Restoring the initial punch, thereby     06:39:21p

23   giving Ms. Bassignani nine minutes of overtime,  06:39:25p

24   correct?                                         06:39:28p

25      A    Correct.                                  06:39:28p
```

659

| | | |
|---|---|---|
| 1 | Q    You also filled out a warning notice for | 06:39:28p |
| 2 | Ms. Bassignani for working nine minutes into | 06:39:41p |
| 3 | overtime, correct? | 06:39:44p |
| 4 | A    Correct. | 06:39:44p |
| 5 | Q    So do you think what happened here is | 06:39:45p |
| 6 | you initially deleted the nine minutes and then | 06:39:47p |
| 7 | you said, no, I better discipline her for this, | 06:39:50p |
| 8 | but I better pay her for the time, if I'm going | 06:39:53p |
| 9 | to discipline her? | 06:39:56p |
| 10 | A    Yeah.  In fact, this -- I remember doing | 06:39:56p |
| 11 | this and I thought this was when I stopped.  This | 06:39:59p |
| 12 | is why I thought I had done it only for a short | 06:40:03p |
| 13 | time because I remember thinking this is not | 06:40:06p |
| 14 | right, and I have to stop doing this.  But I | 06:40:09p |
| 15 | guess the fear of losing my job was more than I | 06:40:14p |
| 16 | thought it was. | 06:40:18p |
| 17 | Q    Why wouldn't you be just as afraid of | 06:40:18p |
| 18 | losing your job for violating company policy? | 06:40:22p |
| 19 | A    I don't know.  I guess I didn't feel I | 06:40:25p |
| 20 | was going to get caught for doing it at the | 06:40:27p |
| 21 | time.  And that was it.  I don't know.  I just | 06:40:32p |
| 22 | felt like it wouldn't show up on a report that -- | 06:40:36p |
| 23 | you know, an initial report, that changes were | 06:40:44p |
| 24 | being made or whatever.  So -- | 06:40:47p |
| 25 | Q    Did Ms. Bassignani ever complain to you | 06:41:12p |

1    STATE OF CALIFORNIA    )

2    COUNTY OF SONOMA        )

3        I, LINDA VACCAREZZA, a Certified Shorthand

4    Reporter of the State of California, duly

5    authorized to administer oaths pursuant to

6    Section 2025 of the California Code of Civil

7    Procedure, do hereby certify that

8                   JOHN D. HANSEN,

9        The witness in the foregoing examination,

10   was by me duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the

12   within-entitled cause; that said testimony of

13   said witness was reported by a disinterested

14   person, and was thereafter transcribed under my

15   direction into typewriting and is a true and

16   correct transcription of said proceedings.

17       I further certify that I am not of counsel

18   or attorney for either or any of the parties in

19   the foregoing examination and caption named, nor

20   in any way interested in the outcome of the cause

21   named in said caption.

22       Dated the 14th day of November, 2007.

23       _____

24       LINDA VACCAREZZA, RPR, CSR #10201

25

```
 1                      Preferred Reporters
                        201 E. Watmaugh Road
 2                     Sonoma, California 95476

 3                      November 15, 2007

 4

 5

 6  To:   John D. Hansen
          EDGAR LAW FIRM
 7        ATTENTION::  JEREMY R. FIETZ, ESQUIRE
          408 College Avenue
 8        Santa Rosa, CA  95401

 9  Re:   Cruz, Hansen v. Dollar Tree Store
          Deposition taken on November 1, 2007
10        Reported by Linda Vaccarezza

11  Dear Mr. Hansen,

12       The original transcript of your deposition taken in
    the above-entitled action has been prepared and is
13  available at this office for your reading, correcting and
    signing.
14
         You may wish to discuss this matter with your
15  attorney to determine if counsel requires that the
    original transcript of your deposition be read, corrected
16  and signed by you before it is sealed.

17       Your rights regarding signature of this deposition
    are contained in the California Code of Civil Procedure.
18
         If you wish to make arrangements to review the
19  original transcript of your deposition, please contact
    this office during office hours, 9:00 to 5:00 Monday
20  through Friday, to make an appointment to review the
    original transcript.
21
                        Sincerely,
22

23
                        Sherry Morrison
                        Office Manager
24  cc:   All Counsel

25
```