1  MAUREEN E. MCCLAIN (State Bar No. 062050)
   Email: mcclain@kmm.com
2  ALEX HERNAEZ (State Bar No. 201441)
   Email: hernaez@kmm.com
3  KAUFF MCCLAIN & MCGUIRE LLP
   One Post Street, Suite 2600
4  San Francisco, California 94104
   Telephone:  (415) 421-3111
5  Facsimile:   (415) 421-0938

6  Attorneys for Defendant
   DOLLAR TREE STORES, INC.
7
   BETH HIRSCH BERMAN (VA Bar No. 28091)
8  Email: bberman@williamsmullen.com
   WILLIAMS MULLEN
9  999 Waterside Drive
   1700 Dominion Tower
10 Norfolk, VA 23510
   Telephone:  (757) 629-0604
11 Facsimile:   (757) 629-0660

12 *Pro Hac Vice* Attorneys for Defendant
   DOLLAR TREE STORES, INC.
13

14                 UNITED STATES DISTRICT COURT

15                NORTHERN DISTRICT OF CALIFORNIA

16

17 KASSONDRA BAAS and KELLY LOFQUIST,       CASE NO. C 07-03108 JSW
   individually and on behalf of all others
18 similarly situated,                       **DECLARATION OF BETH HIRSCH
                                             BERMAN IN OPPOSITION TO
19                  Plaintiffs,              PLAINTIFFS' MOTION FOR CLASS
                                             CERTIFICATION**
20 v.

21 DOLLAR TREE STORES, INC.,                **DATE:**  April 4, 2008
                                            **TIME:**  9:00 a.m.
22                  Defendant.              **DEPT.:**  Crtrm. 2, 17th Floor
                                            **JUDGE:**  Hon. Jeffrey S. White

23                                          **COMPLAINT FILED:** June 13, 2007
                                            **TRIAL DATE:**   No date set.
24

25

26

27

28

KAUFF MCCLAIN &
MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

-1-

DECLARATION OF BETH HIRSCH BERMAN IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    CASE NO. C 07-03108 JSW

1

2        I, Beth Hirsch Berman, declare as follows:

3        1.      I am over the age of eighteen and have personal knowledge of the facts

4    set forth below.  If called upon as a witness, I could testify competently thereto.

5
6        2.      I am a shareholder in the law firm of Williams Mullen, P.C., pro hac vice

7    counsel for Dollar Tree Stores, Inc. in the above captioned matter.

8        3.      Attached as Exhibit A is a true and correct copy of the Initial Disclosures

9    received from Plaintiffs in this matter.

10       4.      Attached as Exhibit B is a true and correct copy of Defendant, John D.

11   Hansen's Response to Defendant's Request for Production of Documents in the matter

12   of Miguel A. Cruz and John D. Hansen v. Dollar Tree Stores, Inc., Case No. 07-02050

13
14   SC.  In Request No. 14, Dollar Tree asked Hansen to produce all documents referencing

15   his counsel's representation of Kassondra Bassignani (aka Kassondra Baas) and Kelly

16   Lofquist.  Hansen declined to produce any such documents generally and specifically

17   relating to any informed waiver by Hansen with regard to his counsel's dual

18   representation.

19       5.      As a result of Hansen's refusal to answer the foregoing request, a meet

20
21   and confer was held among Jeremy Fietz on behalf of Plaintiffs, and Maureen McClain

22   and me on behalf of Dollar Tree.  Mr. Fietz, on behalf of Hansen, Cruz, Baas and

23   Lofquist continued to refuse to produce any documents relating to his clients informed

24   waiver.  As a follow-up to the meet and confer, Maureen McClain sent an email to Mr.

25   Fietz, a true and correct copy of which is attached hereto as Exhibit C, advising Mr.

26   Fietz's that his continued refusal to provide any waivers or consents on the part of his

27

28

KAUFF, MCCLAIN
& MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

-2-
C:\Documents and

DECLARATION OF BETH HIRSCH BERMAN IN OPPOSITION              CASE NO: C 07 03108 JSW
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    clients would cause Dollar Tree to oppose any attempted use on his part to rely on such

2    documents during the course of any proceedings.

3       6.      On October 11, 2007 and November 1, 2007, I attended the deposition of

4    John D. Hansen.  Attached hereto as Exhibit D is a true and correct copy of the relevant

5
     portions of the transcript of that deposition.
6

7       7.      On October 12, 2007 and November 2, 2007, I attended the deposition of

8    Miguel Cruz.  Attached hereto as Exhibit E is a true and correct copy of the relevant

9    portions of the transcript of that deposition.

10      8.      On October 15, 2007, I attended the deposition of Kelly Lofquist.

11   Attached hereto as Exhibit F is a true and correct copy of the relevant portions of the
12
     transcript of that deposition.
13

14      9.      On October 17, 2007, I attended the deposition of Kassondra Baas.

15   Attached hereto as Exhibit G is a true and correct copy of the relevant portions of the

16   transcript of that deposition.

17      I declare under penalty of perjury that the foregoing is true and correct.

18      Executed in Norfolk, Virginia this 5th day of March, 2008.

19

20                                              BETH HIRSCH BERMAN

21

22

23

24

25   1251716

26

27

28

Kauff, McClain
& McGuire LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

                                         -3-
DECLARATION OF BETH HIRSCH BERMAN IN OPPOSITION                    CASE NO: C 07 03108 JSW
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# EXHIBIT A

1   Donald S. Edgar, Esq. (SBN 139324)
2   Jeremy R. Fietz, Esq. (SBN 200396)
    Rex Grady, Esq. (SBN 232236)
3   **EDGAR LAW FIRM**
    408 College Avenue
4   Santa Rosa, California, 95401
    Tel:   (707) 545-3200
5   Fax:   (707) 578-3040
6
    Attorneys for Plaintiffs,
7   KASSONDRA BAAS and KELLY LOFQUIST
    individually and on behalf of all employees
8   similarly situated
9
10
11              UNITED STATES DISTRICT COURT
12             NORTHERN DISTRICT OF CALIFORNIA
13
14
15   KASSONDRA BAAS and KELLY          )   CASE NO.  C 07- 03108 JSW
     LOFQUIST, individually and on behalf of )
16   all others similarly situated,        )   **CLASS ACTION**
17              Plaintiffs,             )
                                        )   **PLAINTIFFS' INITIAL DISCLOSURE**
18        v.                           )
19   DOLLAR TREE STORES, INC.,         )   F.R.C.P. §26(a)(1)
20                                     )
              Defendants.              )
21                                     )
22
23
24   **PLAINTIFFS KASSONDRA BAAS AND KELLY LOFQUIST HEREIN PROVIDE**
25   **THEIR INITIAL DISCLOSURES PURSUANT TO FEDERAL RULES OF CIVIL**
26   **PROCEDURE §26(a)(1).**
27
28

                          - 1 -

PLAINTIFFS' INITIAL DISCLOSURE                    CASE NO.  07-03108 JSW

1

2  **F.R.C.P. §26(a)(1)(A) – Witnesses:**

3

4      **Plaintiff: Kassondra Baas:**

5          A former employee of Dollar Tree, is represented by the Edgar Law

6      Firm and may be contacted through counsel. Ms. Baas is expected

7      to have information concerning 1) the manner in which the time-

8
       recording system was operated, 2) the manner in which the
9
       computer time recording program was manipulated to reduce the
10
11     wages earned by store employees.

12      **Plaintiff: Kelly Lofquist:**

13          A former employee of Dollar Tree, is represented by the Edgar Law

14
       Firm and may be contacted through counsel. Ms. Baas is expected
15
16     to have information concerning 1) the manner in which the time-

17     recording system was operated, 2) the manner in which the

18
       computer time recording program was manipulated to reduce the
19
20     wages earned by store employees.

21  **Current and former Dollar Tree employees:**

22      **Miguel A. Cruz:**

23          A former employee of Dollar Tree, is represented by the Edgar Law

24
       Firm and may be contacted through counsel. Mr. Cruz is expected
25
26     to have information concerning 1) the manner in which the time-

27     recording system was operated, 2) the way in which he, as a store

28     manager, was instructed by his supervisor to alter the computer

- 2 -

PLAINTIFFS' INITIAL DISCLOSURE                    CASE NO.  07-03108 JSW

time records to lessen the total time paid to hourly store employees as well as to move time from overtime days to non-overtime days.

**John D. Hansen:**

A current employee of Dollar Tree, is represented by the Edgar Law Firm and may be contacted through counsel. Mr. Hansen is expected to have information concerning: 1) the manner in which the time-recording system is operated, 2) the way in which he, as a store manager, was instructed by his supervisor to alter the computer time records to lessen the total time paid to hourly store employees as well as to move time from overtime days to non-overtime days.

**Other witnesses:**

It is anticipated that several employees of Dollar Tree have knowledge of the matters alleged in the complaint – their identities are known to Dollar Tree and will be subject to further discovery. Particularly, it is anticipated that Dollar Tree is aware of the identity of witnesses concerning the manner in which the time-recording computer programs operated, the manner in which the data may be manipulated, and the manner in which payroll is processed utilizing the time record data. Dollar Tree is also expected to be aware of the identities of store managers and former store managers who were instructed to manipulate the time records.

- 3 -

PLAINTIFFS' INITIAL DISCLOSURE                    CASE NO. 07-03108 JSW

## F.R.C.P. §26(a)(1)(B) – Documents:

Dollar Tree-related documents in the possession of the Plaintiffs have already been produced to defendant in the *Cruz/Hansen* litigation. Plaintiffs may have additional paystubs (however, Dollar Tree has possession of these documents in any event).

It is believed by Plaintiffs that the electronic records of the computer system will be integral in establishing the extent to which compensable time was stolen from store employees. Plaintiffs have been informed that Defendant has taken steps to preserve such information for production and use in this litigation.

## F.R.C.P. §26(a)(1)(C) – Computation of Damages:

The calculation of damages sought in this action is dependent upon the records of Defendant's computer time tracking system. More specifically, Plaintiffs are currently unable to calculate damages without knowing which exact dates, and in what amounts, time was erased, and which exact dates, and in what amounts, their time was moved from premium (overtime) pay to regular pay. It is anticipated that the production of these computer records will enable Plaintiff to conduct, with exactitude, such calculations for themselves and the entire class. Generally speaking, Plaintiffs are entitled to the premium pay (.5 times their hourly rate) for all time that was moved from an overtime period to a non-overtime period. Plaintiffs are entitled to receive their appropriate hourly rate for all regular time erased from the computer system, and time and a half for all overtime erased from the system. Plaintiffs are entitled to statutory "waiting time" and other penalties, attorneys' fees, costs, and interest, based upon the violations of statutes alleged in the Complaint. In addition, Plaintiffs seek damages for

- 4 -

PLAINTIFFS' INITIAL DISCLOSURE                              CASE NO.  07-03108 JSW

Dollar Tree's failure to provide accurate itemized wage statements as required by Labor Code §226(e). The Labor Code provides for the greater of actual damages or a penalty of $50 for the initial pay period in which a violation occurs and $100 per employee for each violation in a subsequent pay period (up to a maximum of $4,000), in addition to attorney's fees and costs. Plaintiffs also claim tort damages for fraud, including punitive damages. These amounts are also not subject to calculation until such time as discovery has been produced by the Defense.

Plaintiffs anticipate that upon the production of appropriate compensation and time records for each putative class member, Plaintiffs will have a computation performed that will then be provided to the defense. Plaintiffs also intend to retain an expert to calculate the applicable interest and penalties. Essentially, the manner of calculation of damages will be the same for each member of the putative class.

Dated: October 8, 2007

EDGAR LAW FIRM

By: _____
Jeremy R. Fietz, Esq.

-5-

PLAINTIFFS' INITIAL DISCLOSURE                    CASE NO. 07-03108 JSW

1
## PROOF OF SERVICE

2        I am employed in the City and County of Santa Rosa, State of California. I am
over the age of 18 and not a party to the within action. My business address is 408
3    College Avenue, Santa Rosa, California 95401. I served the foregoing document(s)
described as:

4

### PLAINTIFFS' INITIAL DISCLOSURES

5
on the interested parties by placing ( ) the original ( X ) a true and correct copy thereof
6    in a sealed envelope addressed as follows:

7
    MAUREEN E. McCLAIN              BETH HIRSCH BERMAN
8        ALEX HERNAEZ                   WILLIAMS MULLEN
    KAUFF McCLAIN & McGUIRE LLPOne    Dominion Tower, Suite 1700
9        Post Street, Suite 2600San Francisco,     999 Waterside Drive
    California 94104                    Norfolk, VA 23510
10       Telephone: (415) 421-3111         Telephone: (757) 629-0604
    Facsimile: (415) 421-0938          Facsimile: (757) 629-0660
11
    Attorneys for Defendant
12

13   [X]      VIA FACSIMILE TRANSMISSION:
14
    By causing the above referenced material to be transmitted to the facsimile
15       numbers listed above (with confirmation of successful transmission thereof).

16   [ ]      VIA U.S. MAIL:
17
    I am readily familiar with the firm's practice for collection and processing of
18       correspondence for mailing. Under that practice such envelope(s) would be
deposited with the U.S. postal service with postage thereon fully prepaid, at
19       Santa Rosa, California.

20   [X]      FEDERAL:
21       I declare that I am employed in the office of a member of the bar of this court
at whose direction the service was made.
22

23   I declare under penalty of perjury under the laws of the state of California, and United
States of America that the above is true and correct and was executed on October 8,
24   2007.

25

26   _____
    JEREMY R. FIETZ
27

28

-6-

PLAINTIFFS' INITIAL DISCLOSURE             CASE NO. 07-03108 JSW

# EXHIBIT B

1  Donald S. Edgar, Esq. (SBN 129324)
2  Jeremy R. Fietz, Esq. (SBN 200396)
   Rex Grady, Esq. (SBN 232236)
3  **EDGAR LAW FIRM**
   408 College Avenue
4  Santa Rosa, California 95401
   Tel:   (707)  545-3200
5  Fax:   (707)  578-3040

6
7  Attorneys for Plaintiffs,
   MIGUEL A. CRUZ and JOHN D.
8  HANSEN, individually and on
   behalf of others similarly situated

9

10                 **UNITED STATES DISTRICT COURT**

11                 **NORTHERN DISTRICT OF CALIFORNIA**

12

13  MIGUEL A. CRUZ and JOHN D.              )    CASE NO. 07-02050 SC
14  HANSEN, individually and on behalf of all )
    others similarly situated,                )    CLASS ACTION
15                                            )
16            Plaintiffs,                     )    **PLAINTIFF, JOHN D. HANSEN'S**
                                              )    **RESPONSE TO DEFENDANT'S**
17        v.                                  )    **REQUEST FOR PRODUCTION OF**
                                              )    **DOCUMENTS, SET ONE**
18  DOLLAR TREE STORES, INC.,                 )
19                                            )
            Defendants.                       )    Honorable Judge Samuel Conti
20                                            )
21                                            )
22  ──────────────────────────────           )

23

24        Plaintiff, JOHN D. HANSEN, individually, and on behalf of all others similarly

25  situated (hereinafter "Responding Party"), hereby responds to the Request for

26  Production of Documents propounded by Defendant, DOLLAR TREE STORES, INC.

27  (hereinafter "Propounding Party") as follows:

28

                                    - 1 -

─────────────────────────────────────────────────────────────────
RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS        CASE NO.  07-2050 SC

1
## RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS

2
**REQUEST FOR PRODUCTION NO. 1:**

3
    All DOCUMENTS relating to employment YOU held prior to working for DOLLAR

4
TREE.

5
**RESPONSE NO. 1:**

6

7
    Plaintiff objects that this request is overly broad, unduly burdensome, not

8
calculated to lead to the discovery of admissible evidence and violative of Plaintiff's

9
privacy rights.  Without waiving said objection, Plaintiff produces his resume, which

10
highlights his jobs prior to working for Dollar Tree at Exhibit A.

11

12
**REQUEST FOR PRODUCTION NO. 2:**

13
    All DOCUMENTS YOU received or obtained from DOLLAR TREE at any time.

14
**RESPONSE NO. 2:**

15
    Plaintiff produces all Dollar Tree documents located in his possession, or

16
provided to counsel, at Exhibit B.

17

18
**REQUEST FOR PRODUCTION NO. 3:**

19
    All communications or filings made by YOU or on YOUR behalf with any

20
governmental agency or court, state, federal or local (apart from this LAWSUIT) that

21
concerned YOUR employment at DOLLAR TREE.

22

23
**RESPONSE NO. 3:**

24
    Plaintiff is unaware of any documents responsive to this request.

25
**REQUEST FOR PRODUCTION NO. 4:**

26
    All DOCUMENTS which mention DOLLAR TREE or relate to YOUR employment

27
at DOLLAR TREE.

28

- 2 -

1  **RESPONSE NO. 4:**

2      Plaintiff objects that the request is overly broad and violative of the attorney work-

3  product doctrine.  Without waiving said objection Plaintiff produces all Dollar Tree

4

5  documents located in his possession, or provided to counsel, at Exhibit B.

6  **REQUEST FOR PRODUCTION NO. 5:**

7      All notations YOU have made at any time which reference or concern YOUR

8  employment at DOLLAR TREE, including DOCUMENTS referencing YOUR job

9  responsibilities, YOUR hours of work, or YOUR pay at DOLLAR TREE.

10

11  **RESPONSE NO. 5:**

12      Plaintiff produces all Dollar Tree documents located in his possession, or

13  provided to counsel, at Exhibit B.

14  **REQUEST FOR PRODUCTION NO. 6:**

15      All communications (including e-mail) YOU have had with anyone (aside from

16

17  your counsel as identified on a privilege log) concerning YOUR employment at DOLLAR

18  TREE, whether YOU sent or received them.

19  **RESPONSE NO. 6:**

20      Plaintiff is unaware of any documents responsive to this request.

21

22  **REQUEST FOR PRODUCTION NO. 7:**

23      All communications (including e-mail) YOU have had with anyone (aside from

24  YOUR counsel as identified on a privilege log) concerning the allegations of YOUR

25  COMPLAINT.

26  **RESPONSE NO. 7:**

27

28      Plaintiff is unaware of any documents responsive to this request.

- 3 -

RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS          CASE NO.  07-2050 SC

**REQUEST FOR PRODUCTION NO. 8:**

All DOCUMENTS relating to any internal complaints YOU made to DOLLAR

TREE regarding any of the allegations made in YOUR COMPLAINT.

**RESPONSE NO. 8:**

Plaintiff is unaware of any documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 9:**

All DOCUMENTS supporting or relating to YOUR allegations in Paragraph 70(e)

of the COMPLAINT that YOU were told by a variety of persons at DOLLAR TREE that

YOU were an exempt employee.

**RESPONSE NO. 9:**

Plaintiff produces all Dollar Tree documents located in his possession, or

provided to counsel, at Exhibit B.  Documents specifically responsive to this request

include, but are not limited to, the paystubs (wage statements).

**REQUEST FOR PRODUCTION NO. 10:**

All DOCUMENTS which support or demonstrate that YOUR supervisor or other

DOLLAR TREE managers had knowledge of how YOU performed YOUR job duties.

**RESPONSE NO. 10:**

Plaintiff produces all Dollar Tree documents located in his possession, or

provided to counsel, at Exhibit B.

**REQUEST FOR PRODUCTION NO. 11:**

All DOCUMENTS (aside from ones produced in response to previous requests)

which itemize, document or support YOUR claim for compensatory damages in the

LAWSUIT.

- 4 -

**RESPONSE NO. 11:**

Plaintiff produces all Dollar Tree documents located in his possession, or provided to counsel, at Exhibit B.

**REQUEST FOR PRODUCTION NO. 12:**

All DOCUMENTS (aside from ones produced in response to previous requests) which itemize, document or support YOUR claims for penalty amounts in the LAWSUIT.

**RESPONSE NO. 12:**

Plaintiff produces all Dollar Tree documents located in his possession, or provided to counsel, at Exhibit B.

**REQUEST FOR PRODUCTION NO. 13:**

All DOCUMENTS supporting YOUR request for the recovery of attorneys' fees, including any contract YOU have with YOUR counsel concerning the payment of attorneys' fees and/or litigation costs.

**RESPONSE NO. 13:**

Plaintiff objects to this request, as it is invasive of the attorney-client privilege and attorney work-product doctrine, and is premature. If the plaintiffs prevail in their claims an award of attorneys' fees and costs, and the basis therefore, will be established at the appropriate time.

**REQUEST FOR PRODUCTION NO. 14:**

All DOCUMENTS referencing YOUR counsel's present representation of Kassondra Bassignani (also referenced as Kassondra Baas) and/or Kelly Lofquist.

- 5 -

**RESPONSE NO. 14:**

Plaintiff objects to this request, as it is invasive of the attorney-client privilege and attorney work-product doctrine.   Plaintiff further objects that this request is overly broad, unduly burdensome, and not calculated to lead to the discovery admissible evidence in this matter.  Without waiving said objections, upon information and belief, Plaintiff includes, at Exhibit B, Dollar Tree documents relating to Ms. Baas and Ms. Lofquist and/or provided by them.

**REQUEST FOR PRODUCTION NO. 15:**

All DOCUMENTS relating to any other LAWSUIT or legal claim YOU have brought (or participated in as a class member) concerning any employment-related claims.

**RESPONSE NO. 15:**

Plaintiff is unaware of any documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 16:**

All DOCUMENTS showing or relating to any information that YOU have regarding the performance of job duties by the other DOLLAR TREE Store Managers (aside from YOU and YOUR co-Plaintiff).

**RESPONSE NO. 16:**

Plaintiff produces all Dollar Tree documents located in his possession, or provided to counsel, at Exhibit B.

Dated:  September 14, 2007

*EDGAR LAW FIRM*

By: _____
Donald S. Edgar, Esq.
Jeremy R. Fietz, Esq.
Attorneys for Plaintiffs

- 6 -

## VERIFICATION:

I, JOHN D. HANSEN, declare that:

I am a Plaintiff in the action herein. I have read Plaintiff, John D. Hansen's Response to the Defendant's Request for Production of Documents, Set One, herein and know the contents thereof. The same is true of my own knowledge except to those matters alleged upon information and belief, which matters I believe to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 14, 2007

John D. Hansen

1

## PROOF OF SERVICE

2

3       I am employed in the City and County of Santa Rosa, State of California.  I am over the
age of 18 and not a party to the within action. My business address is 408 College Avenue, Santa
Rosa, California 95401.  I served the foregoing document(s) described as:

4

5       ## RESPONSE TO REQUEST FOR PRODUCTION

6       on the interested parties by placing (  ) the original ( X ) a true and correct copy thereof in a
sealed envelope addressed as follows:

7

8       MAUREEN E. McCLAIN                    BETH HIRSCH BERMAN
        ALEX HERNAEZ                         WILLIAMS MULLEN
9       KAUFF McCLAIN & McGUIRE LLP          Dominion Tower, Suite 1700
        One Post Street, Suite 2600          999 Waterside Drive
10      San Francisco, California  94104     Norfolk, VA  23510
        Telephone:   (415) 421-3111         Telephone:   (757) 629-0604
11      Facsimile:    (415) 421-0938         Facsimile:    (757) 629-0660

12      Attorneys for Defendant              Attorneys For Defendant
        DOLLAR TREE STORES, INC.            DOLLAR TREE STORES, INC.

13

        (Via UPS with all documents)         (Via US Mail w/o documents)

14

15      [ X ]    VIA OVERNIGHT MAIL:

16               By delivering such documents to an overnight mail service or an authorized
                 courier in an envelope or package designated by the express service courier
17               addressed to the person(s) on whom it is to be served.

18      [  ]     VIA U.S. MAIL:

19               I am readily familiar with the firm's practice for collection and processing of
                 correspondence for mailing.  Under that practice such envelope(s) would be
20               deposited with the U.S. postal service with postage thereon fully prepaid, at
                 Santa Rosa, California.

21

22      [ X ]    FEDERAL:

23               I declare that I am employed in the office of a member of the bar of this court
                 at whose direction the service was made.

24

25      I declare under penalty of perjury under the laws of the state of California, and United States of
        America that the above is true and correct and was executed on September 14, 2007.

26

27                                          _Jeremy_ [signature]
                                            JEREMY R. FIETZ

28

# EXHIBIT C

REDACTED

---

**From:** Jeremy Fietz [mailto:jeremy@classattorneys.com]
**Sent:** Thursday, February 14, 2008 2:52 PM
**To:** McClain, Maureen
**Cc:** Berman, Beth Hirsch
**Subject:** RE: meet and confer session re Plaintiffs' discovery responses

Maureen,

We are reviewing your memorandum and will respond next week regarding any reconsideration of our discovery objections. We will also advise as to whether we would consider any change in our willingness to provide writings between our office and our clients (thought it is likely that we will not change our position on the attorney-client privilege basis). Regarding the amended complaint in Baas/Lofquist, we understand that the only issue of dispute is that you do not want us to have a cause of action for Meal periods because of the potential class-wide settlement of those causes of action pending in southern California. While we understand that the pending settlement may propose a release of such claims, unless and until those claims are released, we don't believe there is any sound legal basis to prevent an amendment. Will you agree to permit the amended complaint or do we need Court intervention to sort out the meal break cause of action issue? If you will not stipulate to the amendment will you agree to a joint letter to the Court or is it your position that a formal motion is necessary?

Sincerely,
Jeremy

     -----Original Message-----
     **From:** McClain, Maureen [mailto:mcclain@kmm.com]
     **Sent:** Thursday, February 14, 2008 11:00 AM
     **To:** Jeremy Fietz
     **Cc:** Berman, Beth Hirsch
     **Subject:** meet and confer session re Plaintiffs' discovery responses

Jeremy: As a follow-up to our meet and confer session of February 1, 2008, I attach a memorandum regarding Mr. Cruz's use of multiple social security numbers and multiple names in conjunction with employment. Please let me know whether you will reconsider your objections. With reference to a second topic of our meet and confer session, that of Plaintiffs providing any consents to conflicting representation signed by any of your four clients in the Cruz/Hansen and Baas/Lofquist matters, you said that you would never provide such information to defendant on the grounds of attorney client privilege. We disagree with your assertion of the privilege, and hereby provide notice that we will oppose any attempt on your part to rely upon any such documents in the course of any court proceedings given that they have not been produced to us. Regarding the third topic of our meet and confer discussion (that of your proposed amendment to the Baas/Lofquist complaint, Ms. Berman has communicated, and will communicate further, on that topic with you. Sincerely, Maureen McClain

# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

MIGUEL A. CRUZ, and John
D. Hansen, individually
and on bahalf of all
others similarly
situated,

          Plaintiffs,

                 Case No.   C07-02050 SC

  vs.

DOLLAR TREE STORES, INC.,

          Defendant.


DEPOSITION OF JOHN D. HANSEN


DATE:          THURSDAY, OCTOBER 11, 2007

TIME:         10:05 a.m.

LOCATION:      Kauff, McClain & McGuire
               One Post Street, Suite 2600
               San Francisco, California


PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227


REPORTED BY:  Wendy L. Van Meerbeke, CSR #3676

1

1  you know, before that happened, that -- so that's

2  how I ended up with the two.

3  **Q. It was your decision to discharge**

4  **Ms. Baas; correct?**

5  **A. Yes. Well, of course, I had counseling**

6  **from -- what was her name? Candace Camp and Rick.**

7  Q. Ms. Camp was and is a regional human

8  resource person; correct?

9  A. Yes.

10  Q. Was it your practice, when you were

11  discharging an employee at your store, to consult

12  with Ms. Camp?

13  A. Yes.

14  Q. Is it correct that that consultation

15  consisted of you telling Ms. Camp what the

16  performance problems were and Ms. Camp saying, "I

17  think your decision to terminate is appropriate"?

18  A. Correct.

19  Q. Did Ms. Camp ever come down to the store

20  and do an independent investigation with respect to

21  your reasonings?

22  A. No. I don't believe she has ever been to

23  the store.

24  Q. So she has never been to the store for any

25  reason; is that right?

1    Q. Briefly, what were Ms. Baas' performance

2 issues?

3    A. Just tasks that I asked her to do weren't

4 getting done.  The closing procedures weren't 100

5 percent followed.  There were a couple that I just

6 can't recall right now.

7        We had had an incident in a meeting -- oh,

8 yeah.  Actually, the main reasons -- now I

9 remember -- is the way she was interacting with

10 customers, the way she was interacting with her

11 associates, including myself.

12    Q. Was it part of your job responsibility to

13 evaluate how Ms. Baas interacted with customers?

14    A. I would -- yeah.  I was in charge of the

15 store, so, yes -- I would say yes.

16    Q. Was it part of your job responsibility to

17 counsel Ms. Baas with respect to a better way to

18 interact with customers?

19    A. Yes, definitely.

20    Q. At some point in time, did you say to

21 Ms. Baas, "If you don't correct this problem, I'm

22 going to have to terminate your employment"?

23    A. To be honest, I don't think I ever

24 actually said that.

25    **Q. Did you give her warning notices --**

1   A. Yes.

2   Q. -- that she needed to improve?

3   A. Uh-huh.

4   Q. Yes?

5   A. Yes.

6   Q. You said that Ms. Baas was not following

7   closing procedures that you required. What were

8   those procedures?

9   A. Just like making sure that the end caps

10   were clean and things like that, mostly the

11   cleanliness of the store. That was the procedures

12   I was upset about.

13   Q. Would you give her direction in that

14   regard?

15   A. Yes. I actually would come in and close

16   with her a couple times and show her, you know, the

17   way I would do things.

18   Q. Did you view that as a training session

19   with her?

20   A. Uh-huh.

21   Q. Yes?

22   A. Yes. Another one in the jar.

23   Q. What were Ms. Lofquist's performance

24   deficiencies?

25   A. A little of the same. I didn't really

1    A. Yeah.

2    Q. For disciplinary reasons?

3    A. Uh-huh.

4    Q. Yes?

5    A. Yes. Sorry.

6        MS. McCLAIN: May I have this marked as

7 next in order, please?

8        (A document was marked as Exhibit 28

9 for identification.)

10       MS. McCLAIN:

11    Q. Is this the effective notice for

12 termination?

13    A. Oh, no. This was just another -- it looks

14 like around the exact same time, so maybe I had

15 like three or four ready for her.

16    **Q. So this again is a warning notice to**

17 **Ms. Lofquist based upon her not following your**

18 **direction; is that right?**

19    **A. Yeah.**

20    **Q. You made the decision to issue this**

21 **warning notice?**

22    **A. Uh-huh.**

23    **Q. Yes?**

24    **A. Yes.**

25    **Q. How would you describe the reasons for**

1 **Ms. Lofquist's termination? Your recommendation**

2 **that she be terminated.**

3     **A. Um, mostly the attendance, um, not showing**

4 **up enough and, um, not showing up on time.**

5     Q. Did you ever ask her what her problem was?

6     A. Well, towards the end, she moved to

7 Lakeport, which was an hour, at least, I think,

8 drive, and so I'm sure that was a problem.

9     Q. You don't recall ever specifically asking

10 her, but you knew that that was a factor or you

11 thought that was a factor; is that right?

12     A. I never asked. I just said, you know --

13 you know, I just made sure she knew that it was

14 starting to get on my nerves.

15     Q. Did you advise both Ms. Bassignani and

16 Ms. Lofquist of their terminations? Did you tell

17 them?

18     A. What do you mean?

19     Q. Did you call them and say, "You're fired"?

20     A. Yes. Kassondra -- I believe she was off

21 that week or something. I can't remember exactly

22 what it was.

23         And all of a sudden, the -- I was supposed

24 to do it the next day when she was supposed to show

25 up, but she -- she didn't get her check. She was

1 know, a big blob in the day. It's just, you know,

2 um, I do my stuff on Monday, and that was really

3 the rest of it. That's all -- that's all I really

4 have to do.

5    Q. We talked about all of your paperwork on

6 Monday. But you don't restrict your personnel

7 functions to Monday; do you?

8    A. No. Recently with this store, I'm taking

9 over a store so there seems to be a lot of issues

10 that I'm needing to tie up from the previous

11 management.

12    Q. Such as?

13    A. Payroll issues. There's a lot happening

14 right now. Very disturbing, actually.

15    Q. Some questions of what the previous

16 manager did with respect to payroll?

17    A. Correct.

18    Q. The previous manager was Mr. Berger;

19 correct?

20    A. Correct.

21    Q. And what kind of problems are you finding?

22    A. Missing hours, literally ignoring -- when

23 you type in a shift, it goes into the computer.

24 The manager has the authority to ignore it, whether

25 that punch ever happened. It's still documented in

00258

1  there.

2      I found a lot of days ignored and either

3  not even paid or given as sick pay or given as

4  vacation pay.

5      Q. Is someone investigating this?

6      A. Um, I just found it yesterday.

7      Q. Who have you told about it?

8      A. Rick. And I left a whole file for him

9  last night.

10     Q. You've been spending a fair amount of time

11  investigating this payroll issue?

12     A. Yesterday took up a lot of my day to do

13  that. Um, but I'd say, you know, hearing the

14  complaints in the last week -- I'vd had a couple of

15  them that I have found issues of, you know, people

16  writing on the -- on the -- if Compass -- if the

17  time clock is not working, you're supposed to write

18  down your stuff. Well, if that's not entered in

19  the Compass, they don't get paid. So I found

20  sheets that didn't correlate with what was in

21  Compass.

22     Q. So you've been doing an audit of the time

23  worksheets versus the Compass records; is that

24  right?

25     A. Yes. Uh-huh.

1    Q.  Did Mr. Tellstrom ever direct you to

2  change an employee's punches to avoid overtime?

3    A.  I don't recall whether he did or not.

4    Q.  And he certainly didn't do it very often

5  under any circumstance because you only did this

6  once; correct?

7    A.  Correct.  Um, I didn't have a whole lot of

8  issues with it and so I don't think it was

9  something that -- you know, it wasn't something

10  that was recurring.

11    Q.  You didn't have a lot of issues with

12  overtime because you scheduled your employees

13  correctly?

14    A.  Correct.

15    Q.  And they didn't work overtime,

16  necessarily?

17    A.  Uh-huh.

18    Q.  And you understood that if somebody did

19  work overtime, the way to handle it was to say,

20  "Please don't do that.  We're going to pay you, but

21  please don't do that"; correct?

22    A.  Correct.

23    Q.  You have no current recollection that you

24  can tell me of a day, place and time when

25  Mr. Tellstrom said to you, "Alter time records"; is

1  that right?

2  A. That's correct.

3  Q. Did any other Dollar Tree manager ever say

4  to you in any fashion, "Alter time records"?

5  A. Not to me. No.

6  Q. When you reviewed 1868 punches -- which

7  you're doing online; correct?

8  A. Uh-huh.

9  Q. Yes?

10  A. Yes.

11  Q. Did you do so to make sure that people had

12  punched in and out correctly? Did you have any

13  other purpose other than to make sure that the

14  punches correctly reflected what they were doing?

15  A. No. That was exactly what I was doing.

16  Q. With the goal being that they were paid

17  for all time worked?

18  A. Correct. That the punches that they

19  entered were correct and that, you know -- that if

20  they left one off, it was -- it was either I'd have

21  to ask them directly or have it documented of when

22  they signed in and out. And even if I asked them,

23  I would ask somebody else to double-check.

24  Q. So you wanted to get the time accurate; is

25  that right?

1  A. Correct.

2  Q. And was there ever a case when an employee

3  forgot to punch in and out for lunch, for example?

4  Did that happen?

5  A. It happened all the time. Yeah.

6  Q. And did that mean they didn't take the

7  lunch or just meant they forgot to punch in and

8  out?

9  A. Um, most of the time they just forgot to

10  punch in and out.

11  Q. Do you recall any instance where someone

12  didn't take the lunch?

13  A. Um, no, not necessarily.

14  Q. When you were reviewing time records, you

15  were often doing them the next day, right, or maybe

16  even a couple of days later?

17  A. Yeah. If I wasn't -- if there was some

18  left over from the next day and they weren't fixed,

19  yes, I would do them.

20  Q. So you're sitting at the computer and you

21  see that Vickie doesn't have a punch-out or back in

22  for lunch, for example?

23  A. Okay.

24  Q. That happened maybe not with Vickie, but

25  that happened; is that right?

1 once.

2    A. Counsel -- I honestly --

3    MR. FIETZ: Don't say anything about --

4 I'll move to strike that testimony.

5    MS. McCLAIN:

6    Q. You don't have to tell me what, um -- what

7 transpired. The fact of the matter is --

8    A. It was --

9    Q. Hang on.

10    A. Okay. Go ahead.

11    Q. The fact of the matter is that you had an

12 opportunity to speak with your counsel in that time

13 frame; correct?

14    A. Correct.

15    Q. Um, and as you sit here today, can you

16 really tell me whether it was none, one, two or

17 three?

18    A. Um, I can't tell you how many times. No.

19 I honestly -- and then it was more of -- because

20 I -- because it could have been more than once, and

21 I don't remember. I don't remember. To be

22 truthful and honest, there's not -- I don't think

23 there's any way I could remember how many times.

24    Q. You didn't keep a record of it?

25    A. Oh, absolutely not.

1    Q. And, um you're -- you're certain it was

2 limited, though? We're not talking about more than

3 two or three?

4    A. No.

5    MR. FIETZ: Objection. Lacks foundation.

6    THE WITNESS: I'm not exactly sure, to be

7 honest, how many times I did it. I remember there

8 was a short period of time that I felt very

9 pressured and some of the stuff was happening. And

10 that's all I can remember. So that's all I figure.

11 It's a very limited amount of time that I did it.

12    MS. McCLAIN:

13    Q. And it was your decision to handle the

14 pressure in that fashion; wasn't it?

15    A. It was my decision?

16    Q. It was your decision to handle whatever

17 pressure you were feeling by making that change, no

18 one else's?

19    A. No one else's. No.

20    Q. Correct?

21    A. Correct.

22    Q. Thank you. Good. We'll see you the

23 beginning of November. Your counsel and I will be

24 talking about scheduling before then.

25    A. Okay.

CERTIFICATION OF DEPOSITION OFFICER

I, WENDY L. VAN MEERBEKE, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth in the within entitled cause; that said deposition was taken at the time and place set forth; that the testimony of said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was thereafter transcribed by computer under my direction into booklet form; that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Dated the 1st day of November, 2007.

WENDY L. VAN MEERBEKE, CSR 3676

290

Preferred Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

October 27, 2007

TO:    John D. Hansen
       c/o Jeremy R. Fietz, Esq.
       Santa Rosa, CA 95401

Re:    Cruz v. Dollar Tree Stores
       Deposition taken on October 11, 2007
       Reported by Wendy Van Meerbeke, CSR #3676

Dear Mr. Hansen,

       The original transcript of your deposition taken in the above-entitled action has been prepared and is available at this office for your reading, correcting and signing.

       You may wish to discuss this matter with your attorney to determine if counsel requires that the original transcript of your deposition be read, corrected and signed by you before it is sealed.

       Your rights regarding signature of this deposition are contained in the California Code of Civil Procedure.

       If you wish to make arrangements to review the original transcript of your deposition, please contact this office during office hours, 9:00 to 5:00 Monday through Friday, to make an appointment to review the original transcript.

                    Sincerely,

                    Wendy L. Van Meerbeke
                    Certified Shorthand Reporter

cc:  All Counsel

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL A. CRUZ, and JOHN D. HANSEN, individually, and on behalf of all others similarly situated, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No: C07-02050 SC |
| | ) |
| | ) |
| DOLLAR TREE STORES, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

DEPOSITION OF JOHN D. HANSEN
VOLUME II

DATE:           Thursday, November 1, 2007

TIME:           9:32 a.m.

LOCATION:       Kauff, McClain & McGuire
                One Post Street,  26th Floor
                San Francisco, California 94104

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

Reported By:  Linda Vaccarezza, RPR, CSR #10201

292

00309

1 reviewing payroll issues; is that right?          09:

2    A   Yeah.  There are -- it's kind of an          09:

3 extraordinary issue of -- of just these people --      09:

4 looks like hours were cut from them.  And so...        09:

5    **Q   This is a situation you told me about**          **09:**

6 **involving your examination of payroll reports**          **09:**

7 **that Mr. Berger was responsible for, correct?**          **09:**

8    **A   True.  Correct.**                    **09:**

9    **Q   Have you ever spoken to Mr. Berger about**        **09:**

10 **those issues?**                         **09:**

11   **A   Actually, no.  I've made it kind of --**        **09:**

12 **didn't want to talk to him after I found all**          **09:**

13 **this.**                             **09:**

14   **Q   You've reported it to the company,**          **09:**

15 **correct?**                           **09:**

16   **A   I reported it to Rick, yes.  And what**          **09:**

17 **he's -- and now I'm talking to Pat Doss about it.**      **09:**

18   **Q   Ms. Doss is in payroll in Virginia,**          **09:**

19 **correct?**                           **09:**

20   **A   Yes.**                           **09:**

21   **Q   Is it correct that Ms. Camp came out to**        **09:**

22 **investigate the situation at your store?**            **09:**

23   **A   Well, she came out Tuesday and asked for**        **09:**

24 **some records, and that's all.  She asked me if I**      **09:**

25 **had any questions or anything.  But that was**          **09:**

1 pretty much it for her.                          09:

2   Q   Did you understand that Candice Camp was      09:

3 investigating the issue you had raised concerning    09:

4 time?                                  09:

5   A   I had a feeling that's what it was, but     09:

6 she didn't, specifically, say that to me, no.     09:

7   Q   What payroll records did she ask for?     09:

8   A   The written time sheets and any        09:

9 schedules that had been made from the past.        09:

10   Q   When do you expect Mr. Martinez to        09:

11 arrive?                          09:

12   A   You mean -- he's in there as an          09:

13 assistant now, but I need to train him.          09:

14   Q   So he's started working?            09:

15   A   Yes.  He was working the previous two --    09:

16 I like to have him work regular -- as just an      09:

17 associate first, to see how well they work before    09:

18 I promote them.                      09:

19   Q   You, then, had Mr. Martinez in kind of a    09:

20 trial period to analyze his general work?        09:

21   A   Correct.                    09:

22   Q   When was that trial period?          09:

23   A   I would say the two weeks prior.        09:

24   Q   So from about the beginning of October    09:

25 to the middle of October?                09:

1    Q   Mr. Hansen, setting aside the                02:

2  information you have been researching with           02:

3  respect to Mr. Corina's pay that you have told us      02:

4  about, involving a period when Mr. Berger was the      02:

5  store manager, setting aside issues related to        02:

6  that, has any employee of 2262 come to you and        02:

7  complained about their pay?                    02:

8    A   Well, I mean, since I've been there or       02:

9 --                                02:

10   Q   Well, let's start with since you've been      02:

11 there.                          02:

12   A   You mean problems with me since I've        02:

13 been there or problems before?              02:

14   Q   Problems -- okay.                 02:

15   A   There's been four employees. But that      02:

16 was all done before I got there. All the         02:

17 problems were -- happened before I got there,       02:

18 around the same time that Leo's were too.        02:

19   **Q   All the employees who have complained      02:**

20 **have complained about activity that occurred when    02:**

21 **Mr. Berger was the store manager; is that right?    02:**

22   **A   Correct.                    02:**

23   **Q   Have any of them complained about        02:**

24 **activity that occurred when Mr. Cruz was the      02:**

25 **store manager?                      02:**

1    A   No. I don't -- no. I mean, no. I         02:

2  mean, all the things that I found, I couldn't go      02:

3  back that far. So I mean, all these people don't      02:

4  speak English, so it's not very specific of when      02:

5  they are having problems. So...              02:

6    Q   How far back can you go in the system?       02:

7    A   I can only go back to January.            02:

8    Q   Do you know when Mr. Berger became a       02:

9  store manager?                      02:

10    A   As far as I know, it was around          02:

11  January. So, yeah.                   02:

12    Q   You've already fully told us about        02:

13  Mr. Corina's complaint; is that right?          02:

14    A   Already told you, yes.              02:

15    Q   You've discussed discovering the issues?    02:

16    A   Yes.                        02:

17    Q   Calling Pat Doss, and Candice came over     02:

18  to look at the records?                 02:

19    A   Yes.                        02:

20    Q   And is that same process being followed     02:

21  with respect to the other three employees?       02:

22    A   Yes. I submitted Leonardo's, now I'm      02:

23  going to go to the others and continue to        02:

24  research all those.                  02:

25    Q   Who are the others?                02:

1    A   Maria Olvera, Maria Gutierrez and          02:

2  Juanna, whatever her last name is. She's in      02:

3  there. Juanna. Juanna Rodriguez.          02:

4    Q   Are you looking at Exhibit 63?      02:

5    A   Yes.                  02:

6    Q   Do you have an understanding from      02:

7  talking to Ms. Camp, Ms. Doss, or from any other    02:

8  source, that once this audit is done, if Dollar    02:

9  Tree concludes that money is owing, it will be    02:

10  paid?                  02:

11   A   Yes.              02:

12   Q   How do you have that understanding?      02:

13   A   I'm sorry?              02:

14   Q   How do you have that understanding?      02:

15   A   Actually, the only way is people say,    02:

16  you know, we need to get to the source of the    02:

17  problem, get these people money if we owe it to    02:

18  them. That's -- you know.          02:

19   Q   Who said that to you?          02:

20   A   Rick has said it, and I believe Pat has    02:

21  said it when I talked to Rick.          02:

22   Q   Pat is Ms. Doss, correct?        02:

23   A   Yeah. Uh-huh.            02:

24   Q   Could the witness see, Ms. Reporter,      02:

25  please, Exhibit 30 from the first day of his      02:

1    A   I'm not sure if my name would have been                    04:

2   referenced at the bottom, but there would have            04:

3   just have been hours there.  And on the written            04:

4   one -- I mean on the piece of paper, I would have         04:

5   scribbled out my name, the one that we post on            04:

6   the wall, and put my name in there.                    04:

7        So it -- there should be no punched            04:

8   hours in or out that she was there, because I            04:

9   didn't punch in on her, I punched in on my own.         04:

10       But just a flat schedule would have been       04:

11   made with her name there.                    04:

12   **Q   Ms. Hansen had access when she was**            **04:**

13   **working at 1868 to the Compass system, correct?**      **04:**

14   **A   Yes.**                    **04:**

15   **Q   She had the ability to edit time because**       **04:**

16   **she was an assistant manager, correct?**            **04:**

17   **A   Correct.  I think I used her user name**       **04:**

18   **and password before I got -- before my name was**      **04:**

19   **transferred into 1868.  That's how I was able to**      **04:**

20   **make changes, until everything got switched.**         **04:**

21   **Q   For how long did that last?**            **04:**

22   **A   I don't recall.  Maybe a couple weeks.**         **04:**

23   Q   How did you know her password?            04:

24   A   She told it to me.                    04:

25   Q   There was a time when you were working         04:

1    A   Maria Olvera, Maria Gutierrez and                02:

2  Juanna, whatever her last name is.  She's in          02:

3  there.  Juanna.  Juanna Rodriguez.                     02:

4    Q   Are you looking at Exhibit 63?                    02:

5    A   Yes.                                              02:

6    Q   Do you have an understanding from                02:

7  talking to Ms. Camp, Ms. Doss, or from any other       02:

8  source, that once this audit is done, if Dollar        02:

9  Tree concludes that money is owing, it will be         02:

10 paid?                                                   02:

11    A   Yes.                                             02:

12    Q   How do you have that understanding?             02:

13    A   I'm sorry?                                       02:

14    **Q   How do you have that understanding?**          **02:**

15    **A   Actually, the only way is people say,**        **02:**

16 **you know, we need to get to the source of the**       **02:**

17 **problem, get these people money if we owe it to**     **02:**

18 **them.  That's -- you know.**                          **02:**

19    **Q   Who said that to you?**                        **02:**

20    **A   Rick has said it, and I believe Pat has**      **02:**

21 **said it when I talked to Rick.**                      **02:**

22    Q   Pat is Ms. Doss, correct?                        02:

23    A   Yeah.  Uh-huh.                                   02:

24    Q   Could the witness see, Ms. Reporter,            02:

25 please, Exhibit 30 from the first day of his           02:

1 had deleted time from Tina Toler's work records?        03:

2    A   I mean, I don't remember ever doing it,        03:

3 period.  So...                        03:

4    Q   So if you didn't do it, you wouldn't        03:

5 have discussed it, correct?                    03:

6    A   Correct.                    03:

7    **Q   Did you ever delete time from Tina Toler        03:**

8 **or anyone else's time records in front of            03:**

9 **Ms. Lofquist?                        03:**

10   **A   I don't --                    03:**

11   **Q   I mean, taking away time that was            03:**

12 **actually worked?                        03:**

13   **A   I don't recall doing -- I don't remember        03:**

14 **ever doing that.  I mean, I think the only thing        03:**

15 **that I remember doing is the overtime thing.  I        03:**

16 **don't remember because I didn't want to get into        03:**

17 **the issue.  Because when I got to Dollar Tree,        03:**

18 **there seemed to be a lot of issues of people of        03:**

19 **time shaving, of things that I heard, and I never        03:**

20 **wanted to get into that kind of a problem.  So I        03:**

21 **remember thinking that wasn't something that I        03:**

22 **really wanted to get into.                    03:**

23   Q   You told me on the first day of your        03:

24 deposition that you had heard rumors and hearsay        03:

25 that DMs were altering time, but that you had no        03:

1 factual knowledge to that effect.                03:

2     Do you recall that testimony?             03:

3 A   Yes.                          03:

4   Q   Is that what you're referring to, these       03:

5 rumors and hearsay, when you say that there seem        03:

6 to be a lot of people shaving time?            03:

7   A   Well, no, these were actual people          03:

8 talking about it a lot.                  03:

9   Q   People talked to you, when you first got      03:

10 to Dollar Tree, about shaving time, but you never       03:

11 observed it --                    03:

12   A   I never physically observed it being        03:

13 done.  But there was numerous complaints of        03:

14 people noticing hours missing off their checks.      03:

15   Q   Did you ever investigate any of those       03:

16 complaints?                     03:

17   A   At the time, I didn't have the capacity      03:

18 to.                          03:

19   Q   Did you ever investigate any of those       03:

20 complaints?                     03:

21   A   No.                      03:

22 Q   Do you agree that there can be mistakes      03:

23 in payroll, honest mistakes?             03:

24 A   Honest mistakes, yeah.  I believe it       03:

25 could be.  Uh-huh.                 03:

1 violation of Dollar Tree policy for family                03:

2 members to work in the same store?                03:

3    A    Yes. I think at the time he applied, I        03:

4 didn't realize it was her son. And, you know, so        03:

5 they weren't working together, you know, after        03:

6 that. I think he only worked there a couple of        03:

7 days. So, yeah.                        03:

8    Q    During that time when those extra people        03:

9 were there for a few days, did you ever work in        03:

10 the middle of the night?                    03:

11    A    Oh, I was there the whole time. Yeah.        03:

12    Q    During the time when you were working in        03:

13 the middle of the night and Kelly Lofquist's son        03:

14 was working in the middle of the night, was        03:

15 Ms. Lofquist, to your observation, ever working        03:

16 in the middle of the night?                    03:

17    A    I don't recall if she was there that        03:

18 night. I know that there was some -- there was a        03:

19 time that she worked in the middle of the night.        03:

20 I don't remember if it was the same time that I        03:

21 had her son. I thought -- I thought she came and        03:

22 picked him up. That was about it.                03:

23    <u>Q    How did it happen that Ms. Lofquist was</u>        <u>03:</u>

24 <u>working in the middle of the night on one</u>            <u>03:</u>

25 <u>occasion?</u>                        <u>03:</u>

1   A   We just needed as much help as we could        03:

2 get, so.                            03:

3   Q   Did she volunteer?                  03:

4   A   I think I asked her. And she said she        03:

5 would do it. Yeah. It was a way to get more        03:

6 hours.                          03:

7   Q   Did you pay her for that time?          03:

8   A   Yeah. Yeah.                    03:

9   Q   Did you tell her to punch in and          03:

10 carefully clock her time, make sure she got paid?    03:

11   A   As far as I remember. I don't remember      03:

12 ever not telling her -- as far as I know, it was      03:

13 her. I never asked anybody to come in and not --    03:

14 work off the clock. So I don't remember -- you      03:

15 know, come in, punch the clock, and go to work.      03:

16 That's all I remember.                03:

17   Q   Did you ever kind of wink at somebody;      03:

18 say, you know, we all need to be on the clock but    03:

19 I'm not looking if you're not on clock. Do you      03:

20 understand the question?                03:

21     Did you ever pretend like you wanted      03:

22 people to work on the clock but knew that they      03:

23 were not working on the clock, employees at store    03:

24 1868?                        03:

25   A   No. I -- I don't recall -- I mean, I      03:

00567

1  A  I'm not sure if my name would have been          04:

2  referenced at the bottom, but there would have          04:

3  just have been hours there. And on the written          04:

4  one -- I mean on the piece of paper, I would have          04:

5  scribbled out my name, the one that we post on          04:

6  the wall, and put my name in there.          04:

7      So it -- there should be no punched          04:

8  hours in or out that she was there, because I          04:

9  didn't punch in on her, I punched in on my own.          04:

10     But just a flat schedule would have been          04:

11  made with her name there.          04:

12  **Q  Ms. Hansen had access when she was**          **04:**

13  **working at 1868 to the Compass system, correct?**          **04:**

14  **A  Yes.**          **04:**

15  **Q  She had the ability to edit time because**          **04:**

16  **she was an assistant manager, correct?**          **04:**

17  **A  Correct. I think I used her user name**          **04:**

18  **and password before I got -- before my name was**          **04:**

19  **transferred into 1868. That's how I was able to**          **04:**

20  **make changes, until everything got switched.**          **04:**

21  Q  For how long did that last?          04:

22  A  I don't recall. Maybe a couple weeks.          04:

23  Q  How did you know her password?          04:

24  A  She told it to me.          04:

25  Q  There was a time when you were working          04:

00583

1 didn't make the change at the time. I don't            04:

2 know.                                    04:

3    THE VIDEOGRAPHER: This concludes Videotape        04:

4 Number 3, Volume 2. The time is approximately         04:

5 4:31 p.m. We are now off the record.              04:

6    (Recess taken from 4:31 p.m. to 4:35 p.m.)        04:

7    THE VIDEOGRAPHER: This is the beginning of        04:

8 Videotape Number 4 of Volume 2 of the deposition       04:

9 of John Hansen in the case of Miguel A. Cruz and       04:

10 John Hansen versus Dollar Tree Stores,             04:

11 Incorporated, et al. Today's date is November 1,      04:

12 2007. We are now on the record.              04:

13 BY MS. MCCLAIN:                      04:

14    **Q   Looking at Ms. Kosinski's time,**         **04:**

15 **Mr. Hansen, for June 30, 2006?**             **04:**

16    **A   Uh-huh.**                     **04:**

17    **Q   You once again used Rebecca's password**     **04:**

18 **and made a change in her start time, correct?**      **04:**

19    **A   Made a change in her start time. Yes.**      **04:**

20 **Okay. From --**                      **04:**

21    **Q   She punched in at 11:58, and you changed**    **04:**

22 **it to a punch that was three minute later;**        **04:**

23 **correct?**                        **04:**

24    **A   Okay.**                      **04:**

25    **Q   Agreed?**                     **04:**

00584

1    A   Agreed.                          04:

2    Q   Did you do that to keep Ms. Kosinski          04:

3    under five hours or at five hours?                04:

4    A   It looks like she was over five hours.        04:

5    Q   You see you also changed her end shift        04:

6    time, correct? She punched out at 17:08, and you    04:

7    changed it to 17:00, correct?                 04:

8    A   I mean -- I can't recall why.             04:

9    Q   Do you agree with me that you made that       04:

10   change to deprive her of eight minutes?           04:

11    A   Well, I assume I would have. For what        04:

12   reason, I don't know why. Maybe -- I'm not        04:

13   sure. Maybe if she clocked in and out late, I       04:

14   don't know. Or, I mean, she clocked in early.       04:

15   Maybe didn't start to work.                   04:

16        She used to clock in and would go to the     04:

17   back and put her stuff away and things like        04:

18   that. And maybe I didn't feel that was time        04:

19   worked, that was -- or something. I really        04:

20   honestly don't remember -- couldn't recall why I    04:

21   did it on this instance.                      04:

22    Q   The changes in her punches leave her        04:

23   working precisely five hours, correct, from        04:

24   12:00 -- or very close to five hours. From 12       04:

25   noon to 5:00?                          04:

00585

1    A   Yes.  Yeah.  Three hours, 59 -- four            04:

2   hours and 59 minutes.                               04:

3    Q   Her actual punches put her a little over       04:

4   five hours, correct?                                04:

5    A   Uh-huh.                                         04:

6    Q   Yes?                                            04:

7    A   Yes.                                            04:

8    **Q   So the change deprived her of minutes,        04:**

9   **but those minutes brought her to five hours,       04:**

10  **correct?                                           04:**

11   **A   Yes.                                           04:**

12   **Q   Did you do that so that you would have a       04:**

13  **record that she had no lunch entitlement, no meal   04:**

14  **period entitlement?                                04:**

15   **A   I don't recall.                               04:**

16   **Q   Did you ever do that, change an               04:**

17  **employee's time taking off just a few minutes so    04:**

18  **that it would look like they only worked five       04:**

19  **hours?                                             04:**

20   **A   I don't recall if I did that or not.  I       04:**

21  **-- you know, all I know is now I don't do things    04:**

22  **like that.  I don't remember if I was thinking of   04:**

23  **doing stuff like that then.                        04:**

24   Q   When did you stop doing things like            04:

25  that?                                               04:

00586

1    A    I don't remember doing it. So I'm just          04:

2 speculating on why I would have done that.          04:

3    Q    This is at a time when you were,          04:

4 according to your testimony, extremely conscious          04:

5 of the fact that all punches needed to be          04:

6 absolutely accurate, correct?          04:

7    A    Yes.          04:

8    Q    Because you had heard all these rumors          04:

9 of time shaving?          04:

10    A    Right.          04:

11    Q    Do you agree that, barring any other          04:

12 explanation, you shaved Ms. Kosinski's time on          04:

13 6/30/2006?          04:

14    A    I may have had a reason to do it. I          04:

15 don't know. I can't recall from that time.          04:

16    **Q    So we can't, as I hear your testimony,**          **04:**

17 **Mr. Hansen, conclude anything from the way these**          **04:**

18 **punch edits appear on the page, because there may**          **04:**

19 **be an underlying explanation that makes them**          **04:**

20 **perfectly legitimate, correct?**          **04:**

21    **A    Correct.**          **04:**

22    Q    And the explanation in this case may be          04:

23 that you actually observed that Ms. Kosinski,          04:

24 while she punched in at 11:58, didn't really get          04:

25 to work until 12:01, correct?          04:

00587

1    MR. FIETZ: Objection. Misstates testimony,          04:

2 lacks foundation.                    04:

3 BY MS. MCCLAIN:                      04:

4    Q   Is that right? An explanation that          04:

5 would be perfectly legitimate for the            04:

6 punches we just talked about was that you           04:

7 actually observed that Ms. Kosinski worked that        04:

8 different time?                    04:

9    MR. FIETZ: Same objection.             04:

10 BY MS. MCCLAIN:                    04:

11   Q   Correct?                04:

12   A   Well, I would say legitimate reason,       04:

13 yes. That would be -- if I had observed that she      04:

14 -- I felt she was -- with her understanding, that     04:

15 she wasn't punching the clock correctly.          04:

16   **Q   So not only -- we can't conclude**       **04:**

17 **anything from the punch detail on its face**      **04:**

18 **because there may be these underlying**        **04:**

19 **explanations, correct?**                **04:**

20   **A   Correct.**                **04:**

21   **Q   And we really can't tell what those**      **04:**

22 **underlying explanations are now, correct, because**    **04:**

23 **you didn't keep contemporaneous notes of them?**     **04:**

24   **A   Correct.**                **04:**

25   Q   Can we turn to Karen Richmond, please,        04:

1 be the one that actually went into the system,    04:

2 correct?    04:

3   A   Sure.    04:

4   Q   Is that right?    04:

5   A   Correct.    04:

6   **Q   Ms. Richmond punched out at 13:47 on**    **04:**

7 **that same day, correct?**    **04:**

8   **A   Yes.**    **04:**

9   **Q   And you, at the same time that you**    **04:**

10 **changed the start shift, made a change in the end**    **04:**

11 **shift, correct?**    **04:**

12   **A   Correct.**    **04:**

13   **Q   To take off 17 minutes, correct?**    **04:**

14   **A   Yes.**    **04:**

15   **Q   Why did you make those changes?**    **04:**

16   **A   I don't know.**    **04:**

17   **Q   Do you have any idea?**    **04:**

18   **A   No.**    **04:**

19   **Q   The changes reduced the shift to eight**    **04:**

20 **hours, correct?**    **04:**

21   **A   You would have to do the math for me, if**    **04:**

22 **that's correct.**    **04:**

23   **Q   Why don't you do the math.**    **04:**

24   **A   Isn't that more than eight hours?  Isn't**    **04:**

25 **that -- I mean, if you go from two o'clock to**    **04:**

00591

1  1:30, that's, like, you know -- that's 11 hours,          04:

2  isn't it?  Unless there was a long lunch.  I             04:

3  guess.                                        04:

4     Q   Look at the lunch and calculate that,           04:

5  please.                                      04:

6     A   Okay.  I guess there was -- two and a           04:

7  half hour lunch.  So it looks like I made it to         04:

8  eight hours, yes.  I'm not sure why she would be         04:

9  working that long.                             04:

10    Q   You made it to eight hours by changing         04:

11  the start time and the end time to reduce 18            04:

12  minutes, correct?                             04:

13    A   It looks like it, yes.                       04:

14    Q   Were you depriving Ms. Richmond of            04:

15  overtime that she worked on 6/28/2006?                04:

16    A   I honestly can't remember if I was or          04:

17  not.  I don't know.                            04:

18    Q   You can't tell from this --                    04:

19    A   I mean, to look at it, yes.  I would          04:

20  have to say just looking at this, I would have to      04:

21  say that's what I was doing.  But I don't know        04:

22  what the circumstances.  Like before, I don't          04:

23  know what the circumstances were.                04:

24    Q   You remember that you did that extremely       04:

25  rarely.  So you would expect there to be other        04:

00594

1 you?                          04:

2    A   I don't recall whether he did or not.        04:

3 No.                           04:

4    Q   Can you tell me, under oath, that        04:

5 Mr. Cossolotto ever approved your changing time        04:

6 to deprive employees of work time?           04:

7    A   No. I can't say that he ever approved.        04:

8    Q   Can you tell me that he even knew you        04:

9 ever did that?                     04:

10   A   I couldn't tell you whether he did or        04:

11 not.                         04:

12   Q   And you certainly can't tell me that he        04:

13 ever suggested that you do that, correct?        04:

14   A   I could not, no.                04:

15   **Q   Looking at Ms. Rose, please?**        **04:**

16   **A   Uh-huh.**                **04:**

17   **Q   For 6/29. We see that Ms. Rose punched**        **04:**

18 **in at 13:58, correct?**                **04:**

19   **A   Uh-huh.**                **04:**

20   **Q   Yes?**                **04:**

21   **A   Yes.**                **04:**

22   **Q   And you changed the punch in to 14:01,**        **04:**

23 **correct?**                **04:**

24   **A   Correct.**                **04:**

25   **Q   Thereby reducing three minutes, correct?**        **04:**

00595

1   A   Correct.                          04:

2   Q   You did that on July 1st, correct?          04:

3   A   Yes.                          04:

4   Q   Ms. Rose punched out at 19:04, correct,      04:

5   and you changed the punch to 19:00?          04:

6   A   Yes.                          04:

7   Q   Correct?                      04:

8   A   Yes.                          04:

9   Q   Thereby reducing four minutes, correct?      04:

10   A   Correct.                      04:

11   Q   Did you do that to bring the shift          04:

12   within five hours, or was there some other      04:

13   reason?                          04:

14   A   I can't recall.  I mean, the only thing      04:

15   I know that these two -- Rose, Valerie and Sophia      04:

16   have in common is that they are extreme talkers      04:

17   and just tend to talk quite a bit before their      04:

18   shifts and after their shifts.              04:

19        And so I'm not sure if I talked to them      04:

20   about doing that at that point and changed the      04:

21   time or -- I'm not exactly sure.          04:

22   Q   Do you recall, Mr. Hansen, that there      04:

23   were occasions when you observed Ms. Rose or      04:

24   Ms. Kosinski talking and said, you know, I know      04:

25   you weren't working, so I'm going to change your      04:

00596

1  time to reflect when you actually started        04:

2  working?                              04:

3    A   I know for -- yeah.  I know I've done      04:

4  that before.  I know -- I remember doing it      04:

5  specifically with Sophia a few times.  You know,    04:

6  that she was just socializing.  After she had      04:

7  been cashed out, there was no work being        04:

8  performed or anything like that.  Yeah.        04:

9    MS. MCCLAIN:  May I have this marked as next    04:

10  in order, please.                    04:

11  (Exhibit 117 was marked for identification.)      04:

12  BY MS. MCCLAIN:                  04:

13    Q   This is an Audit Trail Report for July      04:

14  2nd through July 8th, 2006.  That was a time when    04:

15  you were working as -- an assistant manager at    04:

16  1868; is that right?                  04:

17    A   That still doesn't look like my name is    04:

18  in there, because I still see Becky's edits and I    04:

19  have punches here.                  04:

20    Q   If you turn to the third page, you have    04:

21  punches, correct?                  04:

22    A   Yes.                      04:

23    Q   Those are punches as an assistant      04:

24  manager at 1868; is that right?            04:

25    A   Yes.                      04:

00605

1   that point.  So I don't remember ever having      05:

2   Lisa's.                              05:

3      Q   So on 7/7, if we look at the punches,      05:

4   the first thing that happened is that 12 minutes      05:

5   was added to lunch, correct?                  05:

6      A   Yes.                            05:

7      Q   And the second thing that happened was      05:

8   that six minutes was taken off the end of the      05:

9   shift, correct?                         05:

10     MR. FIETZ:  I apologize, Ms. McClain.  I've      05:

11   gotten off which one we are looking at.  Can you      05:

12   tell me?                            05:

13     MS. MCLAIN:  Yes.  We are on 4564, 7/7/2006.      05:

14   Ms. Bassignani's time.                   05:

15     THE WITNESS:  I see that.              05:

16     MR. FIETZ:  Thank you.                05:

17     THE WITNESS:  Yes.  Six minutes.          05:

18   BY MS. MCCLAIN:                        05:

19     Q   So that's a total of 18 minutes taken      05:

20   off time, correct?                      05:

21     A   Yes.                          05:

22     Q   And does that reduce the day to 8.5 with      05:

23   .5 for lunch?                          05:

24     A   Yeah.  It sounds right.              05:

25     Q   Do you have any factual understanding to      05:

00606

1  tell me whether it is correct or not correct that    05:

2  the edits made, with respect to this time,    05:

3  deprived Ms. Bassignani of overtime to the tune    05:

4  of 18 minutes?    05:

5  A   It appears so.    05:

6  Q   And can you tell me whether there's a    05:

7  legitimate explanation for that situation?    05:

8  A   No, I could not.    05:

9  Q   Do you think there was a legitimate    05:

10  explanation, or would it be total speculation on    05:

11  your part to say one way or the other whether it    05:

12  was legitimate or illegitimate?    05:

13  A   Complete speculation.    05:

14  Q   And you can't tell just by looking at    05:

15  this punch edit report whether it was legitimate    05:

16  or illegitimate, correct?    05:

17  A   No.    05:

18  Q   Is that right?    05:

19  A   Correct.    05:

20  Q   If you look at your time for July 4th,    05:

21  2006.    05:

22  A   Yes.    05:

23  Q   There is a change in the start shift,    05:

24  correct, adding about 3.6 hours, correct?    05:

25  A   Okay.  Right.    05:

00619

1  A  Uh-huh.                          05:

2  Q  Yes?                            05:

3  A  Yes.                            05:

4  Q  This is a change you made on July 4 at     05:

5  12:41, correct?                    05:

6  A  Correct.                        05:

7  Q  The change you made was to lengthen the    05:

8  start lunch, correct?  The punch in for start    05:

9  lunch was 12:16, and you changed it to a start    05:

10  lunch of 12:00, correct?             05:

11  A  Okay.  Yes.                     05:

12  Q  Adding 16 minutes to the lunch time and    05:

13  hence non-paid time, correct?         05:

14  A  Okay.                          05:

15  Q  Yes?                           05:

16  A  Yes.                           05:

17  **Q  Can you tell me why you did that?**       **05:**

18  **A  No.**                          **05:**

19  **Q  Can you tell me whether it was a**         **05:**

20  **legitimate change or an illegitimate change?**    **05:**

21  **A  No, I could not.**                  **05:**

22  Q  Looking at this, you simply can't tell    05:

23  me; is that right?                   05:

24  A  Correct.                        05:

25  Q  Was it the case that from time to time    05:

00624

1   Q   If you look at 8/15, please, for          05:

2   Ms. Bassignani on 0025.                     05:

3   A   Okay.                          05:

4   Q   We see that you increased              05:

5   Ms. Bassignani's lunch time by 20 minutes,      05:

6   correct?  She punched an end lunch at 11:36 and     05:

7   you edited that to have an end lunch 20 minutes     05:

8   later at 11:56, correct?                 05:

9   A   Yes.                          05:

10   Q   You, therefore, gave her a longer lunch     05:

11   time of unpaid time, correct?              05:

12   A   Correct.                       05:

13   Q   Did you do that because she took a        05:

14   longer lunch or did you do that to bring her down     05:

15   to an eight-hour workday?                05:

16   A   It may have been to cut it down.  I       05:

17   don't remember, to be honest.             05:

18   Q   Your answer is, I don't know?            05:

19   A   I don't know.  Yeah.               05:

20   Q   Either one is possible?               05:

21   A   Either one is possible.               05:

22   Q   If you look at Ms. Bassignani on 8/18,      05:

23   please, we see that you made a punch change for      05:

24   the start shift that provided Ms. Bassignani with     05:

25   two more minutes of work, correct?  Her punch in     05:

1  11:03, and you changed the clock out to 11:33,                06:

2  correct?                          06:

3  A   Correct.                      06:

4  Q   Do you know why you did that?              06:

5  A   No.                           06:

6  Q   Was it because she was in error and          06:

7  really worked until 23:33?                  06:

8  A   I can only speculate.  I don't know.         06:

9  **Q   Over and over again you've said to me, I      06:**

10 **cannot look at these Audit Trail Reports and tell      06:**

11 **you whether the change was legitimate or          06:**

12 **illegitimate and I really can't recall all of the      06:**

13 **underlying circumstances to fill that information      06:**

14 **in, correct?                      06:**

15 **A   That's correct.              06:**

16 **Q   Is that true of every change, not just      06:**

17 **the ones we have looked at?              06:**

18 **A   I would have to say yes.  I can't say      06:**

19 **100 percent what would be really -- I know for a      06:**

20 **fact that I did some that were wrong, and I did      06:**

21 **some that were right.  But I can't say which ones      06:**

22 **are which without going back in time and looking      06:**

23 **at it and being there.              06:**

24    MS. MCCLAIN:  May I have this marked as next      06:

25 in order, please.                      06:

1  I always needed to cover up on -- I felt like          06:

2  these were mistakes that I made in not being a          06:

3  good manager, I guess, of a store.          06:

4    Q    Every time you did that, did you say to          06:

5  yourself, boy, I hope I don't get caught, I'm          06:

6  violating company policy?          06:

7    A    I don't remember.          06:

8    Q    Did you have that thought on occasion,          06:

9  "I hope I don't get caught"?          06:

10   A    No.  I think afterwards -- I remember at          06:

11 one time thinking -- having a really bad feeling          06:

12 of what I was doing, but I don't remember.          06:

13   **Q    Because you knew every time you made a          06:**

14 **change that interfered with an employee's work or          06:**

15 **misrepresented when they took lunch, that you          06:**

16 **were violating company policy, correct?          06:**

17   **A    Correct.          06:**

18   Q    Would you turn to Lisa Murphy, please?          06:

19   A    Okay.          06:

20   Q    On 9/28.  Ms. Murphy has filled out the          06:

21 Time Clock Worksheet for 9/28, correct?          06:

22   A    Uh-huh.          06:

23   Q    Were you using the Time Clock Worksheet          06:

24 to guide your punch edits for 9/28?          06:

25   A    Looks like it's pretty straightforward.          06:

00651

1   Q   So you didn't write down or edit, enter          06:

2   with your edits, the handwritten notations of         06:

3   Ms. Murphy.  Why did you do that?                     06:

4   A   I actually don't know.  Maybe I wasn't            06:

5   paying close enough attention.  I'm not sure.         06:

6   Q   Did you do that to deprive Ms. Murphy of          06:

7   any pay for time worked?                              06:

8   A   No.  Because it looks as though it                06:

9   was -- I mean, it was a half an hour written down     06:

10  here, and it's a half an hour here.  So it            06:

11  wouldn't have -- it wouldn't have made any            06:

12  difference.  And the clock out time is the same       06:

13  time, too.                                            06:

14  Q   And so there are times when your edits           06:

15  are just mistakes, correct?                           06:

16  A   Yes, I would say.                                 06:

17  Q   And we can't tell, by looking at any              06:

18  particular edit, whether it was a mistake,            06:

19  whether it was deliberate, whether it deprived        06:

20  someone's time, or whether it added time,             06:

21  correct?                                              06:

22  MR. FIETZ:  Objection.  Foundation.               06:

23  BY MS. MCCLAIN:                                       06:

24  Q   Correct?                                          06:

25  A   I'm not sure what you want from that             06:

00652

1  **answer.**                              **06:**

2  **Q   We really can't tell, can we, even if it      06:**

3  **appears on the sheet, that you added time, that      06:**

4  **is you gave the employee more time than they      06:**

5  **actually worked, but it may well be that you made      06:**

6  **that edit to correspond with actual time,      06:**

7  **correct?**                              **06:**

8  **A   Correct.**                        **06:**

9   MS. MCCLAIN:  May I have this marked as next      06:

10  in order, please.                      06:

11  (Exhibit 122 was marked for identification.)      06:

12  BY MS. MCCLAIN:                    06:

13   Q   My reference in this document is on      06:

14  4804, please.                      06:

15   A   I thought you were talking about a date.      06:

16   Q   Sorry.  It's on the Bates Stamp.      06:

17   A   Got you.                    06:

18   Q   And it's in reference to Ms. Kosinski.      06:

19   A   Okay.                    06:

20   Q   Ms. Kosinski started a shift on      06:

21  12/13/2006 at 6:55, correct?      06:

22   A   Yeah.  Yes, got it.      06:

23   Q   Ms. Kosinski punched out for lunch at      06:

24  11:25, correct?                    06:

25   A   Yes.                    06:

1   Q   So all told, you -- thereby adding time          06:

2   to the lunch or reducing time in the end shift,          06:

3   took away approximately an hour and 20 minutes;          06:

4   correct?                              06:

5   A   Correct.                         06:

6   Q   Why did you do that?                   06:

7   A   That one looks more likely just to          06:

8   reduce the overtime.                    06:

9   Q   Why do you say that?                  06:

10   A   It's just the normal punches in and they     06:

11   are just drastically changed.               06:

12   Q   Did Ms. Kosinski ever complain about     06:

13   this instance?                         06:

14   A   Yes.  I -- well, actually, it was          06:

15   never -- I talked to her about it.  I remember     06:

16   having a discussion with her about this.          06:

17   Q   Did Ms. Kosinski complain about it?  Did     06:

18   she say, I've looked at my paycheck and it's     06:

19   missing an hour and 20 minutes or so?          06:

20   A   No.  I'm assuming I added it somewhere     06:

21   else because --                         06:

22   Q   Because why?                     06:

23   A   Because that was a discussion that I had     06:

24   with her.                            06:

25   Q   How did that discussion arise?          06:

00655

1    A   I think it happened while I was asking      06:

2  her what happened on the overtime and discussing      06:

3  it at that point and telling her the pressure      06:

4  that I was under and having -- became more of a      06:

5  friendly conversation at that point.      06:

6    Q   You were criticizing her for working      06:

7  overtime and somehow told her that because of      06:

8  that, you had taken away an hour and 20 minutes      06:

9  of her pay?      06:

10    A   No. I was finding out why she was --      06:

11  why she had worked overtime, and then explained      06:

12  to her the pressure that I was under to not have      06:

13  overtime.      06:

14      And I believe at that point -- I mean,      06:

15  this could be that instance where I didn't -- you      06:

16  know, where I added it to somewhere else.      06:

17      I'm trying to find if that's --      06:

18    Q   You're quite confident that you added it      06:

19  somewhere else because you told her you were      06:

20  going to add it; is that right?      06:

21    A   Yeah.      06:

22    Q   And you were making that representation      06:

23  that you had told her you were going to add it,      06:

24  you are sure you did that, correct?      06:

25    A   Yes. I'm pretty sure I did.      06:

00656

1  Q  So Ms. Kosinski actually lost no time?    06:

2  A  Correct.                    06:

3  Q  Once you added it at some other date?    06:

4  A  Correct.                    06:

5  Q  Because you added it at time-and-a-half;    06:

6 is that right?                    06:

7  MR. FIETZ: Foundation.            06:

8 BY MS. MCCLAIN:                06:

9  Q  Did you?                06:

10  A  I don't remember if I did this time or    06:

11 not, but I'm pretty sure that was the discussion    06:

12 that I had with her at that time, and then I    06:

13 would add it, time-and-a-half, somewhere else.    06:

14  Q  And having had that discussion with her,    06:

15 you were quite confident you did it; is that    06:

16 right?                    06:

17  A  I am. I'm looking at it. I don't know    06:

18 where I would find it here. But because I think    06:

19 there may have been a time where I -- where I    06:

20 just added the regular and then there might have    06:

21 been another time where I talked to her. I can't    06:

22 remember. I know there's -- but I know there was    06:

23 a time where I had a discussion with her about    06:

24 it.                    06:

25  Q  Did Ms. Kosinski say that's fine if you    06:

00657

1  add it some other time, that would be okay?          06:

2   A   She did.  Yes.                    06:

3   Q   So one would assume if you hadn't done          06:

4  that, you would have heard from her further,          06:

5  right?  She would have complained about it?          06:

6   A   Correct.                    06:

7   Q   Did she complain about it again?          06:

8   A   No.  I think that was the day I decided          06:

9  it was not worth doing it any more.                    06:

10   Q   Have a look, please, at the next page.          06:

11   A   Okay.                    06:

12   Q   We see an end shift for Ms. Kosinski on          06:

13  12/15, that is two days later?                    06:

14   A   Uh-huh.                    06:

15   Q   That was supplied by Ms. Lofquist,          06:

16  correct?                    06:

17   A   Okay.                    06:

18   Q   Ms. Lofquist provides an end shift of          06:

19  6:30 in the evening, correct?                    06:

20   A   Correct.                    06:

21   Q   You made a change on December 16 to          06:

22  elongate the end shift to almost 8:00, correct?          06:

23   A   Correct.                    06:

24   Q   You added essentially an hour and 21          06:

25  minutes to that shift time, correct?                    06:

00658

1   **A  Correct.**          **06:**

2   **Q  Is that where you made the adjustment?**  **06:**

3   **A  It looks like that it is.  So, yes.**    **06:**

4   **Q  Do you think we'll find another place**    **06:**

5   **where you added a half of that time again?**    **06:**

6   **A  I'm not sure.  Like I said, there may**    **06:**

7   **have been one time.  I remember Sophia was very**    **06:**

8   **cautious of -- because she's -- you know, a very**    **06:**

9   **meticulous person.  So I think I --**    **06:**

10   **Q  You think you did it right?**    **06:**

11   **A  Yeah.  So --**    **06:**

12   **Q  Is that right?**    **06:**

13   **A  I may have just -- I think there was one**  **06:**

14   **time I did it to her where I may not have added**    **06:**

15   **the extra half hour.  And I don't know if that**    **06:**

16   **was here or not.  This could have been that time**    **06:**

17   **where I had the discussion with her.  But --**    **06:**

18   Q  Would you go, please, back to    06:

19   Ms. Bassignani's audit report that we were    06:

20   looking at, which is Exhibit --    06:

21   A  119.    06:

22   Q  Yes.  Have a look, please, at the page    06:

23   with the Bates stamp 0030.  Would you also,    06:

24   please, look at Exhibit 17, which is in the pile    06:

25   from the first day.    06:

00659

1    MS. MCCLAIN:  Ms. Reporter, please.                06:

2    Q   See that, on October 11, 2006                   06:

3  Ms. Bassignani had a punch out at 16:16,             06:

4  correct?                                06:

5    A   Uh-huh.                           06:

6    Q   So that's 4:16 in the afternoon,                06:

7  correct?                                06:

8    A   Yeah.                            06:

9    Q   And you initially reduced that punch out         06:

10  by nine minutes, correct?                       06:

11   A   Yes.                             06:

12   Q   That reduction brought Ms. Bassignani to        06:

13  eight hours of work, correct?                      06:

14   A   Yes.                             06:

15   **Q   You did that on October 11th, correct?**        **06:**

16   **A   Yeah.**                            **06:**

17   **Q   That change, which reduced the nine**         **06:**

18  **minutes of overtime.  On October 14, which is,**    **06:**

19  **what, three days later, you made another change,**   **06:**

20  **correct?**                             **06:**

21   **A   Yes.**                             **06:**

22   **Q   Restoring the initial punch, thereby**         **06:**

23  **giving Ms. Bassignani nine minutes of overtime,**   **06:**

24  **correct?**                             **06:**

25   **A   Correct.**                          **06:**

1    STATE OF CALIFORNIA    )

2    COUNTY OF SONOMA    )

3        I, LINDA VACCAREZZA, a Certified Shorthand

4    Reporter of the State of California, duly

5    authorized to administer oaths pursuant to

6    Section 2025 of the California Code of Civil

7    Procedure, do hereby certify that

8            JOHN D. HANSEN,

9        The witness in the foregoing examination,

10    was by me duly sworn to testify the truth, the

11    whole truth and nothing but the truth in the

12    within-entitled cause; that said testimony of

13    said witness was reported by a disinterested

14    person, and was thereafter transcribed under my

15    direction into typewriting and is a true and

16    correct transcription of said proceedings.

17        I further certify that I am not of counsel

18    or attorney for either or any of the parties in

19    the foregoing examination and caption named, nor

20    in any way interested in the outcome of the cause

21    named in said caption.

22        Dated the 14th day of November, 2007.

23

24    _____

25        LINDA VACCAREZZA, RPR, CSR #10201

665

1
                          Preferred Reporters
                          201 E. Watmaugh Road
2                        Sonoma, California 95476

3                           November 15, 2007

4

5

6   To:   John D. Hansen
          EDGAR LAW FIRM
7         ATTENTION::   JEREMY R. FIETZ, ESQUIRE
          408 College Avenue
8         Santa Rosa, CA  95401

9   Re:   Cruz, Hansen v. Dollar Tree Store
          Deposition taken on November 1, 2007
10        Reported by Linda Vaccarezza

11  Dear Mr. Hansen,

12       The original transcript of your deposition taken in
    the above-entitled action has been prepared and is
13  available at this office for your reading, correcting and
    signing.
14
         You may wish to discuss this matter with your
15  attorney to determine if counsel requires that the
    original transcript of your deposition be read, corrected
16  and signed by you before it is sealed.

17       Your rights regarding signature of this deposition
    are contained in the California Code of Civil Procedure.
18
         If you wish to make arrangements to review the
19  original transcript of your deposition, please contact
    this office during office hours, 9:00 to 5:00 Monday
20  through Friday, to make an appointment to review the
    original transcript.
21
                          Sincerely,
22

23                        Sherry Morrison
                          Office Manager
24  cc:   All Counsel

25

# EXHIBIT E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

MIGUEL A. CRUZ, and JOHN
D. HANSEN, individually
and on behalf of all
others similarly
situated,

          Plaintiffs,    Case No.  C07-02050 SC

    vs.

DOLLAR TREE STORES, INC.,

        Defendant.

DEPOSITION OF MIGUEL A. CRUZ

DATE:        FRIDAY, OCTOBER 12, 2007

TIME:        9:32 A.M.

LOCATION:    Kauff, McClain & McGuire
            One Post Street, Suite 2600
            San Francisco, California

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

REPORTED BY:  Wendy L. Van Meerbeke, CSR #3676

1

1  assistant managers; correct?

2    A.  No.

3    Q.  Who else worked overtime?

4    A.  Sometimes stockers.

5    Q.  Did the stockers ever work more than eight

6  hours?

7    A.  Yes.

8    Q.  Did some of your employees get overtime?

9    A.  No.

10   Q.  None of your employees in the Healdsburg

11  store ever got overtime; is that right?

12   A.  No -- yes.

13   **Q.  Let's be very clear about this.  It's your**

14  **testimony that while you were store manager at**

15  **Healdsburg, no one got a single penny of overtime?**

16   **A.  I never checked their check, so I don't**

17  **know.**

18   **Q.  But you think you went in and changed**

19  **every possible overtime hour; is that right?**

20   **A.  Yes.**

21   Q.  Must have taken a lot of time for you to

22  do that.

23      MR. FIETZ:  That's not a question.

24  Miguel, you don't have to answer.

25

1    Q. Yes?

2    A. Yes.

3    **Q. Ms. Cape got overtime for 9-18; correct?**

4    **A. I don't remember.**

5    **Q. The hours would suggest she got overtime;**

6 **wouldn't they?**

7    **A. Yes.**

8    **Q. And you made no changes which got rid of**

9 **the overtime; correct?**

10    **A. Yes.**

11    Q. So your testimony is that you always

12 changed everyone's punches to deprive them of

13 overtime was not truthful; was it?

14    A. I made a mistake.

15    MR. FIETZ: Argumentative.

16    MS. McCLAIN:

17    Q. You made a mistake?

18    A. Yeah.

19    Q. Just one? This is the only time where

20 we're going to find that somebody got overtime at

21 store 2262; is that correct?

22    MR. FIETZ: Objection. Argumentative,

23 lacks foundation.

24    THE WITNESS: I don't know.

25

1    **Q. We see on October 1, 2006 that Ms. Rose**

2 **started work at 7:34 in the morning; correct?**

3    **A. Yes.**

4    **Q. And she ended work at 2200, which is**

5 **o'clock; correct?**

6    **A. Yes.**

7    **Q. Ms. Rose got overtime for that day; didn't**

8 **she?**

9    **A. Yes.**

10    Q. And you supplied punches because Ms. Rose

11 didn't punch end breaks, start breaks and lunches,

12 correct, but you didn't change her hours? She got

13 the overtime; didn't she?

14    A. 10-22 -- what was the date?

15    Q. 10-1.

16    A. 10-1.

17    Q. The shift started at 7:34 a.m. and ended

18 at 11:00 o'clock p.m.

19    A. Yes.

20    Q. How many times do you think we're going to

21 find in the punch audit reports people who worked

22 over eight hours and there were no changes?

23    A. I don't know.

24    Q. Why did you allow overtime on these days

25 if -- the two days we've just looked at if

1     Is it correct that assistant managers were

2 not to assign overtime to employees without

3 approval from you?

4     A. Nobody should be allowed, not even me.

5     Q. No one should be allowed to sign overtime;

6 correct?

7     A. No.

8     Q. Was it a policy of Dollar Tree that under

9 no circumstances ever, ever, ever could you work

10 overtime -- could anyone work overtime?

11     MR. FIETZ: Objection. Vague.

12     MS. McCLAIN:

13     **Q. Did you understand that Dollar Tree had**

14 **any policy one way or the other about hourly**

15 **employees working overtime?**

16     **A. No.**

17     Q. You didn't understand that there was a

18 policy either prohibiting it or allowing it?

19     A. As far as I know, you're not supposed to

20 give overtime at Dollar Tree.

21     Q. How do you know that?

22     A. From Mr. Rick.

23     MS. McCLAIN: May I have this marked as

24 next in order, please?

25

00253

1    A. Mr. Rick.

2    Q. How did Mr. Tellstrom tell Mr. Corina

3 that?

4    A. He will call me to tell him.

5    Q. Is it correct that every time we see a

6 change between the schedule and the actual worked,

7 that Mr. Tellstrom made that decision?

8    A. Yes.

9    Q. Every single time it appears in these

10 schedules?

11    A. Yes.

12    Q. And Mr. Tellstrom called you up and told

13 you that?

14    A. Yes.

15    Q. Did Mr. Corina get overtime for October

16 11th?

17    A. I don't remember.

18        MS. McCLAIN: May I have this marked as

19 next in order, please?

20        (A document was marked as Exhibit 59

21 for identification.)

22        MS. McCLAIN:

23    Q. If you look on the second page of this

24 document, Mr. Cruz, do you see a time period on

25 October 11th that corresponds with Mr. Corina's

1  schedule -- his actual work schedule?

2     A. Yes.

3     Q. So the actual time on Exhibit 36 says that

4  he started his shift at 10:49; correct?

5     A. Yes.

6     Q. And the actual time on that same punch

7  audit report says he ended at 8:05; correct?  2005

8  is 8:05?

9     A. Yes.

10     Q. So the numbers correspond precisely to

11  those listed on the actual work time on Exhibit 36;

12  correct?

13     A. Yes.

14     Q. He had apparently no breaks that day, so

15  he was paid for that whole time frame; correct?

16     A. Yes.

17     Q. So he got overtime that day; correct?

18     A. I would say I don't know.

19     Q. This reads as if he's entitled to

20  overtime; correct?

21     A. Yes.

22     Q. And you haven't changed any start shift or

23  end shifts which would deprive him of overtime;

24  correct?

25     A. No.

1    Q. So this is another example where you

2  didn't make a change that reduced an employee's

3  time so that they wouldn't get overtime; correct?

4  There's no change in these punches; is there?

5    A. No.

6    Q. Does this cause you to reconsider your

7  testimony, Mr. Cruz, that you changed everyone's

8  time so that no one ever got overtime?

9    A. No.

10    Q. You still think that testimony is

11  accurate?

12    A. Yes.

13    Q. Even in the face of now three examples

14  where people got overtime?

15    A. Yes.

16    Q. How do you explain that?

17    A. A mistake.

18    Q. A mistake on your part?

19    A. Yes.

20    Q. Letting that overtime slip by?

21    A. Yes.

22    **Q. Did Mr. Tellstrom ever call you and say,**

23  **"I see that so-and-so got overtime. You didn't**

24  **change the punch audit report as you should have"?**

25    **A. Oh, yeah, for sure.**

CERTIFICATION OF DEPOSITION OFFICER

I, WENDY L. VAN MEERBEKE, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth in the within entitled cause; that said deposition was taken at the time and place set forth; that the testimony of said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was thereafter transcribed by computer under my direction into booklet form; that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Dated the 1st day of November, 2007.

WENDY L. VAN MEERBEKE, CSR 3676

265

Preferred Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

October 31, 2007

TO:    Miguel A. Cruz
       c/o JEREMY R. FIETZ, ESQ.
       408 College Avenue
       Santa Rosa, California 95401

Re:    Hansen v. Dollar Tree Stores
       Deposition taken on October 12, 2007
       Reported by Wendy Van Meerbeke, CSR #3676

Dear Mr. Cruz,

        The original transcript of your deposition
taken in the above-entitled action has been
prepared and is available at this office for your
reading, correcting and signing.

        You may wish to discuss this matter with your
attorney to determine if counsel requires that the
original transcript of your deposition be read,
corrected and signed by you before it is sealed.

        Your rights regarding signature of this
deposition are contained in the California Code of
Civil Procedure.

        If you wish to make arrangements to review
the original transcript of your deposition, please
contact this office during office hours, 9:00 to
5:00 Monday through Friday, to make an appointment
to review the original transcript.

                        Sincerely,

                        Wendy L. Van Meerbeke
                        Certified Shorthand Reporter

266

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL A. CRUZ, and JOHN D. HANSEN, individually, and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>vs.<br><br><br>DOLLAR TREE STORES, INC.,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No: C07-02050 SC<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DEPOSITION OF MIGUEL CRUZ
VOLUME II

DATE:              Friday, November 2, 2007

TIME:              9:29  a.m.

LOCATION:          Kauff, McClain & McGuire
                   One Post Street,  26th Floor
                   San Francisco, California 94104

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

Reported By:  Linda Vaccarezza, RPR, CSR #10201

267

00435

1   A   It says change by -- it says right here,        01:

2 Lori.                              01:

3   Q   My question is whether Lori made the        01:

4 change using somebody else's name?  You can't        01:

5 tell that from here, can you?                01:

6   A   No.                        01:

7   Q   You can't tell whether Lori was using        01:

8 her correct number or whether somebody else was        01:

9 using Lori's number.  All you can tell is that        01:

10 Lori is designated as the person making the        01:

11 change, correct?                    01:

12   A   Yes.                        01:

13   **Q   While you were working at Dollar Tree,        01:**

14 **did you have any factual information that        01:**

15 **suggested to you that the assistant managers or        01:**

16 **anyone else at Dollar Tree used each other's        01:**

17 **numbers when editing changes, when making        01:**

18 **changes?                    01:**

19   **A   Yes.                    01:**

20   **Q   What information did you have on this        01:**

21 **subject?                    01:**

22   **A   When I first started, if I remember        01:**

23 **right, Mr. Rick gave me Lori's codes.        01:**

24   Q   Is this before you had your own code?        01:

25   A   I don't remember.                01:

1    A   Yes.

2    Q   The employee had punched a start break

3    at 12:51, correct?

4    A   12:51?  I don't see 12:51.  What day is

5    it?

6    Q   It's the very first line on page 60,

7    9/23/2006.

8    A   Yes.

9    Q   The employee's punch is at 12:51,

10   correct?

11   A   Yes.

12   Q   You changed that punch to 13:50,

13   correct?

14   A   Yes.

15   Q   Why did you do that?

16   A   I don't remember why.

17   Q   It has no impact upon pay, correct, that

18   change?

19   A   No.

20   Q   Do you agree with that statement; that

21   change has no impact on pay, correct?

22   A   Yes.

23   Q   Why did you do it?

24   A   I don't know.

25   Q   Do you have any recollection?  Did the

00484

1   A   No.                           03:

2   Q   Do you see anything questionable on 101?    03:

3   A   No.                           03:

4   Q   Do you see anything questionable on 102?    03:

5   A   No.                           03:

6   Q   Do you see anything questionable on 103?    03:

7   A   No.                           03:

8   Q   Do you see anything questionable on 104?    03:

9   A   No.                           03:

10   Q   You see that you made a change on 104 on    03:

11  10/24, correct, and this is a change for       03:

12  Ms. Rodriguez Lopez, correct?               03:

13   A   Yes.                          03:

14   Q   Ms. Rodriguez Lopez punched out at 10:37    03:

15  in the morning, correct?                   03:

16   A   Yes.                          03:

17   Q   And you increased her work time by        03:

18  changing the punch to an hour later, right,    03:

19  11:37?                            03:

20   A   Yes.  Yes.                      03:

21   Q   So that change gave her an hour more of    03:

22  pay, correct?                         03:

23   A   Yes.                          03:

24   **Q   Can you tell me, looking at this        03:**

25  **document today, why you made that change?        03:**

**Cruz,Miguel Vol.2 11-2-07.dep**          **Page 484**

00485

1    **A   No.                           03:**

2    **Q   Can you tell me whether it's legitimate      03:**

3    **or illegitimate?                        03:**

4    **A   No.                           03:**

5    **Q   Would that be your testimony, Mr. Cruz,      03:**

6    **for every punch edit that we were to look at,      03:**

7    **that you couldn't tell today what the underlying      03:**

8    **circumstances were?                      03:**

9    **A   Yes, I don't remember.               03:**

10   Q   Do you see anything questionable on page    03:

11   105?                       03:

12   A   No.                      03:

13   Q   Do you see anything questionable on page    03:

14   106?                       03:

15   A   No.                      03:

16   Q   Do you see anything questionable on page    03:

17   107?                       03:

18   A   No.                      03:

19   Q   Do you see anything questionable on page    03:

20   108?                       03:

21   A   No.                      03:

22   Q   Do you see anything questionable on page    03:

23   109?                       03:

24   A   No.                      03:

25   Q   Do you see anything questionable on page    03:

1    STATE OF CALIFORNIA      )

2    COUNTY OF SONOMA         )

3        I, LINDA VACCAREZZA, a Certified Shorthand

4    Reporter of the State of California, duly

5    authorized to administer oaths pursuant to

6    Section 2025 of the California Code of Civil

7    Procedure, do hereby certify that

8              MIGUEL CRUZ,

9        The witness in the foregoing examination,

10   was by me duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the

12   within-entitled cause; that said testimony of

13   said witness was reported by a disinterested

14   person, and was thereafter transcribed under my

15   direction into typewriting and is a true and

16   correct transcription of said proceedings.

17       I further certify that I am not of counsel

18   or attorney for either or any of the parties in

19   the foregoing examination and caption named, nor

20   in any way interested in the outcome of the cause

21   named in said caption.

22       Dated the 15th day of November, 2007.

23

24   LINDA VACCAREZZA, RPR, CSR #10201

25

494

1                Preferred Reporters
                201 E. Watmaugh Road
2          Sonoma, California 95476

3            November 15, 2007

4

5

6  To: Miguel Cruz
      EDGAR LAW FIRM
7      ATTENTION:  Jeremy R. Fietz, Esquire
      408 College Avenue
8      Santa Rosa, CA  95401

9  Re:  Cruz, Hansen v. Dollar Tree
      Deposition taken on November 2, 2007
10     Reported by Linda Vaccarezza, CSR #10201

11  Dear Mr. Cruz,

12     The original transcript of your deposition
taken in the above-entitled action has been
13  prepared and is available at this office for your
reading, correcting and signing.

14

15     You may wish to discuss this matter with
your attorney to determine if counsel requires
that the original transcript of your deposition
16  be read, corrected and signed by you before it is
sealed.

17

18     Your rights regarding signature of this
deposition are contained in the California Code
19  of Civil Procedure.

20     If you wish to make arrangements to review
the original transcript of your deposition,
please contact this office during office hours,
21  9:00 to 5:00 Monday through Friday, to make an
appointment to review the original transcript.

22

23          Sincerely,

24          Linda Vaccarezza
           Certified Shorthand Reporter

25  cc:  All Counsel

495

# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

KASSONDRA BAAS AND KELLY LOFQUIST,

individually and on behalf of all

others similarly situated,

              Plaintiffs,

      vs.               Case No. C0703108 JSW

DOLLAR TREE STORES, INC.,

           Defendants.

_____/


DEPOSITION OF KELLY LOFQUIST

October 15, 2007


REPORTED BY:

SANDRA L. CARRANZA, CRR, RPR, CSR 7062


PREFERRED REPORTERS

CERTIFIED SHORTHAND REPORTERS

201 E. Watmaugh Road

Sonoma, California  95476

Phone (707) 938-9227

```
 1      Q.    Is it correct then that at least one of      10:05:29

 2  your divorces was contested?   There was testimony     10:05:31

 3  taken about it?                                        10:05:35

 4      A.    No.   I don't believe so.   I don't remember. 10:05:36

 5      Q.    If they were not contested, that would mean  10:05:42

 6  that you were testifying --                            10:05:45

 7      A.    One of my marriages was annulled, so there   10:05:46

 8  was no -- there was no court proceeding in that.       10:05:47

 9      Q.    Was that Mr. Kelley?                          10:05:53

10      A.    Mr. Albertony.                               10:05:55

11      Q.    If your divorces were not contested, is it   10:06:05

12  correct then that your testifying in court has been    10:06:07

13  restricted to criminal proceedings?                    10:06:11

14      A.    Yes.                                         10:06:13

15      Q.    As far as you know, those criminal           10:06:14

16  proceedings have all been in California; is that       10:06:15

17  right?                                                 10:06:17

18      A.    They have all been in California.            10:06:18

19      Q.    Have they all been in Sonoma County?         10:06:19

20      A.    Yes.                                         10:06:22

21      Q.    You told me that you and Ms. Baas discussed  10:06:28

22  unfair practices.   And when I asked you what you      10:06:32

23  talked about, you said Tina being deprived of an       10:06:35

24  hour of work because Mr. Hansen wished to meet his     10:06:41

25  payroll hours, correct?
```

40

1       A.    Right.                                          10:06:49

2       Q.    Do you know that as a fact, or do you just    10:06:50

3  know that Mr. Hansen told you that?                        10:06:52

4       A.    I was sitting right there.                     10:06:54

5       Q.    You were sitting with him?                     10:06:55

6       A.    When he did it.                                10:06:57

7       Q.    Did you watch him do it?                       10:06:59

8       A.    Yes.                                           10:07:00

9       Q.    So you saw him actually go into the Compass    10:07:02

10  report and make a change in Tina's hours; is that        10:07:06

11  right?                                                    10:07:10

12      A.    Yes.                                           10:07:11

13      Q.    Did you say to him that's not right,           10:07:12

14  Mr. Hansen?                                               10:07:14

15      A.    No.                                            10:07:15

16      Q.    Why not?                                       10:07:15

17      A.    I didn't want to lose my job.                  10:07:16

18      Q.    You knew Mr. Hansen had the authority to       10:07:18

19  fire you?                                                 10:07:21

20      A.    Yes.                                           10:07:22

21      Q.    Did you know that what he was doing was        10:07:34

22  inconsistent with company policy, with Dollar Tree       10:07:36

23  policy?                                                   10:07:40

24      A.    I don't know.                                  10:07:41

25      Q.    How did Mr. Hansen accomplish that task of

41

1    Q.    Right.                                          10:26:37

2          Is there more than one number for human          10:26:38

3    resources?                                            10:26:41

4    A.    I don't remember.                               10:26:42

5    Q.    Do you recall there being a care line           10:26:43

6    number as well, an anonymous line where you could     10:26:44

7    make reports?                                         10:26:46

8    A.    Tip line, yeah.                                 10:26:50

9    Q.    Tip line?                                        10:26:51

10          (Reporter clarification.)                       13:14:02

11         MS. McCLAIN:   Tip line.                         10:26:52

12    Q.    Do you know what Dollar Tree called that

13    tip line?                                            10:26:54

14    A.    I don't remember.                               10:26:55

15    Q.    Did you ever call human resources to           10:26:58

16    complain about any change in your pay?               10:27:01

17    A.    No.                                            10:27:06

18    Q.    Why not?                                        10:27:06

19    A.    I didn't want to complain and lose my job.     10:27:08

20    Q.    You thought Mr. Hansen would have fired you    10:27:10

21    for that?                                            10:27:12

22    A.    I thought, yeah, I might rock the boat and     10:27:13

23    get fired, yeah.                                     10:27:15

24    Q.    My question is more specific than that.        10:27:16

25    Did you think Mr. Hansen would fire you for that,

```
 1   clocking in and out for a 30-minute meal break even   14:12:38
 2   when you didn't take them?                            14:12:42
 3      A.   Yes.                                          14:12:43
 4      Q.   What did he say to that?                      14:12:44
 5      A.   He didn't really have too much to say.        14:12:46
 6      Q.   You don't recall --                           14:12:49
 7      A.   I don't recall what -- what our               14:12:51
 8   conversation was, but I know we talked about it.      14:12:53
 9      Q.   Did you ever make an inquiry of anyone --     14:13:09
10   of human resources, of the tip line, of a manager --  14:13:11
11   as to what Dollar Tree's policies were with respect   14:13:15
12   to payment for time worked?                           14:13:20
13      A.   No.                                           14:13:23
14      Q.   Did you ever inquire of anyone -- again,      14:13:23
15   human resources, a manager, the tip line -- as to     14:13:26
16   whether Dollar Tree expected you to accurately        14:13:33
17   record your hours worked?                             14:13:38
18      A.   No.                                           14:13:40
19      Q.   Did you have a general understanding that     14:13:42
20   it was your obligation to accurately record your      14:13:43
21   hours worked?                                         14:13:46
22      A.   Yes.                                          14:13:47
23      Q.   Where did you get that understanding from?    14:13:48
24      A.   Prior -- previous employment.                 14:13:49
25      Q.   Did you always punch in when you arrived at
```

```
 1      Q.   Can you tell me whether it was a day later    14:58:51

 2   or two days later or three days later?                14:58:53

 3      A.   It was one to two days later.                 14:58:56

 4      Q.   On this occasion you did not punch in?        14:58:58

 5      A.   No.                                           14:59:00

 6      Q.   Is that right?                                14:59:00

 7      A.   Correct.                                      14:59:01

 8      Q.   Did you tell Mr. Hansen that you hadn't       14:59:03

 9   punched in?                                           14:59:06

10      A.   Yes.                                          14:59:07

11      Q.   What did he say?                              14:59:08

12      A.   Good.                                         14:59:09

13      Q.   Were there any witnesses to either of those   14:59:11

14   conversations with Mr. Hansen?  To your knowledge,    14:59:16

15   did anyone overhear?                                  14:59:20

16      A.   My son.  He was one of the temporary hired.   14:59:22

17      Q.   Is that Daniel?                               14:59:37

18      A.   Yes.                                          14:59:38

19      Q.   We will find that there was a                 14:59:41

20   Daniel Patrick on the payroll for some time in the    14:59:42

21   Christmas season of 2006; is that right?              14:59:48

22      A.   Correct.                                      14:59:50

23      Q.   For a couple of days?                         14:59:50

24      A.   Yes.                                          14:59:52

25      Q.   And the first such day that he was on the
```

```
 1    payroll is the occasion of the first such instance;    14:59:54

 2    is that right?                                          14:59:56

 3       A.   Correct.                                        14:59:57

 4       Q.   It was your observation that Daniel heard       15:00:01

 5    Mr. Hansen both express regret that you had punched     15:00:05

 6    in on the first occasion and express pleasure that      15:00:08

 7    you had not punched in on the second occasion; is       15:00:12

 8    that right?                                             15:00:14

 9       A.   I don't know if he overheard it.  I know he     15:00:15

10    was there.                                              15:00:18

11       Q.   I asked you whether you thought there were      15:00:20

12    any witnesses to the conversation.  Is your answer,     15:00:22

13    maybe Daniel, you're not sure?                          15:00:24

14       A.   No, he was there.                               15:00:26

15       Q.   The question is whether he heard the            15:00:28

16    conversation.                                           15:00:29

17       A.   I don't know.                                   15:00:30

18       Q.   My question really is, do you know whether      15:00:32

19    anyone was close enough to hear the conversation,       15:00:35

20    and your answer is you're not sure?                     15:00:37

21       A.   I don't know.                                   15:00:40

22       Q.   But your son was there somewhere?               15:00:42

23       A.   He was there right next to me.                  15:00:44

24       Q.   Did you talk to your son about this on any      15:00:46

25    other occasion?
```

1   once; is that right?                                    15:09:22

2      A.   Yes.                                            15:09:23

3      Q.   Do you have any information whatsoever that     15:09:31

4   this situation, having people work when they weren't    15:09:34

5   punched in or punched out, entering meal periods,       15:09:39

6   deducting overtime, do you have any factual             15:09:42

7   information that that occurred at any other store       15:09:46

8   aside from 1868?                                        15:09:48

9      A.   No.                                             15:09:55

10     Q.   Do you have any factual information that        15:09:56

11  suggests to you that Mr. Hansen was doing this          15:09:57

12  because some higher manager told him to do it?          15:10:01

13     A.   Just hearsay.                                   15:10:06

14     Q.   You don't have any direct factual              15:10:08

15  information about that; is that right?                  15:10:10

16     A.   No.                                             15:10:11

17     Q.   You never heard another manager tell him       15:10:11

18  that.  Mr. Hansen never said, well, I'm just doing      15:10:13

19  this because so and so told me to do it.  You don't     15:10:17

20  have any direct accounting of that?                     15:10:19

21     A.   Just John telling me.                          15:10:21

22     Q.   So your information is John telling you; is     15:10:23

23  that right?                                             15:10:25

24     A.   Yes, hearsay from him.                         15:10:25

25     Q.   Do you have --

```
 1   how the district manager bonus was calculated?    15:12:15

 2       A.   No, I don't.                             15:12:18

 3       Q.   You had a bonus as an assistant manager, 15:12:20

 4   correct?                                          15:12:23

 5       A.   Once.                                    15:12:24

 6       Q.   That was based upon sales?               15:12:24

 7       A.   Yes.                                     15:12:25

 8       Q.   So if the store sales improved, managers at 15:12:26

 9   the store level got bonuses, correct?            15:12:30

10       A.   Correct.                                 15:12:33

11       Q.   Did you have any factual information that 15:12:33

12   your bonus was related in any way to payroll hours? 15:12:34

13       A.   No.                                      15:12:39

14       Q.   Is that the case with Mr. Hansen as well? 15:12:39

15   Was his bonus based on the same criteria as yours, 15:12:42

16   or do you know?                                   15:12:45

17       A.   I don't know.                            15:12:46

18       Q.   You never saw an e-mail that said, don't 15:12:49

19   pay people for time worked, did you, from        15:12:53

20   Mr. Tellstrom?                                    15:12:55

21       A.   No.                                      15:12:56

22       Q.   So the only e-mails you saw that gave you 15:12:56

23   any information was the e-mails that said, let's  15:13:03

24   keep employee hours in line with sales projections? 15:13:05

25       A.   Yes.  Or we are going to owe him.
```

REPORTER CERTIFICATE

1

2          I hereby certify that the witness to the

3     foregoing deposition was by me duly sworn to testify

4     to the truth the whole truth and nothing but the

5     truth in the within-entitled cause; that said

6     deposition was taken at the time and place herein

7     named; that the deposition is a true record of the

8     witness's testimony as reported to the best of my

9     ability by me, a duly certified shorthand reporter

10    and a disinterested person, and was thereafter

11    transcribed under my direction into typewriting by

12    computer; that the witness was given an opportunity

13    to read and correct said deposition and to subscribe

14    the same.  Should the signature of the witness not

15    be affixed to the deposition, the witness shall not

16    have availed himself or herself of the opportunity

17    to sign or the signature has been waived.

18          I further certify that I am not

19    interested in the outcome of said action, nor

20    connected with, nor related to any of the parties in

21    said action, nor to their respective counsel.

22          IN WITNESS WHEREOF, I have hereunto set

23    my hand this October 26, 2007

24

25              SANDRA L. CARRANZA
                CSR No. 7062

318

1                     PREFERRED REPORTERS
                 CERTIFIED SHORTHAND REPORTERS
2                    201 E. Watmaugh Road
                 Sonoma, California  95476
3                   Phone (707) 938-9227
4
     October 26, 2007
5
     TO:   KELLY LOFQUIST
6          C/O:  JEREMY R. FIETZ, ATTORNEY AT LAW
           EDGAR LAW FIRM
7          408 College Avenue
           Santa Rosa, California 95401
8
     RE:   KASSONDRA BAAS AND KELLY LOFQUIST, individually
9          and on behalf of all others similarly situated
           vs. DOLLAR TREE STORES, INC.
10         Deposition taken October 15, 2007
           Reported by SANDRA L. CARRANZA, CSR No. 7062
11
     Dear Ms. Lofquist:
12
     The original transcript of your deposition taken in
13   the above-entitled action has been prepared and is
     available at this office for your reading,
14   correcting and signing.  In the alternative, you may
     wish to review your counsel's copy.  Please notify
15   this office and all counsel of any corrections you
     wish to make.
16
     Your rights regarding signature of this deposition
17   are contained in the California Code of Civil
     Procedure Section 2025.520.  Unless otherwise
18   directed, your original deposition transcript will
     be sealed after 35 days.
19
     If you wish to make arrangements to review the
20   original transcript of your deposition, please
     contact this office during office hours, 9:00 to
21   5:00 Monday through Friday, to make an appointment.
22                   Sincerely,
23
24             Sandra L. Carranza
                    CSR No. 7062
25   cc:  All counsel
26

319

REPORTER CERTIFICATE

1

2          I hereby certify that the witness to the

3    foregoing deposition was by me duly sworn to testify

4    to the truth the whole truth and nothing but the

5    truth in the within-entitled cause; that said

6    deposition was taken at the time and place herein

7    named; that the deposition is a true record of the

8    witness's testimony as reported to the best of my

9    ability by me, a duly certified shorthand reporter

10   and a disinterested person, and was thereafter

11   transcribed under my direction into typewriting by

12   computer; that the witness was given an opportunity

13   to read and correct said deposition and to subscribe

14   the same.  Should the signature of the witness not

15   be affixed to the deposition, the witness shall not

16   have availed himself or herself of the opportunity

17   to sign or the signature has been waived.

18          I further certify that I am not

19   interested in the outcome of said action, nor

20   connected with, nor related to any of the parties in

21   said action, nor to their respective counsel.

22          IN WITNESS WHEREOF, I have hereunto set

23   my hand this October 26, 2007

24          _____

             SANDRA L. CARRANZA

25              CSR No. 7062

318

```
 1                  PREFERRED REPORTERS
             CERTIFIED SHORTHAND REPORTERS
 2                201 E. Watmaugh Road
                 Sonoma, California  95476
 3                 Phone (707) 938-9227
 4
     October 26, 2007
 5
     TO:  KELLY LOFQUIST
 6         C/O:  JEREMY R. FIETZ, ATTORNEY AT LAW
           EDGAR LAW FIRM
 7         408 College Avenue
           Santa Rosa, California 95401
 8
     RE:  KASSONDRA BAAS AND KELLY LOFQUIST, individually
 9         and on behalf of all others similarly situated
           vs. DOLLAR TREE STORES, INC.
10         Deposition taken October 15, 2007
           Reported by SANDRA L. CARRANZA, CSR No. 7062
11
     Dear Ms. Lofquist:
12
     The original transcript of your deposition taken in
13   the above-entitled action has been prepared and is
     available at this office for your reading,
14   correcting and signing.  In the alternative, you may
     wish to review your counsel's copy.  Please notify
15   this office and all counsel of any corrections you
     wish to make.
16
     Your rights regarding signature of this deposition
17   are contained in the California Code of Civil
     Procedure Section 2025.520.  Unless otherwise
18   directed, your original deposition transcript will
     be sealed after 35 days.
19
     If you wish to make arrangements to review the
20   original transcript of your deposition, please
     contact this office during office hours, 9:00 to
21   5:00 Monday through Friday, to make an appointment.
22                   Sincerely,
23
24              Sandra L. Carranza
                   CSR No. 7062
25   cc:  All counsel
26
```

319

# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

KASSONDRA BAAS AND KELLY LOFQUIST,
individually and on behalf of all
others similarly situated,

        Plaintiffs,

    vs.              Case No. C0703108 JSW

DOLLAR TREE STORES, INC.,

        Defendants.
_____/

DEPOSITION OF KASSONDRA BAAS

October 17, 2007

REPORTED BY:

SANDRA L. CARRANZA, CRR, RPR, CSR 7062

PREFERRED REPORTERS
CERTIFIED SHORTHAND REPORTERS
201 E. Watmaugh Road
Sonoma, California  95476
Phone (707) 938-9227

1

00059

1 Mr. Hansen's attention?

2  A.  Yes.  No.  I don't know if I advised her of

3 that.

4 Q.  Did you advise her to call payroll?

5 A.  The only thing I advised her was to check

6 her pay stubs.

7 Q.  So your answer was no, you did not advise

8 her to call payroll, correct?

9 A.  Right.

10 Q.  Did you advise her to call human resources?

11 A.  No.

12 Q.  Did you know, at that time, that there was

13 a Dollar Tree representative in California?

14 A.  Like Candace?

15 Q.  Yes.

16 A.  Yes.

17 Q.  You're speaking of Candace Camp?

18 A.  Yes, I'm sorry.

19 **Q.  How did you know that Candace was a human**

20 **resources employee?**

21 **A.  Because the time period from April until,**

22 **possibly, July or August -- from possibly June,**

23 **maybe -- no.  July or August, when I was still**

24 **getting $7.35 an hour, I had e-mailed Candace Camp**

25 **about my increase in pay, unknowingly or not**

00060

1 **thinking we didn't have a store manager to correct**

2 **all that, so I e-mailed Candace Camp, and she then**

3 **talked to Mike Cossolotto, who, at the time, was the**

4 **district manager, and then they sent me a retro,**

5 **retro pay for the increase in wages from the time**

6 **period of April 2006 to whatever my current --**

7 **whatever the current month was that I e-mailed.**

8 Q.   If I understand your answer, there was a

9 time when you did not get the increase after you had

10 been promoted, you e-mailed Candace Camp and said, I

11 want the increase, or what's going on here, or words

12 to that effect; she handled the matter and made sure

13 that you got the assistant manager pay retroactive

14 to when you started in that position?

15 A.   Correct.

16 Q.   So your one encounter with human resources

17 at Dollar Tree found the function to be effective,

18 correct, it took care of the problem that you

19 raised?

20 A.   Right. I e-mailed -- I e-mailed Candace a

21 few times on that matter and my status as an

22 assistant manager.

23 Q.   Did you keep these e-mails?

24 A.   No. Sorry. I -- I wasn't aware that I

25 could.

1 A.  With regard to that message, no.

2 **Q.  I understand that you had made Care Line**

3 **reports but not on that topic; is that right?**

4 **A.   Right.**

5 **Q.  Am I correct that the Care Line is a phone**

6 **that you can -- a phone number that you call to make**

7 **any complaint or voice any concern you have, at all,**

8 **about Dollar Tree?**

9 **A.  Employee and/or customers.**

10 Q.  How many times did you call the Care Line?

11 A.  A few.

12 Q.  Did you call using your name, or did you

13 make anonymous calls?

14 A.  Both.

15 Q.  Tell me all that you recall and what the

16 topics were, please.

17 A.  With regard to John Hansen and the

18 overtime.  I made calls and stated that there was

19 things going on around the store that needed -- that

20 needed attention or looking into.

21 Q.  Did you ever, specifically, mention that

22 overtime wasn't being paid, or did you just,

23 generally, say things needed to be looked into?

24 A.  I generalized.

25 Q.  I want to be very clear that I understand

00079

1 superior, "Hey, dude, you know, watch your step,"

2 or, you know, "Fix yourself."

3 I just wasn't aware if that was something

4 that, as an assistant, I could go to a store manager

5 and say.

6 Q.  You had told us on one occasion, leaving a

7 message for Mr. Cossolotto that you have described.

8 Is that the only conversation, communication,

9 e-mail, any sort of communication that you had with

10 Mr. Cossolotto with respect to overtime issues?

11 A.  I believe so.

12 **Q.  Did you ever have a communication with**

13 **Mr. Tellstrom with respect to overtime issues?**

14 **A.  With respect overtime, specifically?**

15 **Q.  Yes.**

16 **A.  No.**

17 **Q.  So you never communicated in any way to**

18 **Mr. Tellstrom a concern that Mr. Hansen was reducing**

19 **overtime from people's time records; is that right?**

20 **A.  Specifically, no.**

21 **Q.  Is that correct?**

22 **A.  I mean, yes.**

23 Q.  When you said "Specifically, no," you're

24 saying, I never specifically said anything about

25 overtime to Mr. Tellstrom; is that correct?

1  A.  I think one time face-to-face.

2  Q.  How were the other communications

3  accomplished?

4  A.  Over the phone.

5  Q.  On each of those occasions, Mr. Tellstrom

6  would say, "What are you talking about?  Give me

7  some details," something along those lines?

8  A.  Right.  He would -- he would want to talk

9  with me about it, but I didn't feel comfortable --

10  Q.  Again, so we're talking about --

11  A.  -- telling him specifics --

12  Q.  I'm sorry.  I will take responsibility for

13  that one.

14  Is the reason why you didn't give

15  Mr. Tellstrom any further details your lack of

16  comfort with talking about your supervisor, or is

17  there some other reason?

18  A.  That's part of it.  Keeping my job.  I

19  didn't want to lose my job, and I was afraid that if

20  I "ratted out my boss," that I would be out soon

21  myself of a job.

22  Q.  Is that because you thought Mr. Hansen had

23  the power to make the decision to terminate you?

24  A.  Yeah.

25  **Q.  You knew that what he was doing was against**

00082

1 **company policy, correct?**

2 **A.  I thought, yeah.**

3 Q.  So why would you be afraid about losing

4 your job for reporting some conduct that was against

5 company policy?

6 A.  I don't know.  I was just afraid.

7 Q.  Did Mr. Tellstrom try to get you to give

8 him the information?

9 A.  He did.

10 Q.  Aside from the specifics that you have now

11 told me about that you recall, and that is the

12 specific with regard to Ms. Kosinski and the two

13 other specifics with regard to Ms. Pinole -- was

14 that her last name?

15 A.  Pinola.

16 Q.  Pinola?

17 A.  I wanted to go back that one.

18 Q.  Sure.

19 A.  Because I don't -- I'm trying to remember

20 if it was Matthew was the .20, or if it was myself

21 that had the .20.

22 Q.  You're not sure that Matthew was involved

23 in this?

24 A.  Right.  I am not for sure.  I'm not

25 positive that it was Matthew that had the .20 or if

00253

1 Can I say something?

2 Q.  Sure.

3 A.  From what it looks like, every -- every

4 punch, like 1348, end lunch, ignore, she put start

5 break, 2:00 o'clock.  And then she ignored it on the

6 next line.

7 Q.  Right.

8 A.  End break -- or wait.  Yes, end break, and

9 then she ignored it.  And then did the end lunch but

10 then ignored it.  Oh, she ignored start lunch at

11 1418.  She put end lunch, 1418.  And, for whatever

12 reason, hit the start lunch again at 1418, but

13 ignored it.  Then did the start break, end break.

14 Do you guys follow?

15 MR. FIETZ:  Yeah.

16 THE WITNESS:  I'm sorry.  Do you follow?

17 So the break within the lunch is now

18 nonexistent.

19 MR. FIETZ:  Because it was ignored.

20 THE WITNESS:  Correct.  Or, well, I retract

21 -- not nonexistent; it is ignored.  And then John

22 Hansen I punched out at 7:35, and he punched me out

23 at 6:30.  And that's the end of my name.

24 **MS. McCLAIN:  Q.  Do you have any**

25 **recollection of this particular day of November 18,**

00254

1 **2006?**

2 **A. Specifically?**

3 **Q. Yes.**

4 **A. No.**

5 Q. Can you tell me from looking at this series

6 of punches, with any certainty, what happened with

7 any of the punches?

8 MR. FIETZ: Objection. Vague.

9 MS. McCLAIN: Q. Can you tell me whether

10 you were paid correctly or incorrectly for this day

11 from looking at this document?

12 A. From looking at the document, it shows

13 incorrectly.

14 Q. Because you believe Mr. Hansen changed your

15 end shift punch to the -- almost --

16 A. 8.5 hours.

17 Q. Let's just look at his end punch for a

18 minute.

19 A. Oh, I'm sorry.

20 Q. An hour and five minutes, correct?

21 A. Yes.

22 Q. So this appears to you to suggest that he

23 reduced your time by an hour and five minutes that

24 day, correct?

25 A. Yes.

00256

1 out a time when you stopped working.  That was not a

2 mistake; is that right?

3 A.  Correct.

4 Q.  Do you remember, aside from the two

5 hours -- let me change that question.

6 Do you remember talking to Mr. Hansen about

7 any particular date, because you would have been

8 able to see these punches, correct?  You would have

9 been able to go into the system the next day?

10 A.  I don't -- you don't go into your own.

11 Q.  Did you have access to look at your own?

12 A.  You have access to look at your own, yes.

13 Q.  You couldn't change it, but you could look

14 at it, correct?

15 A.  Yes.

16 **Q.  So when you first started suspecting**

17 **Mr. Hansen of potentially making some changes in**

18 **your time, did you start looking at your time**

19 **regularly?**

20 **A.  No.**

21 **Q.  So you can't tell me today whether you saw**

22 **this in November of 2006 and brought it to**

23 **Mr. Hansen's attention or not?**

24 **A.  I didn't bring anything of my own time to**

25 **Mr. Hansen's attention.**

1 **Q. So you can tell me you didn't bring it to**

2 **Mr. Hansen's attention. Can you tell me whether or**

3 **not you saw it?**

4 **A. No, I cannot.**

5 Q. Is there any time when you would enter a

6 punch before the employee had clocked out?

7 A. You mean enter their punch before?

8 Q. Yes.

9 A. They were done working?

10 Q. Yes.

11 Is there any circumstances when an employee

12 would say, I'm going to be too busy to clock out.

13 Clock me out at X, and I'll leave then? Is that

14 ever a possibility that you'd have a prospective

15 clocking out that you know of?

16 A. Not that I'm aware of for myself.

17 Q. You certainly never did that; is that

18 right?

19 A. Correct.

20 Q. Can it be possible, to your knowledge, for

21 someone to enter an edit, that is, make a change

22 such that we're looking at, when they're not

23 working?

24 MR. FIETZ: Objection. Vague.

25 MS. McCLAIN: Q. Is there any way to make

REPORTER CERTIFICATE

1

2          I hereby certify that the witness to the

3     foregoing deposition was by me duly sworn to testify

4     to the truth the whole truth and nothing but the

5     truth in the within-entitled cause; that said

6     deposition was taken at the time and place herein

7     named; that the deposition is a true record of the

8     witness's testimony as reported to the best of my

9     ability by me, a duly certified shorthand reporter

10    and a disinterested person, and was thereafter

11    transcribed under my direction into typewriting by

12    computer; that the witness was given an opportunity

13    to read and correct said deposition and to subscribe

14    the same.  Should the signature of the witness not

15    be affixed to the deposition, the witness shall not

16    have availed himself or herself of the opportunity

17    to sign or the signature has been waived.

18          I further certify that I am not

19    interested in the outcome of said action, nor

20    connected with, nor related to any of the parties in

21    said action, nor to their respective counsel.

22          IN WITNESS WHEREOF, I have hereunto set

23    my hand this October 30, 2007.

24

                    SANDRA L. CARRANZA
                    CSR No. 7062

PREFERRED REPORTERS
CERTIFIED SHORTHAND REPORTERS
201 E. Watmaugh Road
Sonoma, California  95476
Phone (707) 938-9227

October 30, 2007

TO:  KASSONDRA BAAS
     C/O:  JEREMY R. FIETZ, ATTORNEY AT LAW
     EDGAR LAW FIRM
     408 College Avenue
     Santa Rosa, California 95401

RE:  KASSONDRA BAAS AND KELLY LOFQUIST, individually
     and on behalf of all others similarly situated
     vs. DOLLAR TREE STORES, INC.
     Deposition taken October 17, 2007
     Reported by SANDRA L. CARRANZA, CSR No. 7062

Dear Ms. Baas:

The original transcript of your deposition taken in
the above-entitled action has been prepared and is
available at this office for your reading,
correcting and signing.  In the alternative, you may
wish to review your counsel's copy.  Please notify
this office and all counsel of any corrections you
wish to make.

Your rights regarding signature of this deposition
are contained in the California Code of Civil
Procedure Section 2025.520.  Unless otherwise
directed, your original deposition transcript will
be sealed after 35 days.

If you wish to make arrangements to review the
original transcript of your deposition, please
contact this office during office hours, 9:00 to
5:00 Monday through Friday, to make an appointment.

Sincerely,

Sandra L. Carranza
CSR No. 7062

cc:  All counsel

324